**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. JKB-16-0363** |
| | ) | |
| **GERALD JOHNSON, et al.** | ) | |
| | ) | |

...o0o...

**GOVERNMENT'S RESPONSE TO DEFENDANTS'**
**JOINT MOTION FOR A NEW TRIAL (ECF 556)**

Defendants Gerald Johnson, Kenneth Jones, and Marquise McCants have moved jointly for a new trial pursuant to Federal Rule of Criminal Procedure 33.   The Defendants' motion is based on three sets of communications by or to jurors during the course of the two-month trial in this case.  The Defendants have failed to demonstrate that any of the communications (or alleged communications) constitute external influences upon the jury's deliberations or that they reasonably draw into question the integrity of the jury's verdict.  The Defendants' motion for a new trial should therefore be denied.

## I.       RELEVANT FACTUAL BACKGROUND

Following a roughly two-month jury trial, the Defendants were convicted of racketeering conspiracy and conspiracy to distribute and possess with intent to distribute controlled substances. One Defendant, Johnson, was also convicted of murder in aid of racketeering and conspiracy to commit that offense, as well as possession of ammunition by a felon.  Another Defendant, McCants, was convicted of possession of a firearm by a felon.

The pending motion is based on jury communications relayed to the Court on December 7, 2017 and January 9, 2018, as well as an alleged conversation that purportedly occurred in the

presence of jurors outside the courtroom on January 17, 2018.  We address these communications by (or alleged communications) in turn.

### a.   The December 7, 2017 Communications

On December 7, 2017, the jury brought two issues to the Court's attention, both of which related to events that they had observed inside the courtroom, during the course of the trial, with the Court, counsel, and all parties present.

First, during the lunch break on December 7, multiple jurors informed the Courtroom Deputy Clerk that they:

> had observed that the paralegal, Ms. Panas for the defendants, had in their judgment been passing notes among herself, the defendants, and defense counsel.  They also made the observation that on some occasions, in their view, after the notes had been received by the defendants, that the defendants had then looked up and looked at the jury.

ECF 556-2 at 2.

Based on this communication, the Defendants moved for a mistrial or, in the alternative, for voir dire of individual jurors.  The Court denied both requests.  With respect to the request for a mistrial, the Court found no reason to believe that the jurors had been communicating amongst themselves "regarding the particular substance of the evidence that's been presented to them," or that they had reached "that sort of perilous point where they have lost their capacity to discharge their sworn duty."  *Id*. at 9, 13.  Similarly, with respect to the request for voir dire, the Court determined that questioning jurors individually as to "whether they are specifically frightened or intimidated" in that it would suggest to the jury "that perhaps they should be frightened and that they should be intimidated," and would thus "plant[ ] a seed that isn't already there and growing." *Id*. at 12.

Thus, rather than declare a mistrial or conduct individual voir dire, the Court crafted a written communication to the jury, with the input of all counsel. That communication, which the Court captioned Jury Communication No. 1, read as follows:

> Just after the jury was excused for the lunch break today, while still in the jury room, some members of the jury raised a concern with the Courtroom Deputy Clerk. Jurors noted that the paralegal, Ms. Panas, from time to time seems to be writing and exchanging notes with the Defendants and their lawyers. They also noted that at times the Defendants appear to be looking at the jury.
>
> As a member of the defense team, it is entirely appropriate that Ms. Panas communicate in this fashion with the Defendants and their lawyers. And, it is appropriate and normal if from time to time a Defendant looks at the jury. You should draw no adverse inference from the fact that Ms. Panas is exchanging notes in this fashion or that from time to time a Defendant looks at the jury.
>
> I remind you that each of the Defendants is presumed to be innocent unless and until they are proven guilty beyond a reasonable doubt.

ECF 534 at 12.

The Courtroom Deputy Clerk then presented the Court's communication to the jury. When she returned from the jury room, the Court informed the parties that she had been:

> confronted by one or more jurors with other jurors listening. And they wanted to quiz her about the jury voir dire process that was conducted at the start of this trial … And specifically, they raised with [the Courtroom Deputy Clerk] the concern that during that voir dire selection process, the lawyers for the defendants and presumably their clients, had in their possession a jury list that showed the names and places of residence, not the addresses right, it usually says the city. Whatever that list is. They were concerned, they were surmising that the lawyers had these documents and that the defendants had access to them, and that this was a matter of concern. …
>
> Then the second concern was raised immediately thereafter, which was that while they were answering questions at the bench as potential members of this jury, they are troubled by the fact that they recall that I told them that the defendants, while not themselves at the bench could hear all that was being said at the bench, including the questions that I propounded to them,

and more importantly the answers that they supplied.  And that this was a matter of concern to them.

*Id*. at 43–44.

