# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | * | |
| v. | * | CRIMINAL NO. JKB-16-0363 |
| GERALD THOMAS JOHNSON, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

On January 25, 2018, following a roughly two-month jury trial, Gerald Johnson, Kenneth Jones, and Marquise McCants ("Defendants") were convicted of multiple criminal counts, including racketeering conspiracy and conspiracy to distribute and possess with intent to distribute controlled substances. Now pending before the Court is Defendants' Joint Motion for A New Trial (ECF No. 556) pursuant to Federal Rule of Criminal Procedure 33. The issues have been briefed (ECF Nos. 556-1, 561, & 571), and no hearing is required, Local Rule 105.6 (D. Md. 2016). For the reasons explained below, Defendants' motion will be DENIED.

## I. Background

Defendants assert that the jury was subjected to multiple external influences that affected their ability to render a fair and impartial verdict. The alleged external influences fall under two broad categories: (1) jury communications that were raised with and addressed by the Court during the course of the trial, and (2) an alleged conversation between representatives of the Government that purportedly took place within earshot of jurors, which was first bought to the Court's attention in the present motion.

### A. *December 7, 2017 Jury Communications*

The first communication at issue occurred on December 7, 2017. That day, the jury raised two issues with the Court. First, multiple jurors informed the Courtroom Deputy Clerk that they

> had observed that the paralegal, Ms. Panas for the defendants, had in their judgment been passing notes among herself, the defendants, and defense counsel. They also made the observation that on some occasions, in their view, after the notes had been received by the defendants, that the defendants had then looked up and looked at the jury.

(ECF No. 556-2 at 2.) In addition, "one or more jurors," in the presence of "[p]retty much the entire group," subsequently "raised with [the Courtroom Deputy Clerk] the question of, well, is the judge going to take this up in front of the defendants themselves, in which case they will know that we brought this to the Court's attention." (*Id.* at 4.) Defendants moved for a mistrial or, in the alternative, for voir dire of individual jurors. The Court denied both requests and instead sent the following communication to the jury:

> Just after the jury was excused for the lunch break today, while still in the jury room, some members of the jury raised a concern with the Courtroom Deputy Clerk. Jurors noted that the paralegal, Ms. Panas, from time to time seems to be writing and exchanging notes with the Defendants and their lawyers. They also noted that at times the Defendants appear to be looking at the jury.
>
> As a member of the defense team, it is entirely appropriate that Ms. Panas communicate in this fashion with the Defendants and their lawyers. And, it is appropriate and normal if from time to time a Defendant looks at the jury. You should draw no adverse inference from the fact that Ms. Panas is exchanging notes in this fashion or that from time to time a Defendant looks at the jury.
>
> I remind you that each of the Defendants is presumed to be innocent unless and until they are proven guilty beyond a reasonable doubt.

(Jury Communication No. 1, ECF No. 534 at 12.)

Second, as the Courtroom Deputy Clerk was delivering the above message to the jury, she was

2

> confronted by one or more jurors with other jurors listening. And they wanted to quiz her about the jury voir dire process that was conducted at the start of this trial . . . . And specifically, they raised with [the Courtroom Deputy Clerk] the concern that during that voir dire selection process, the lawyers for the defendants and presumably their clients, had in their possession a jury list that showed the names and places of residence, not the addresses right, it usually says the city. Whatever that list is. They were concerned, they were surmising that the lawyers had these documents and that the defendants had access to them, and that this was a matter of concern.
>
> …
>
> Then the second concern was raised immediately thereafter, which was that while they were answering questions at the bench as potential members of this jury, they are troubled by the fact that they recall that I told them that the defendants, while not themselves at the bench could hear all that was being said at the bench, including the questions that I propounded to them, and more importantly the answers that they supplied. And that this was a matter of concern to them.

(*Id.* at 43–44.) The jurors also sent a note to the Court stating that "[s]everal jury candidates observed the paralegal sharing juror info (the packet) with defendents [sic]. We thought this info was for lawyers only. We are concerned about the info the defendents [sic] may have about us—from a personal safety perspective." (Juror Communication No. 3, ECF No. 534 at 10.) Defendants again requested that the Court either declare a mistrial or conduct voir dire of individual jurors.