Based on these communications, the Defendants renewed their motion for a mistrial or, in the alternative, for voir dire of individual jurors.  The Court denied the motion, noting that in light of the evidence presented to that point, including evidence of approximately half a dozen murders, the fact that "you only have after three weeks a few concerns being expressed" was evidence of "a particularly calm and rational jury in the face of what they have been presented with."  *Id*. at 46–49; *see also id.* at 46 ("[B]ased on what's being presented to these jurors in the last three weeks, I mean, who wouldn't be upset?  Who wouldn't be somewhat concerned?  Who wouldn't be reflecting on the question of, wow, does this create some kind of risk of danger for me or my family."); *id.* at 47 ("[T]here would be something bizarre going on if jurors weren't having some concerns.").  With respect to voir dire, the Court again expressed concern that it would only exacerbate the problem, stating, "I do not want to communicate to them some validation of thoughts or concerns that may … be underlying their earlier communications with us."  *Id.* at 60.  The Court also pointed out that questioning individual jurors regarding their reactions to three weeks of evidence would be "intruding right into the midst of the—sort of the most sacred part of the jury function[.]"  *Id*. at 51.

Instead, the Court focused on whether "the jury that is empanelled in this case is going to perform in a manner consistent with their oaths and legal responsibilities."  *Id.* at 54.  Ultimately, the Court concluded that the appropriate response was not to declare a mistrial or conduct individual voir dire, but to craft a second communication to the jury—Jury Communication No. 2—which it presented to the jury, through the Courtroom Deputy Clerk, that afternoon.  ECF 534 at 11.  Jury Communication No. 2 explained the standard procedures attendant to the voir dire

process, including the use of the juror information packet in the selection of individual jurors. The communication noted that the packet was collected from counsel at the conclusion of the voir dire process, and was "now in the sole possession of the Court." *Id*. The communication stated that while questioning potential jurors at the bench, "the Court was careful … to insure that potential jurors did not reveal personal identifiers." *Id*. Finally, the communication explained that "[t]hese are the standard measures that the Court always follows in the jury selection process to appropriately protect [the] privacy of jurors while also insuring that counsel learn sufficient information to assist them in the jury selection process." *Id*.

### b. The January 9, 2018 Communication

On January 9, 2018, a juror informed a Court Security Officer that an individual or individuals may have taken photographs of jurors as they were departing the jury room and walking to the hallway during the course of an afternoon recess. ECF 556-5 at 1-3. After learning of the juror's report, the Defendants moved twice for a mistrial—first in the courtroom, and again during an on-the-record conference between the Court and counsel in chambers. *Id*. at 8–10, 15–17. The Court denied both motions. *Id*. In denying the second motion, the Court explained that it did not have "enough information before it, not even close, enough to suggest that a mistrial is in order. We're still very much at an investigative exploratory stage." *Id*. at 16. Instead, the Court directed the Courtroom Deputy Clerk to question the jurors individually as to whether they had seen anything while a Judicial Law Clerk kept a record of the jurors' responses. *Id*. at 13–20.

The investigation revealed that one juror, Juror No. 4, reported having seen:

> Two females on both sides of the vestibule doors that—so the outer courtroom doors, holding phones at their waists in both hands with the camera portion pointed out, and then holding them up to approximately chest height but not looking at the phones looking at the jurors. And described it as if they were taking a picture. And said that they were looking at the jurors not their phones when doing this.

*Id*. at 23.

Three additional jurors, Jurors 1, 6, and 11, also observed individuals with phones in the hallway, but none of the jurors believed that the individuals were taking pictures.  *Id*. at 22–24. Juror No. 2 reported that Juror No. 4 "came in and told everyone he had observed someone that he thought may be McCants' mom and another woman surreptitiously taking pictures of them," and that Juror No. 4 had stated something to the effect of, "guys, this is really serious, they're taking pictures of us." *Id*. at 22–23.  The remaining jurors, including all five alternates, reported that they had seen nothing.  *Id*. at 23–25.

Based on this investigation, the Court concluded that there was "not evidence before the Court at this point [that] any actual photographing or image taking was going on."  *Id*. at 29. Although the Court acknowledged that one juror, Juror No. 4, had seen "something that caused him to believe that he was or likely was being photographed," it did not "find any corroboration for Juror No. 4's concerns or observations in the statements of any other jurors, any court security officers, or any other information that's been brought to the Court's attention."  *Id*. at 29–30.  In other words, the Court made a factual finding that the jury had not been subjected to an actual third party contact.

Despite these conclusions, the Court acknowledged the possibility that Juror No. 4 "may well believe that, in fact," some individual or individuals had attempted to take his picture, and "that that could influence his experience here and consequently his judgment with respect to this case."  *Id*. at 30.  Accordingly, over the objection of the government, the Court dismissed Juror No. 4 and seated an alternate juror in his place.  *Id*.

### c.   Mona Carter's Affidavit Regarding the Alleged Conversation on January 17, 2018

On February 5, 2018, Marquise McCants' mother, Mona Carter, executed an affidavit, in which she claimed that on the afternoon of January 17, 2018, she overheard a conversation between undersigned counsel and two of the law enforcement agents assigned to this case, Special Agent Lisa Christy and Task Force Officer Jonathan Hayden of the ATF.  ECF 556-6 at 1.  Carter claimed that during the conversation, the prosecutors and agents "were discussing that Mr. McCants lied about being in BGF [*i.e.*, the Black Guerilla Family] and that he was going to get a lot of time." *Id*.  Carter further claimed that the conversation took place in the vestibule area outside Courtroom 3D, and that four jurors—Juror No. 1, "the shorter white male juror," and two alternate jurors— were sitting nearby at the time.  *Id*.