The Court denied Defendants' requests and instead issued another written statement to the jury in an effort to alleviate the jurors' concerns without exacerbating the issue or improperly intruding into the jury's province. That statement read as follows:

> Some of the jurors have raised questions about the voir dire process under which you were selected to serve in this trial. As is the standard practice in this court, a list of the names of the persons who were eligible for selection to serve on this jury was provided to the lawyers at the beginning of the selection process. That list contains the name of each potential juror, the city in which they live but not their address, their occupation, and in some cases the name of their employer. It also lists the potential juror's age and in some cases the occupation of their spouse. Following standard procedure, these lists were collected from the lawyers at the conclusion of the jury selection process and are now in the sole possession of the Court.

3

> During the jury selection process potential jurors with "yes" answers to the Court's questions were asked to come to the bench where their "yes" answers were heard. Following standard practice for jury selection, the lawyers in the case participated in the conference at the bench with the potential jurors. And the parties themselves were permitted to listen to the interaction remotely through electronic ear pieces. Consistent with standard procedure, the Court was careful during the question and answer process to ensure that potential jurors did not reveal personal identifiers.
>
> These are measures that the Court always follows in the jury selection process to appropriately protect privacy of jurors, while also ensuring that counsel learn sufficient information to assist them in the jury selection process.

(Jury Communication No. 2, ECF No. 534 at 11.)

### B. *January 9, 2018 Jury Communications*

The next incident occurred on January 9, 2018, when a juror informed a Court Security Officer that one or more persons he believed to be associated with Defendants appeared to be taking pictures of jurors with a cellphone as the jurors exited the jury room. After learning of this communication, Defendants moved for a mistrial. After hearing argument from counsel for Defendants and the Government, the Court concluded that the incident warranted further investigation. The Court then instructed the Courtroom Deputy Clerk to meet with jurors individually and ask whether they had observed or noticed anything during the recent break. A law clerk accompanied the Courtroom Deputy to silently observe and take notes.

The investigation revealed that only one juror, Juror No. 4, believed he had observed someone taking pictures of jurors in the hallway outside the courtroom. He reported that he saw,

> [t]wo females on both sides of the vestibule doors that—so the outer courtroom doors, holding phones at their waists in both hands with the camera portion pointed out, and then holding them up to approximately chest height but not looking at the phones looking at the jurors. And described it as if they were taking a picture. And said that they were looking at the jurors not their phones when doing this.

4

(Trial Tr., ECF No. 556-5, at 23.) Three other jurors, Nos. 1, 6, and 11, stated that they had also observed individuals with phones in the hallway, including one of whom was "holding his phone somewhat unnaturally," but did not believe that anyone was taking pictures. Additionally, Juror No. 2 reported that Juror No. 4 had entered the jury room after the break and announced to those present something to the effect of, "guys, this is really serious, they're taking pictures of us." (*Id.* at 22–23.) Two other jurors, Juror No. 7 and Alternate No. 3, briefly noted that they had heard Juror No. 4 mention that people in the hallway were taking pictures of jurors. All of the remaining jurors and alternates reported that they had not seen or heard anything.

Based on the facts gleaned from the investigation, the Court found that there was "no[] evidence . . . [that] any actual photographing or image taking was going on." *Id.* at 29. The Court, however, recognized that Juror No. 4 at least subjectively believed that he and other jurors were being photographed and "that that could influence his experience here and consequently his judgment with respect to this case." *Id.* at 30. Accordingly, the Court dismissed Juror No. 4 over the objection of the Government and seated an alternate in his place.

### C. *Alleged January 17, 2018 Conversation*

The final incident raised by Defendants pertains to a conversation between members of the prosecution team that Mona Carter—Marquise McCants's mother—allegedly heard on January 17, 2018. On February 5, 2018, approximately ten days after the jury rendered its verdict and 19 days after the purported conversation, Ms. Carter executed an affidavit alleging that she heard Assistant United States Attorneys Peter Martinez and Christina Hoffman (the prosecutors trying the case) talking to Special Agent Lisa Christy and Task Force Officer Jonathan Hayden of the ATF about the case within earshot of several jurors. (Mona Carter Aff., ECF No. 556-6.) Ms.