## II.   ARGUMENT

### A.   The December 7 Communications Do Not Trigger a *Remmer* Analysis or Provide Any Basis for Disturbing the Jury's Verdict.

In addressing the impact of the December 7 communications, the Defendants assume, without any analysis, that the issues raised by the jury in those communications concern the type of "external influences" that trigger a "presumption of prejudice," and a mandatory right to a hearing, under *Remmer v. United States*, 347 U.S. 227 (1954), and its progeny.  That assumption is incorrect.

Under the *Remmer* line of cases, "an *external* influence affecting a jury's deliberations violates a criminal defendant's right to an impartial jury."  *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014) (emphasis added) (citing *Parker v. Gladden*, 385 U.S. 363, 364-66 (1966); *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965); *Remmer*, 347 U.S. at 229)).  Thus, when a defendant makes a credible threshold showing of "any *private* communication, contact, or tampering, directly

7

or indirectly, with a juror during a trial about the matter pending before the jury," *and* that the communication, contact or tampering "was of such a nature as to reasonably draw into question the integrity of the verdict," courts have deemed the private communication, contact, or tampering "presumptively prejudicial." *See Remmer*, 347 U.S. at 229–30 (emphasis added); *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002).

But the presumption established by *Remmer* is not as easily triggered as the Defendants suggest. The Fourth Circuit has held that "while a presumption of prejudice attaches to an impermissible communication, the presumption is not one to be casually invoked." *See United States v. Baptiste*, 596 F.3d 214, 221 (4th Cir. 2010); *Stockton v. Virginia*, 852 F.2d 740, 745 (4th Cir. 1988). Further, and importantly for purposes of this case, the Fourth Circuit has distinguished between *external* influences on a jury's deliberations, on the one hand, and *internal* influences, on the other: "the distinction between internal and external influences is critical because, unlike external influences, which '*necessitate a thorough judicial inquiry*, no such obligation is imposed with regard to an internal influence." *Barnes*, 751 F.3d at 245–46 (emphasis in original) (quoting *Wolfe v. Johnson*, 565 F.3d 140, 161 (4th Cir. 2009)).

This raises the question: when is an influence *external*? The Fourth Circuit answered that question in *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006). There, the late Judge Williams explained that an influence is *external* when it results from: (i) "extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case"; or (ii) "an outside influence upon the partiality of the jury, such as *private* communication, contact, or tampering … with a juror." *Id.* at 363 (emphasis added); *see also Barnes*, 751 F.3d at 245. Pursuant to that framework, the Court found in *Robinson* that a juror's reading from the Bible

in the jury room was not an external influence, and did not necessitate a post-verdict hearing. *Robinson*, 438 F.3d at 357–68.

Under the framework established in *Robinson*, the Court should determine that the December 7 communications in this case did not pertain to external influences.  We address both of the December 7 communications below.

a. *The Jury's December 7 Statement that the Defendants Appeared to be Looking at Them Does Not Provide a Basis for Invoking the Presumption of Prejudice.*

First, with respect to the jurors' statement that the defense paralegal appeared to be passing notes among the Defendants, and that on some occasions, the Defendants "looked up" at the jury after receiving the notes, the concerns reflected in the jurors' communication do not implicate "extraneous prejudicial information" or  "private communication, contact, or tampering with a juror."  *Id*. at 363.  To the contrary, multiple courts have held that even where a defendant *stares* at a juror during a trial—which has more potential to influence a juror than appearing to "look up" after receiving a note—he has not subjected the jury to an improper outside influence.  *See*, *e.g.*, *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (defendant staring at juror was not extraneous influence; "[t]o hold otherwise … is to create incentives for a defendant to make his or her jury uncomfortable"); *United States v. Ford*, 761 F.3d 641 654–55 (6th Cir. 2014) (following *Owens*, and affirming trial court's refusal to hold *Remmer* hearing, despite juror's allegation that defendants were "staring [her] down" and causing her to fear for her safety; juror's fear did not result from outside influence, but instead "was a purely personal reaction to seeing the defendant in the courtroom"); *United States v. Lopez*, 271 F.3d 472, 489 (3d Cir. 2001) (affirming trial court's refusal to strike or question juror who sent note asking court to instruct defendant not to stare at her because she "didn't like it"); *cf. United States v. Brown*, 923 F.2d 109, 111–12 (8th Cir. 1991) (defendants not entitled to *Remmer* hearing due to alleged intimidation of jurors by spectators;

"physical closeness, stares, and rebuffed efforts at conversation … are neither unique nor uncommon to public trials and do not of themselves trigger the *Remmer* presumption").