Carter stated that the prosecutors and agents "were discussing that Mr. McCants lied about being in BGF and that he was going to get a lot of time." (*Id.* ¶ 5.)

## II. Analysis

Rule 33(a) of the Federal Rules of Criminal Procedure provides that, upon the defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Despite this seemingly expansive language, the Fourth Circuit has cautioned that a district court should "exercise its discretion to grant a new trial 'sparingly.'" *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (quoting *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997)).

Defendants contend that the Court should have conducted a hearing, under *Remmer v. United States*, 347 U.S. 227 (1954), in response to the jury communications relayed during trial. According to Defendants, the Court's failure to hold such a hearing violated their rights under the Fifth and Sixth Amendments to the United States Constitution and therefore necessitates a new trial. Additionally, Defendants argue that jurors were exposed to improper external communications by the Government, which lends further support to their argument for a new trial. The Court concludes that the jury communications received during trial did not trigger the need for a *Remmer* hearing because there were no credible indications of possible *external* influences on the jury. Moreover, Defendants' allegations regarding the Government's purported improper conversation—raised for the first time post-trial—simply are not credible, and therefore do not lend any weight to their argument.

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . [.]" *United States v. Baptiste*, 596 F.3d 214, 221 (4th Cir.

2010) (quoting *Remmer*, 347 U.S. at 229). Under *Remmer*, a defendant is entitled to an evidentiary hearing *and* a presumption of prejudice when he presents "a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury."[1] *Barnes v. Joyner*, 751 F.3d 229, 242 (4th Cir. 2014). The presumption, however, "is not one to be casually invoked." *Baptiste*, 596 F.3d at 221 (quoting *Stockton v. Virginia*, 852 F.2d 740, 745 (4th Cir. 1988)). Rather, in order to trigger a presumption of prejudice (and the right to a hearing), "the defendant bears the initial burden of 'establish[ing] both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict.'" *Id.* (alteration in original) (quoting *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002)); *see Barnes*, 751 F.3d at 245 (noting that "the *Remmer* presumption and hearing requirement are triggered after the party attacking the verdict satisfies the 'minimal standard' of showing that 'extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions.'" (alteration in original) (quoting *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996))).

Here, Defendants bear the initial burden of showing that a juror (or jurors) were (1) exposed to *external* communications or contact (2) that was more than innocuous. "The distinction between internal and external jury influences is critical because, unlike external influences, which '*necessitate a thorough judicial inquiry*, no such obligation is imposed with regard to an internal jury influence.'" *Barnes*, 751 F.3d at 245–46 (quoting *Wolfe v. Johnson*, 565 F.3d 140, 161 (4th Cir. 2009)). An influence is external if it is either "extraneous prejudicial information;

---

[1] Defendants are entitled to these same procedural safeguards post-trial as well, upon an adequate showing. *See Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1535 (4th Cir. 1986) ("*Remmer* also established the requirement of a post-trial evidentiary hearing in which the prevailing party has the opportunity and burden of rebutting the presumption of juror prejudice.").

7

*i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case," or if it is "an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering . . . with a juror." *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006) (quoting *Remmer*, 347 U.S. at 229). Some examples of external communications or contact with a juror that are sufficient to trigger a *Remmer* hearing include:

- [A] juror being offered a bribe during trial and subsequently being investigated by an FBI agent, *Remmer*, 347 U.S. at 229–30;

- [A] juror applying for a job at the prosecuting attorney's office during the trial, *Smith v. Phillips*, 455 U.S. 209, 216–18 (1982);

- [A] local restaurant owner suggesting to jurors in a capital case that "they ought to fry the son of a bitch," *Stockton*, 852 F.2d at 743; and

- [A]llegations, if proven to be true during an evidentiary hearing, that a juror's husband pressured her throughout the trial to vote for the death penalty, *Fullwood*, 290 F.3d at 681–82.

*Barnes*, 751 F.3d at 245 (list format added); *see also United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) ("Examples [of external influences] include prior business dealings with the defendant, applying to work for the local district attorney, conducting an out of court experiment, and discussing the trial with an employee." (internal citations omitted)).