As far as the government is aware, the Fourth Circuit has not addressed the precise question whether "staring" by the defendant is sufficient to trigger a *Remmer* analysis.  In *United States v. Baptiste*, however, the Court rejected the argument that "stare-downs from members of the crowd" were likely to have influenced the verdict in that case.  596 F.3d 214, 221 (4th Cir. 2010).  The Court therefore held that the defendant had failed to meet his burden of showing an external influence necessary to trigger the *Remmer* presumption.  *Id*.  Thus, although the Court did not decide whether staring by the defendant is categorically an external influence, the result in *Baptiste* is consistent with the holdings of *Owens*, *Ford*, *Lopez*, and *Brown*:  a defendant cannot invoke the *Remmer* presumption, and trigger an evidentiary hearing, simply because he or a spectator has stared at the jury, in the courtroom, during the course of a trial.  *Remmer* is even less applicable here, where the jurors never indicated that any defendant was "staring," or that they felt threatened, but instead simply indicated that the defendants had "looked" in their direction after receiving notes from the defense paralegal.[1]

---

[1]    In *United States v. Simtob*, the Ninth Circuit parted company with the Sixth, Third, and Eighth Circuits by holding that a defendant's alleged "eyeballing" of a juror gave rise to the *Remmer* presumption.  485 F.3d 1058, 1064–66 (9th Cir. 2007).  The holding in *Simtob*, however, cannot be reconciled with the Ninth Circuit's subsequent holding, in a case decided last year, that "a defendant's conduct in court is *not* an external influence."  *United States v. Plascencia-Orozco*, 852 F.3d 910, 925 (9th Cir. 2017) (emphasis added).  Indeed, in support of its holding, the panel in *Plascencia-Orozco* cited with approval the Third Circuit's decision in *Lopez*, which, as discussed above, held that a juror had not been subjected to an outside influence simply because the defendant had stared at her.  *Id*.  *Simtob* is also distinguishable on its facts.  Unlike the jurors in this case, who merely reported that the Defendants had looked in their direction after receiving notes from the defense paralegal, the juror in *Simtob* reported that the defendant had been "eye-balling" her in a threatening manner.  *Id*. at 1065.  Further, the Court in *Simtob* emphasized that unlike in *Owens*, which the Court cited by way of comparison, "[t]he district court did not issue any curative instructions to the jury regarding the perceived threat, nor did it address the jury about the incident in any way."  *Id*.  (citing *Owens*, 426 F.3d at 804–05).  In this case, by contrast, the

To the extent that there is any doubt as to whether the jurors' observations that the defendants appeared to be looking at them could "reasonably draw into question the integrity of the verdict"—as is required for the *Remmer* presumption to be invoked, *see Fullwood*, 290 F.3d at 678—that doubt evaporates upon consideration of Jury Communication No. 1, which the Court issued after receiving input from all counsel on the afternoon of December 7. ECF 534, at 12. The Court's Communication stated, among other things, that (i) "it is appropriate and normal if from time to time a Defendant looks at the jury"; (ii) "You should draw no adverse inference from the fact … that a Defendant from time to time looks at the jury"; and (iii) "I remind you that each of the Defendants is presumed to be innocent unless and until they are proven guilty beyond a reasonable doubt." *Id*.

The Defendants ignore these curative instructions, which foreclose any notion that the Defendants were prejudiced by the jury's observation that the Defendants appeared to look in their direction from time to time.   In light of these instructions, the Court should conclude that, even if one indulges the highly dubious proposition that a defendant can subject a jury to an improper outside influence simply by looking at them, the fact that the Defendants did so in this case did not have any impact on the jury's verdict, particularly in light of the overwhelming evidence of the Defendants' guilt.  Accordingly, the Defendants are not entitled relief on the basis of the jury's initial communication on December 7.

      b. *The Jury's Concern that the Defendants Had Obtained Personal Information About Them During Voir Dire Does Not Provide a Basis for Invoking the <u>Presumption of Prejudice</u>.*

The Defendants further claim that they were entitled to a *Remmer* hearing on the basis of the jury's second communication on December 7, which indicated that the jurors were

---

Court *did* provide a curative instruction, which eliminated any potential prejudice to the defendants, as discussed further below.

"concerned," from "a personal safety perspective," that the Defendants had obtained personal information about them during voir dire. Here again, the jury's communication does not concern the type of external influence that warrants a hearing or any further inquiry under *Remmer*.

There are multiple federal cases in which courts have confronted—and rejected—the very type of argument that the Defendants raise here. For example, in *Kinnamon v. Scott*, 40 F.3d 731 (5th Cir. 1994), the defendant complained that the trial court was required to hold a hearing after a juror expressed concern, on behalf of herself and other jurors, that the defendant had access to "long-form juror information sheets," containing personal information about the jurors, during voir dire. *Id*. at 733. The Fifth Circuit held that no further inquiry was necessary. The key portion of the Court's analysis is squarely applicable to the facts of this case, and is therefore worth quoting at length:

> That members of a jury in a capital murder case do not want the defendant examining information concerning their home addresses, phone numbers, etc., raises no concern of constitutional magnitude. As we understand it, [the defendant's] contention is bottomed on the assertion that [the juror's] expression of concern signals some mid-trial determination by the jury of guilt or perhaps its caution about the defendant. Such a concern by a juror is consistent with an open mind regarding guilt.

*Id*. (emphasis added).