Because the Court is in the best position to "judge the mood at trial and the predilections of the jury," *United States v. Chiantese*, 582 F.2d 974, 980 (5th Cir. 1978), it enjoys broad discretion in determining whether Defendants have satisfied their burden and are entitled to a hearing. *See, e.g.*, *United States v. Vasquez-Ruiz*, 502 F.3d 700, 705 (7th Cir. 2007) ("District court judges have broad discretion to choose how to handle different problems that arise with juries."); *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993) ("[T]he trial judge has discretion, both in cases involving intra-and extra-jury misconduct, to decide how to deal with a situation in which there is an allegation of jury misconduct . . . ."). In making this determination,

trial courts must "balance the probable harm resulting from the emphasis such action would place upon the misconduct . . . against the likely extent and gravity of the prejudice generated by that misconduct." *Chiantese*, 582 F.2d at 980; *see United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998) ("[C]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial . . . [A]ny such investigation is intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident."). In other words, courts must consider whether conducting a hearing or individual voir dire would do more harm than good by drawing more attention to an otherwise innocuous event.

### A.   *Jury Communications During Trial*

Defendants fail to satisfy their threshold burden to show that the jury was subject to an external communication or contact, let alone that such contact was more than an innocuous intervention. First, Defendants argue that the jury was influenced by external communications when the Defendants looked up at the jurors after passing notes between themselves and a paralegal. "A defendant's conduct in court is not an 'external' influence, however." *United States v. Plascencia-Orozco*, 852 F.3d 910, 925 (9th Cir.), *cert. denied*, 138 S. Ct. 412 (2017); *see Owens*, 426 F.3d at 805 ("When a defendant stares at a juror during the course of his trial, . . . he has introduced no outside contact with, nor special information about, a party or witness."); *United States v. Lopez*, 271 F.3d 472, 488–89 (3d Cir. 2001) (holding that district court did not abuse its discretion by "not questioning a juror to ascertain if she was biased against [defendant]" where juror "sent the [district] judge a note . . . requesting that [defendant] stop staring at her," because court "was not confronted with the exertion of an *outside* influence" (emphasis added)). Indeed, allowing a defendant to trigger a *Remmer* hearing based on nothing

9

more than his own glances at the jury would create perverse "incentives for a defendant to make his or her jury uncomfortable," *Owens*, 426 F.3d at 805.

Defendants' second argument—that the jury was influenced by Defendants' access to their personal information—fares no better than their first. Again, Defendants fail at the outset to show that the jury was subjected to any "extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case," *Robinson*, 438 F.3d at 363. Instead, Defendants rely solely on a Seventh Circuit case, *United States v. Blitch*, 622 F.3d 658 (7th Cir. 2010), which they claim dictates resolution in their favor here. In *Blitch*, the Seventh Circuit found that the district court abused its discretion by failing to conduct a *Remmer* hearing after potential jurors raised fears about their safety due to the defendant's access to their personal information. Amazingly, the district court had declared a mistrial in the case the day before this incident after multiple jurors had expressed similar fears regarding their safety. Before declaring a mistrial the preceding day, the district court had individually questioned each juror and then concluded that they could not render an impartial verdict in light of their fears. Despite following this procedure just the day before, the district court declined to take a similar approach with the new venire and cited scheduling concerns as the sole reason for not conducting individual voir dire again. Faced with these two contradictory sets of procedures, and a record devoid of any indication that the district court had considered *anything* other than its own scheduling issues, the Seventh Circuit found an abuse of discretion.

As an initial matter, *Blitch* did not address the threshold question the Court is faced with here: Were the jurors' safety concerns an external influence? *See Blitch*, 622 F.3d at 667 (noting that government "treats the jurors' safety concerns as an external influence"). Here, the Court finds that the jurors' safety concerns were <u>not</u> an external influence because they were

triggered by Defendants' conduct or, more accurately, by standard court procedures for empaneling a jury. As such, Defendants were not entitled to a *Remmer* hearing on this issue. Even assuming *arguendo* that the jurors' concerns did constitute an external influence, however, *Blitch* remains unpersuasive. In *Blitch*, the Seventh Circuit took issue not with the district court's ultimate conclusion to retain the jury but rather with its process, or lack thereof, in reaching that conclusion. Here, by contrast, the Court engaged in a lengthy discussion with counsel for Defendants and the Government regarding the proper response to the jury's concerns and expressly balanced the potential prejudice to Defendants' against the probable harm from validating those concerns.