Similarly, in *Whitehead v. Cowan*, 263 F.3d 708 (7th Cir. 2001), jurors complained that a local newspaper had actually *published* their names and addresses during a trial. *Id*. at 721. As in *Kinnamon*, however, the Seventh Circuit concluded that the jurors' complaint did not warrant a hearing under *Remmer*. "Although it is true that *Remmer* calls for a hearing in many cases where there is a communication with a juror during trial," the Court explained, "we do not agree that *Remmer* applies to the publication of juror addresses." *Id*. at 723. The Court further emphasized that "[t]he media publication of the jurors' names and addresses does not address a matter at issue

in the trial or provide any new information about the case to the jurors, nor did the context of the

publication, as in [*Sheppard v. Maxwell*, 384 U.S. 33 (1966)][2], demonstrate a likelihood that it

would affect the jury's deliberations." *Id.*

The holdings in *Kinnamon* and *Whitehead* are consistent with those in other cases—none

of which the Defendants acknowledge in their briefing—in which courts have determined that

general concerns regarding juror safety and security do not reflect exposure to outside influences,

and thus do not require individual voir dire or follow-up colloquy with jurors.   In *United States v.*

*Thornton*, for example, a case in which the defendants were charged with drug trafficking and

using and possessing firearms, multiple jurors advised the Deputy Clerk that they had "a general

feeling of apprehensiveness regarding their safety."  1 F.3d 149, 155 (3d Cir. 1993).  After learning

of the jurors' concerns, the trial judge determined, as the Court did in this case, that "it's perfectly

understandable why the jurors would feel apprehensive simply from listening to the evidence in

this case as I have and I don't have to ask them why."  *Id.*  The trial judge further determined,

again as the Court did in this case, that "a colloquy is going to make the problem worse," and that

"individual voir dire is unnecessary and would be counterproductive."  *Id.*

The Third Circuit agreed that no further follow-up was necessary.  *Id.* at 156.  The Court

explained that nothing in the jurors' statement that they were generally concerned for their safety

---

[2]     The Seventh Circuit noted that in *Sheppard*, the Supreme Court held that the publication
of juror names and addresses could contribute to the deprivation of a fair trial.  *Id.* at 721.  The
Court distinguished *Sheppard*, however, by noting that "the result in that case 'arose from a trial
infected not only by a background of extremely inflammatory publicity but also by a courthouse
given over to accommodate the public appetite for a carnival.'"  *Id.*  (quoting *Murphy v. Florida*,
421 U.S. 794, 799 (1974)).  The Court also emphasized that unlike in *Sheppard*, the publication of
the jurors' names and addresses did not thrust the jurors "into the role of celebrities"; nor did it
result in external contacts "from both cranks and friends, including anonymous letters."  *Id.*
(citations and quotations omitted).  Each of those distinctions apply equally on the facts of this
case.  Further, and perhaps most importantly, here there is no allegation that anyone *published* the
jurors' personal information, as was the case in *Whitehead* and *Sheppard*.

"intimate[d] that [they] were exposed to extra record information." *Id.*   The Court further noted that the trial judge had weighed the potential "disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by" the jurors' concerns, and had concluded that "voir dire would make the problem worse." *Id.*   "Such balancing demonstrates the exercise of discretion," the Court explained, "rather than its abuse." *Id.*[3]   The same is true on the facts of this case.

Similarly, in *United States v. King*, a drug trafficking prosecution involving members of the Latin Kings, the trial court was presented, while the jury was deliberating, with a note stating that some of the jurors "ha[d] concerns regarding personal safety and security."  627 F.3d 641, 650 (7th Cir. 2010).  As in *Thornton*, the Seventh Circuit found that nothing in the note suggested that the jurors had been subjected to outside influences. *Id.*   The Court further found that, even according to the defendant's own argument, the jurors' fears likely originated from "the invocation of [the defendant's] membership in the Latin Kings." *Id.*   "As this evidence was part of and *intrinsic* to the trial," the Court explained, "there was no cause for inquiry with the jurors." *Id.* (emphasis original).

Rather than acknowledge these cases and attempt to distinguish them, the Defendants rest their argument with respect to both December 7 communications entirely on *United States v. Blitch*, 622 F.3d 658 (7th Cir. 2010).  The holding in *Blitch*, however, is readily confined to its facts, which included "several events … that a district judge might never see during the course of a judicial career." *Id.* at 660.

---

[3]     The Court further emphasized that, as in this case, "[a]ny claim of prejudice is further undermined by the volume of incriminating evidence presented by the government during the remainder of the trial." *Id.*

In *Blitch*, jurors informed a court security officer, after the first day of trial, that they were concerned for their safety because the defendants had access to personal information about them. *Id*. at 661–62.  After questioning the jurors individually, and with the consent of the government and defense counsel, the trial judge declared a mistrial.  *Id*. at 662, 666.  The following morning, the trial judge summoned another venire panel and conducted voir dire in the hope of empaneling a new jury. *Id*. at 662.  At the conclusion of voir dire, however, the trial judge learned that multiple prospective jurors—and indeed, according to the court security officer, the entire venire panel— had again expressed concerns for their safety.  *Id*. at 665–66.  Yet, rather than conduct individual voir dire, as it had the previous day, and as the government and defense counsel again requested, the trial judge told the parties, "I am not going to take every one of these 55 people again."  *Id*. at 666.  The trial judge further stated, when defense counsel requested that the court dismiss the venire panel and start over with voir dire the following Monday, "we won't be able to do that because we might not finish before I have to sit [by designation] on the Federal Circuit."  *Id*.