The January 9, 2017 incident, involving alleged photographing of jurors, likewise did not trigger Defendants' right to a hearing and presumption of juror prejudice. After conducting an investigation, which included the Courtroom Deputy Clerk individually questioning each juror and alternate, the Court expressly found that there was "no corroboration for juror No. 4's concerns or observations in the statements of any other jurors, any court security officers, or any other information that ha[d] been brought to the Court's attention." (ECF No. 556-5, at 29–30.) The Court then concluded as a matter of fact that there was "no[] evidence [that] any actual photographing" took place. (*Id.* at 30.) Accordingly, Defendants again have failed to satisfy their threshold burden to show that the jury was exposed to external communications that would trigger their right to a *Remmer* hearing.[2]

---

[2] Moreover, the Court is confident that each of its responses to the jurors' concerns struck the right balance between reminding them of their duty to remain impartial and assuaging their concerns without exacerbating them. The Court carefully considered the proper scope and extent of each response to ensure that it did not do more harm than good in addressing the jury's entirely rational concerns based on the nature of the evidence before it.

### B. *Issues Raised Post-Trial*

Finally, Defendants argue—briefly—that they are entitled to a new trial because of an alleged conversation that took place between members of the Government outside the courtroom and within earshot of several jurors. The Government denies any such conversation took place. The parties have filed competing affidavits in support of their respective positions. For Defendants, Ms. Carter—Marquise McCants's mother—has submitted an affidavit claiming that on January 17, 2018, she overheard the AUSAs and case agents for the Government "discussing that Mr. McCants lied about being in BGF and that he was going to get a lot of time." (ECF No. 556-6, ¶ 4–5.) She also alleges that this conversation took place in close proximity to two jurors and two alternate jurors. The Government has submitted affidavits from Special Agent Christy and Task Force Officer Hayden in which they both deny ever having a conversation about the substance of the case with each other and the AUSAs in the vestibule outside the courtroom or in front of jurors.[3] (Lisa Christy Aff., ECF No. 561-1; Jonathan Hayden Aff., 561-2.) Moreover, both agents contend that Task Force Officer Hayden was not even present on the day in question because he "was sequestered from the trial at that point because he was a potential rebuttal witness himself." (ECF Nos. 561-1, ¶ 7, 561-2, ¶ 7.)

In evaluating the competing affidavits, the Court finds that Special Agent Christy and Task Force Officer Hayden are credible. Ms. Carter, on the other hand, is not. First, as Mr. McCants's mother, Ms. Carter has a motive to lie. Second, the timing of her affidavit—nearly twenty days after the alleged conversation took place and ten days after her son was convicted—

---

[3] The Government also submitted an affidavit from Lester Smith, who contends that he was robbed at gunpoint by Mr. McCants in August 2010. According to Mr. Smith, approximately one month after the robbery a man and woman identifying themselves as Mr. McCants's parents showed up at his house and asked him about the incident. During the conversation, the woman who claimed to be Mr. McCants's mother repeatedly told him that he "should not go to court" to testify against her son and "reminded [him] that there were two guys who did the robbery . . . . [and] the other guy was still on the streets, and they knew where [Mr. Smith] lived." (Lester Smith Aff., ECF No. 561-3, ¶ 7.)

12

is suspicious. Finally, there is at least some evidence before the Court that Ms. Carter has attempted to obstruct justice in the past by tampering with a witness, which further weakens her credibility in the present circumstances. By contrast, the agents are well-trained and know that such loose talk in front of jurors and defendants' family members is improper. Given their training, the Court finds their denials credible. Moreover, the agents corroborate one another and credibly contend that Task Force Officer Hayden was not even present on the day in question. Accordingly, in weighing the competing affidavits, the Court finds in favor of the Government's version of events.

## III. Conclusion

For the foregoing reasons, Defendants' Joint Motion for A New Trial (ECF No. 556) will be DENIED.

DATED this 3rd day of April, 2018.

BY THE COURT:

/s/
James K. Bredar
Chief Judge