Under these specific circumstances, the Seventh Circuit found that the trial judge had relied on an improper factor—her scheduled appointment to sit on the Federal Circuit by designation— in refusing to question the second panel of jurors individually.  *Id*. at 666–67.  Further, the Seventh Circuit declined to analyze whether the defendants were prejudiced by the trial judge's decision, on the ground that the trial judge had committed a second, prejudicial error by issuing a coercive instruction while the jury was deliberating.  *Id*. at 668–71.  In light of that ruling, the Seventh Circuit's analysis of the trial judge's failure to conduct individual voir dire of the second venire panel is arguably *dicta*.  And whether it is *dicta* or not, the Court's analysis is clearly limited to the unique facts and circumstances of that case, which simply are not present here.  Here, unlike in *Blitch*, the jurors raised personal safety concerns after hearing two weeks of "graphic and

gripping" testimony and evidence regarding "brutal murders, wanton violence, [and] extreme brutality."   After hearing argument by all parties and considering "the totality of the circumstances," the Court determined that the jury's communication reflected a reasonable reaction to the government's proof "in a case of this type and nature," and did *not* cause the Court to conclude that the jurors "have lost their capacity to discharge their sworn duty" to evaluate the evidence with an open mind.  Furthermore, the Court determined that individual voir dire would only make matters worse by "planting a seed" in the jurors' minds that "perhaps they should be frightened and that they should be intimidated."  Tr. (Dec. 7, 2017), at 9–13.  This is a far cry from the situation in *Blitch*, where the prospective jurors' concerns about personal safety arose before the trial had even started (and thus were more likely to reflect bias rather than a reasonable reaction to the weight of the evidence), and where the judge rejected the parties' joint request for individual voir dire based solely on a scheduling conflict, without making any determination that the jurors could be fair and impartial.

Based on the discussion above, to the extent that the Court looks to case law for guidance in assessing the impact of the second December 7 communication by the jury, the Court should not look to *Blitch*, but instead to *Kinnamon* and *Whitehead*, *supra*.  As discussed above, both cases hold that *Remmer* is inapplicable, and no further inquiry is required, where jurors express concerns for their safety on the ground that defendants or others have access to their personal information. *See Kinnamon*, 40 F.3d at 733; *Whitehead*, 263 F.3d at 723.

Further, in this case, unlike in *Kinnamon* or *Whitehead*, the Court issued a lengthy communication to the jury—Jury Communication No. 2—which provided an explanation of the information that was shared during voir dire, as well as the standard protocol for the questioning of potential jurors at the bench.  ECF 534, at 11.  The communication emphasized that juror

questionnaires were collected from the lawyers at the end of jury selection, and were "now in the sole possession of the Court." *Id.* The communication further stated that while questioning potential jurors at the bench, "the Court was careful … to insure that potential jurors did not reveal personal identifiers." *Id.* And the communication concluded by noting that "[t]hese are the standard measures that the Court always follows in the jury selection process to appropriately protect [the] privacy of jurors while also insuring that counsel learn sufficient information to assist them in the jury selection process." *Id.*

By issuing Jury Communication No. 2 on the very day that the jurors came forward and reported their concerns regarding personal safety, the Court went above and beyond what was required by the Fifth and Seventh Circuits in *Kinnamon* and *Whitehead*, respectively. Accordingly, here, as in those cases, the Court should conclude that no *Remmer* hearing was necessary. Here, as in those cases, the Court should conclude that individual voir dire was not required. And here, as in those cases, the Court should conclude that the defendants are not entitled to a new trial on the basis of the jury's second communication on December 7.

**B.    The January 9 Communication Does Not Trigger a *Remmer* Analysis or Provide Any Basis for Disturbing the Jury's Verdict.**

The Defendants contend that they were entitled to a *Remmer* hearing on the basis of the jury's January 9 communication, which suggested that someone had attempted to photograph one or more of the jurors as they were passing from the jury room into the hallway during an afternoon recess. Here again, however, the Defendants cannot make the necessary showing to trigger a *Remmer* analysis.

By way of review, in order to invoke *Remmer* and trigger a "presumption of prejudice," a defendant "bears the initial burden of establish[ing] both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict."

*Baptiste*, 596 F.3d at 221.  In determining whether the defendant has met this burden, courts "refer back to the factors the Supreme Court deemed important in *Remmer* itself: any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury."  *Barnes*, 751 F.3d at 245.

As the Defendants acknowledge, the Court investigated the alleged photographing incident by having the Courtroom Deputy Clerk question the jurors individually as to what they observed while a Judicial Clerk took notes.  Based on that investigation, the Court determined, as a factual matter, that there was insufficient evidence to conclude that any "actual photographing or image taking was going on."  ECF 556-5, at 30.  Although the Court acknowledged that one juror—Juror No. 4—had seen "something that caused him to believe that he was or likely was being photographed," the Court found "no corroboration for [the juror's] concerns or observations in the statements of any other jurors, any court security officers, or any other information that ha[d] been brought to the Court's attention."  *Id.* at 29–30.

In light of these findings, the Defendants cannot make a credible showing that "an unauthorized contact *was made*," let alone that it "was of such a character as to reasonably draw into question the integrity of the verdict."  *Baptiste*, 596 F.3d at 221 (emphasis added).  Instead, the Defendants attempt to meet their burden by pointing to the fact the Court exercised its discretion to dismiss Juror No. 4, on the ground that he "may well have believed that, in fact" he was being photographed, and that that belief "could influence his experience here and consequently his judgment with respect to this case."  ECF 556-5, at 30.  That the Court dismissed Juror No. 4 as a prudential matter, however, does not dispose of the required showing that an unauthorized contact *was made*.  The Defendants are required to make that showing—an actual, unauthorized contact—in order to invoke the *Remmer* presumption.  They have failed to do that

here.  And even assuming that the Defendants *could* make such a showing, they cannot further show that any alleged contact with any member of the jury was related to the matter pending before it.  *Barnes*, 751 F.3d at 245.  Accordingly, the Defendants have failed to demonstrate that they were entitled to *Remmer*'s procedural safeguards of a presumption of prejudice and a mandatory hearing.

The Fourth Circuit recently confronted a similar issue in *United States v. Barahona*, 606 Fed. Appx. 51 (4th Cir. 2015).  In that case, on the third day of a multi-week trial before Judge Titus, a juror informed the court that she believed that the defendant had followed her down a courthouse escalator and taken a picture of her with his cell phone.  *Id*. at 66.  Ultimately, the juror's allegation proved incorrect; after examining the defendant's cell phone, the defendant's attorney informed the court that the defendant's cell phone did not contain pictures of any jurors. *Id*. at 67.  Unlike in this case, Judge Titus did not conduct any further inquiry of the juror who initially reported the incident.

In an opinion by Judge Davis, the Fourth Circuit found that Judge Titus had acted well within his discretion in failing to question the juror.  *Id*. at 68.  The Court also found that the juror's allegation "did not trigger a presumption of prejudice" under *Remmer*, "because it did not reasonably draw into question the integrity of the verdict."  *Id*. at 69.  If that was true in *Barahona*, where the *defendant* was alleged to have taken photographs of a juror, and where no further inquiry was conducted, it is certainly true here as well, where the allegation focused on a third party, and where the Courtroom Deputy Clerk individually questioned every juror, including alternates. *Barahona* thus confirms that the Defendants were not entitled, on the basis of the January 9 communication, to a presumption of prejudice, a mandatory hearing, or any other relief in this case.

19

### C.   The Defendants Are Not Entitled to a New Trial on the Basis of Mona Carter's Allegations, Which are Not Credible and, in Any Event, Do Not Raise the Possibility of Improper Influence.

On February 5, 2018, Mona Carter, the biological mother of Marquise McCants, executed an affidavit, in which she claimed that on the afternoon of January 17, 2018, she overheard a conversation between Assistant United States Attorneys Peter J. Martinez and Christina A. Hoffman and the two primary law enforcement agents assigned to this case, Special Agent Lisa Christy and Task Force Officer Jonathan Hayden of the ATF.   ECF 556-6 at 1.   Carter claimed that the conversation took place in the vestibule area outside Courtroom 3D, and that four jurors— Juror No. 1, a "shorter white male juror," and two alternates—were sitting nearby.   *Id.*   Carter claimed that during the alleged conversation, the prosecutors and the case agents "were discussing that Mr. McCants lied about being in BGF and that he was going to get a lot of time."   *Id.*

Carter's claims are false.   As McCants' mother, Carter is, of course, inherently biased in his favor.   But there are number of additional reasons why the Court should not credit Carter's allegation.   First, the timing of the allegation is suspicious.   Carter alleges the conversation took place on January 17, 2018, *eight* days before the jury rendered its verdict.   Carter attended her son's trial on a regular basis, and she was in frequent contact with McCants and his attorney.   Yet, she waited until February 5, 2018—*nineteen* days after the alleged conversation and *eleven* days after jury convicted her son—to come forward with her allegation.   This delay deprived the government of the ability to investigate the matter and undermined the truth-finding process.   If Carter had come forward with her allegation in a timely manner, the government would have been able to obtain video surveillance footage from the courtroom vestibule area definitively proving

that no such conversation took place.  By the time Carter came forward with her allegation, the footage from January 17, 2018 was no longer available.[4]

Second, Carter's allegation is directly contradicted by the sworn affidavits of both Special Agent Christy and Task Force Officer Hayden.  Ex. 1-2.  In their affidavits, Special Agent Christy and Task Force Officer Hayden explain that at no point during the trial did they ever discuss the substance of this case with AUSAs Martinez and Hoffman in the presence of jurors.  *Id*.  To the contrary, at all times during the trial, Special Agent Christy and Task Force Officer Hayden were careful to avoid discussing the substance of the case in the presence of jurors or the Defendants' family members.  *Id*.  In fact, to the best of their recollection, Special Agent Christy and Task Force Officer Hayden did not participate in *any* conversation together in the vestibule area outside Courtroom 3D on the afternoon of January 17, 2018—whether case-related or otherwise.  *Id.*

Third, Carter has a history of obstructing justice in an effort to keep her son out of jail.  At trial, the government presented evidence that on August 26, 2010, McCants and an accomplice committed an armed home invasion and robbery at the home of Lester Smith at 126 Pheasant Drive, Elkton, Maryland.  Smith's affidavit is attached as Exhibit 3 to this memorandum.  McCants was apprehended by law enforcement while fleeing the scene, and Smith identified him as one of the individuals who had robbed him.  *Id*.  Approximately six weeks later, a woman "who … identified herself as Mr. McCants' mother" showed up at Smith's house with another male and demanded to know whether Smith was planning to testify against her son at trial.  *Id*.  When Smith responded that he did plan on testifying, McCants' mother angrily advised him against going to

---

[4]      On February 9, 2018, the day after the pending motion was filed, the government contacted the Clerk's Office and requested stored video footage depicting the vestibule area outside Courtroom 3D from the afternoon of January 17.  On February 13, however, the Court informed the parties in a minute order that, according to the United States' Marshals Service, the requested video footage had been "over-written" and was no longer available.  ECF 558.

court.  *Id*.  She then reminded Smith that McCants' accomplice had not been apprehended, and that they knew where Smith lived.  *Id*.  Smith asked McCants' mother whether she was threatening him, and McCants' mother simply walked away.  *Id*.  Smith's affidavit is highly damaging to Carter's credibility.  It establishes that Carter is willing to tamper with witnesses and subvert the truth-finding process in order to prevent her son from being held accountable for his crimes.  There is every reason to think her affidavit in this case is just another such attempt.

In light of these factors, the Court should conclude that the Defendants have failed to meet their threshold burden of presenting "a *credible* allegation of communications or contact between a third party and a juror concerning the matter pending before the jury."  *Barnes*, 751 F.3d at 243 (emphasis added).  Accordingly, Carter's affidavit does not trigger the *Remmer* presumption of prejudice or entitle the Defendants to a hearing.

Finally, even if the Court were to accept Carter's allegation as true—and it is not—the Defendants would not be entitled to a new trial because "there exists no reasonable possibility that the jury's verdict was influenced by an improper communication."  *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009).  The Fourth Circuit has directed courts to "look[] at a variety of factors in determining if this standard has been met, including the extent of the improper communication, the extent to which the communication was discussed and considered by the jury, the type of information communicated, the timing of the exposure, and the strength of the Government's case."  *Id.* at 320 (citing *Stockton v. Virginia*, 852 F.2d 740, 843–44 (4th Cir. 1988)).

In *Basham*, the defendant moved for a new trial after learning that the jury foreperson had contacted several news media outlets during the trial to discuss their coverage of the case.  *Id.* at 308.  During one of these contacts, a telephone conversation that lasted approximately six minutes, the jury foreperson was informed by a news producer that "she knew of the Basham case because

she covered [the defendant's] escape from prison." *Id.* at 317.  The trial court determined that the jury foreperson's contacts counted as an external influence, necessitating a *Remmer* hearing, but concluded that the government had rebutted the presumption of prejudice.  In affirming, the Fourth Circuit emphasized that (1) "the extent of the communication, the most important factor, was minimal"; (2) the communications were, in general, "devoid of substantive content," *i.e.*, they did not involve extraneous information relating to facts under deliberation; and (3) to the extent the jury foreperson received any substantive information about the case, "such information was obviously cumulative of what the jury had already heard." *Id.* at 320.

The same analysis applies here.  Even accepting Carter's allegation as true—and again, it is not—the extent of the communication was minimal, consisting of a brief conversation among members of the prosecution team within earshot of several jurors.  Moreover, the substance of the alleged conversation—that McCants had lied about his membership in the Black Guerilla Family—was entirely cumulative of evidence the jury had already heard.[5]  During cross-examination of McCants, the government confronted him with (1) photographs of his abundant BGF tattoos; (2) a letter written to McCants from a fellow BGF member that began with the salutation "Eusi Gyeeda Jamaa"—Swahili for Black Guerilla Family; (3) jail calls and other recordings in which McCants used BGF terminology; and (4) a letter from McCants in which he identified himself as "J"—a reference to BGF—and explained that he had stabbed a rival Bloods member in prison.  The entire thrust of the government's cross-examination was to show that McCants was lying when he denied his gang affiliation.  In closing arguments, too, the prosecutors

---

[5]      The alleged statement that McCants "was going to get a lot of time" was "devoid of substantive content," *Basham*, 561 F.3d at 320, because it did not relate to any facts under deliberation.  But even assuming the statement was substantive, it, too, was cumulative of information the jury had already heard.  McCants *himself* testified (falsely, and over the government's objection) that the prosecutors had told him they would "make sure" he would "spend the rest of [his] life in jail."  Ex. 4, Rough Tr., (Jan. 17, 2018), at 54.

marshalled overwhelming evidence of McCants' membership in BGF and attacked his credibility on a number of grounds.  Simply put, nothing that was allegedly said between members of the prosecution team on January 17, 2018 was new or different from what the jurors had heard over and over again during trial.  And here, as in *Basham*, there is no reasonable possibility that the alleged conversation could have influenced the jury's verdict.  Accordingly, the Defendants are not entitled to a new trial on the basis of Mona Carter's affidavit.

## III.    CONCLUSION

For the foregoing reasons, the Defendants' motion for a new trial should be denied.

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

By:    /s/

Peter J. Martinez
Christina A. Hoffman
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland  21201
(410) 209-4984

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 22nd day of February, 2018 , I caused a copy of the

foregoing Response to be served on defense counsel through the electronic case filing system.


_____/s/_____

Peter J. Martinez
Assistant United States Attorney