**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 18-4312**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GERALD THOMAS JOHNSON, a/k/a Geezy, a/k/a Gzy Tha Prince,

Defendant - Appellant.

———————

**No. 18-4333**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KENNETH JONES, a/k/a K-Slay, a/k/a Slay,

Defendant - Appellant.

———————

Appeals from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Chief District Judge.  (1:16-cr-00363-JKB-1; 1:16-cr-00363-JKB-5)

———————

Argued:  December 10, 2019                    Decided:  March 25, 2020

———————

Before MOTZ and KEENAN, Circuit Judges, and TRAXLER, Senior Circuit Judge.

———————

Vacated and remanded by published opinion. Judge Keenan wrote the majority opinion, in which Senior Judge Traxler joined. Judge Motz wrote a dissenting opinion.

———————————

**ARGUED:** Paul Francis Enzinna, ELLERMAN ENZINNA PLLC, Washington, D.C., for Appellants. Peter Jeffrey Martinez, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Michael D. Montemarano, MICHAEL D. MONTEMARANO, PA, Ellicott City, Maryland, for Appellant Kenneth Jones. Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————————

BARBARA MILANO KEENAN, Circuit Judge:

Gerald Johnson and Kenneth Jones were convicted by a jury of several charges related to their participation in the Black Guerilla Family's (BGF) Greenmount Regime, a violent street and prison gang in Baltimore. During the trial, the district court received multiple reports that members of the jury were concerned about their personal safety. Most notably, one juror reported that family members or friends of the defendants (the defendants' associates) had used cellular telephones to take photographs of the jurors in a public area of the courthouse. Despite the jury's concerns, the court did not conduct an evidentiary hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954) (*Remmer* hearing), to assess the jurors' continuing ability to consider the evidence impartially.

Upon our review, we conclude that the district court abused its discretion in failing to hold a *Remmer* hearing to determine whether the reported incident prejudiced the jurors and affected their ability to impartially consider the evidence. We therefore vacate the district court's judgment and remand the case for the court to conduct an evidentiary hearing in accordance with *Remmer*.

## I.

Johnson, Jones, and seven co-defendants[1] were indicted on numerous charges arising from unlawful activities committed by members of the BGF, of which Johnson was a high-level leader. Johnson and Jones (collectively, the defendants) were both charged

---

[1] Six of the co-defendants pleaded guilty before trial. The conviction of the seventh co-defendant, Marquise McCants, is not at issue in this appeal.

with conspiracy to participate in a racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, as well as conspiracy to distribute and possess with intent to distribute heroin, cocaine, and other controlled substances, in violation of 21 U.S.C. § 841. Johnson also was charged with conspiracy to commit murder in aid of racketeering and murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a), and additional drug and ammunition offenses.

The government introduced evidence at trial showing that for more than a decade, the defendants committed numerous crimes on behalf of the BGF. Johnson acted as a leader of the gang, overseeing an extensive drug distribution operation and attendant acts of violence. The jury heard evidence that Jones was involved in the murders and shootings of several people, which were directed by Johnson and other BGF members.

The government recounted the gang's many efforts to shield the gang's illegal activities "by terrorizing those who dared to cooperate with the police." Multiple witnesses detailed the gang's strict rule against "snitching," which the gang treated as punishable by death. According to government witnesses, Johnson ordered the murders of two individuals whom the gang believed were cooperating with law enforcement. Jones committed one of these murders.

The murder of Moses Malone, a government cooperator, was the "heart of the [government's] case," and formed the basis for Johnson's charges of conspiracy to commit murder in aid of racketeering and murder in aid of racketeering. Malone had been the victim of a robbery and a non-lethal shooting allegedly committed by a BGF member. Following that incident, Malone identified the perpetrator of the robbery in a photo array

4

compiled by law enforcement.  Malone also identified Johnson as the person who likely ordered the crime.

When the gang members learned that Malone had cooperated with the authorities, Johnson ordered that Malone be killed.  The Baltimore City Police Department took Malone into protective custody, but Malone later was evicted from the witness-protection program because of a rules infraction and was killed shortly thereafter.  Notably, Malone's police department contact had received a tip that Malone was in imminent danger on the night of his death, but the authorities were unable to intercept him in time to save his life. The jury was shown graphic photographs depicting Malone's body after he was murdered.

On December 7, 2017, immediately after hearing testimony recounting the police department's frantic efforts to prevent Malone's murder, members of the jury contacted the courtroom deputy clerk.  The jurors expressed concern that the defendants had been exchanging notes with their attorneys and paralegal, and then had "looked up" at the jury. The court observed that the jurors' apprehension was the "potential [e]ffect on a reasonable person of the sort of evidence" that had been presented.

Later the same day, "one or more" jurors approached the courtroom clerk with concerns that the defendants had received access to the jurors' personal information during the voir dire process.  After court adjourned for the day, the jurors gave a note to the courtroom clerk, stating that they were "concerned about info the defendants may have about us from a personal safety perspective."  The court concluded that the jurors' concerns were "of a generalized nature, not of such a level of severity and specificity as to warrant individual voir dire to try to assess the depths of the jurors' feelings."

With respect to the three concerns raised by the jurors on December 7, 2017, the district court denied the defendants' requests for a mistrial or to conduct a voir dire of the jury members. Instead, the court provided certain written assurances to the jurors regarding the court's standard practices and procedures.

On January 9, 2018, the nineteenth day of trial, a court security officer advised the court that a juror had told him "in front of all the rest of the jurors" that some of the defendants' associates had attempted to take photographs of the jurors as they entered the public hallway from the jury room. The court immediately asked the government whether "there may be an effort afoot to tamper with or intimidate a juror," because "[w]hy else does somebody snap pictures of jurors going in and out of a jury room?" Government counsel confirmed that the group of people who had congregated in the area in question were family members of, or witnesses for, the defendants.

The defendants moved for a mistrial, arguing that the jury could not fairly evaluate the testimony of these defense witnesses after the jurors had expressed concern that the witnesses were dangerous. As a "preliminary" and "investigative" measure, the court directed the courtroom deputy and law clerk (collectively, court staff) to interview each juror individually, "off-the-record," and outside the presence of the judge or counsel. The court instructed the court staff to address each juror as follows:

> [A] court security officer indicated that something might have happened as one or more of you were leaving the jury room. Did something happen?

The court staff did not ask whether the jurors felt intimidated by anything they observed, or whether they could remain impartial in evaluating the case.

After conducting these interviews, the court staff informed the court and counsel that a single juror, Juror #4, had reported seeing two women use their cell phones to take photographs of the jurors. Juror #4 described the women as holding the phones chest-high and pointing them outward, while looking at the jurors instead of at the phones. After making this observation, Juror #4 reported her suspicion to some other jurors. Three jurors reported seeing people holding phones in the hallway, but these jurors did not think that those individuals were taking pictures. Another three jurors stated that Juror #4 reported to them that someone, possibly the mother of one of the defendants, had been taking pictures surreptitiously. According to one of these jurors, Juror #4 stated, "[G]uys, this is really serious, they're taking pictures of us."

After considering these reports from the court staff, the district court determined that there was no "corroboration for [Juror #4's] concerns or observations in the statements of any other jurors, any court security officers, or any other information that has been brought to the [c]ourt's attention. So my conclusion is that there is not evidence before the [c]ourt at this point, [that] any actual photographing or image taking, was going on." The court nevertheless was "concerned" that Juror #4 "may well believe" that "something was going on . . . that could influence [the juror's] experience here and consequently [the juror's] judgment with respect to the case." The court therefore dismissed Juror #4 from service on the jury, but did not explain that juror's absence to the remaining members of the jury. The court declined the defendants' request to conduct a voir dire of the other jurors, concluding that there was "not a sufficient basis for concern."

7

The United States Marshal's Service, together with the United States Attorney's Office, conducted a further investigation of the reported photographing incident after the court adjourned for the day. The deputy marshals searched the cell phone of one of the individuals observed by Juror #4, but did not discover any photo images. When the deputy marshals reported to the court the next morning the results of their inquiry, the court noted that this information "further supports the [c]ourt's conclusion" that the incident reported by Juror #4 had been handled properly "with a minimum of fanfare," and that neither individual voir dire nor a mistrial was warranted. The court orally informed the jurors that the reported incident had been investigated, and that no photographs had been found.

The jury returned verdicts of guilty on all charges. The defendants moved for a new trial under Federal Rule of Criminal Procedure 33, arguing that their Sixth Amendment right to a fair trial was violated because the court failed to conduct a *Remmer* hearing on the question of juror bias. The district court denied the motions, and sentenced the defendants to terms of life imprisonment without the possibility of parole. This appeal followed.

## II.

The defendants argue that the district court abused its discretion when it failed to conduct a *Remmer* hearing to evaluate whether the jurors could remain impartial after the reported cell phone incident. The defendants emphasize that this reported incident occurred after the jurors already had expressed their fear of the defendants on more than one occasion. According to the defendants, the jurors' multiple reports regarding their fear

8

of the defendants, including the one juror's concern that the defendants' associates had taken photographs of the jury, were "external influences" that under *Remmer* entitled them to a presumption of prejudice and an evidentiary hearing.

In response, the government contends that although the district court declined to conduct a *Remmer* hearing, the court nonetheless took adequate steps to ensure juror impartiality. In the government's view, the court acted within its discretion by dismissing the single juror who had reported the alleged photographing, and by informing the remaining jurors that, in fact, no photographs had been taken.

We review the district court's decision declining to conduct a *Remmer* hearing under a "somewhat narrowed modified abuse of discretion standard," which "grants us more latitude to review the trial court's conclusion" in the context of all the evidence presented. *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009) (citation and internal quotation marks omitted). A defendant's Sixth Amendment right to trial by an impartial jury is violated if an influence outside the jury's deliberative process, a so-called "external influence," affects the jury's decision-making. *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014). "[I]f even a single juror's impartiality is overcome" by such an external influence, the defendant's right to an impartial jury has been compromised. *United States v. Lawson*, 677 F.3d 629, 648-49 (4th Cir. 2012) (citation omitted).

In *Remmer v. United States*, the Supreme Court established the procedures that a district court must follow when there has been a direct or indirect "private communication, contact, or tampering . . . with a juror during a trial about the matter pending before the jury." *Remmer*, 347 U.S. at 229. A defendant seeking a *Remmer* hearing must present a

9

"credible allegation" that "an unauthorized contact was made," and that the contact "was of such a character as to reasonably draw into question the integrity" of the trial proceedings, constituting "more than an innocuous intervention." *Barnes*, 751 F.3d at 242-45 (citations and internal quotation marks omitted).

If the defendant makes this threshold showing, he is entitled under *Remmer*: (1) to a rebuttable presumption that the external influence prejudiced the jury's ability to remain impartial; and (2) to an evidentiary hearing to determine "what actually transpired" and whether the challenged contact was harmless. *Remmer*, 347 U.S. at 229; *Barnes*, 751 F.3d at 242-44. At such evidentiary hearing, the government bears the burden of rebutting the presumption of prejudice by showing that there was "no reasonable possibility" that the jury "was influenced by an improper communication." [2] *Basham*, 561 F.3d at 319 (citation and internal quotation marks omitted); *see also United States v. Small*, 944 F.3d 490, 504 (4th Cir. 2019).

Applying these principles, we consider whether the district court received a "credible allegation" of a non-innocuous external influence requiring that the court hold an evidentiary hearing under *Remmer*. *Barnes*, 751 F.3d at 242, 244; *Basham*, 561 F.3d at 319. In conducting our analysis, we focus on the alleged photographing incident reported by Juror #4, the most serious claim regarding the jurors' ability to remain impartial.

---

[2] "When a serious, non-speculative question of juror impartiality arises" based on a factor *internal* to the jury's deliberative process, the district court must evaluate "whether the affected jurors remain fair and impartial." *United States v. Smith*, 919 F.3d 825, 834 (4th Cir. 2019). In such circumstances, however, the presumption of prejudice dictated by *Remmer* is inapplicable. *See Barnes*, 751 F.3d at 245-46 (explaining that the requirements of *Remmer* apply only to external influences).

We think it is beyond dispute that a juror's report of jury members being photographed by the defendants' associates during a trial involving murdered witnesses, and that juror's act of conveying this information to other jurors, were "more than innocuous interventions," and constituted conduct "of such a character as to reasonably draw into question" the ability of the jurors to remain impartial. *Barnes*, 751 F.3d at 244-45 (citations omitted). The district court immediately recognized the seriousness of Juror #4's allegations. As noted above, after receiving Juror #4's report of photographs being taken, the court questioned whether "there may be an effort afoot to tamper with or intimidate a juror," because "[w]hy else does somebody snap pictures of jurors going in and out of a jury room?" Given the plainly prejudicial nature of Juror #4's allegation and the court's response reflecting its assessment that the report was credible, the criteria for a *Remmer* hearing were met.

The district court's management of this incident was flawed both procedurally and substantively and, thus, failed to comply with the requirements of *Remmer*. Procedurally, the district court erred in delegating to its staff members the responsibility of questioning the jurors. A court confronted with a credible allegation of an improper external contact may not rely on ex parte, third-party information. Instead, a judge must "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, *in a hearing with all interested parties permitted to participate*." *Remmer*, 347 U.S. at 229-30 (emphasis added); *Barnes*, 751 F.3d at 242. Thus, the procedure employed by the district court disregarded the fact-finding purpose of a *Remmer* hearing, which is based on considerations of due process. *See Barnes*, 751 F.3d at 243-44, 251. As we emphasized

11

in *Barnes*, "without a hearing, a criminal defendant is deprived of the opportunity to uncover facts that could prove a Sixth Amendment violation." *Id.* at 250. This procedure also deprived the defendants of the presumption of prejudice to which they were entitled under *Remmer*. *Remmer*, 347 U.S. at 229; *Barnes*, 751 F.3d at 242-43.

The investigation directed by the district court also was substantively deficient. The court engaged in an abbreviated consideration of Juror #4's allegation and took an unduly narrow view of the types of external contacts that would mandate a *Remmer* hearing. Although Juror #4 had alleged that two persons had used their cell phones to take photographs of the jurors, only one of those phones was examined to determine whether such photographs were taken.

Moreover, by focusing on the question whether photographs, in fact, had been taken, and in failing to consider whether the defendants' associates had in any way intimidated the jurors by displaying their cell phones, the district court failed to consider the *effect* on the jurors of the perceived external contact. A third party's threat or perceived attempt to take a photograph of a juror may be no less intimidating to that juror than the actual taking of such a photograph. Thus, the question whether a photograph was taken was not dispositive of the prejudice inquiry, as one or more jurors may have *felt* intimidated regardless. By limiting its inquiry to the actual existence of photographs, the district court left key substantive matters unresolved, namely, whether anyone had attempted or threatened to take photographs of the jurors, the identity of the alleged actors and their relationship to the case, and the impact of Juror #4's statement on other members of the

jury. Thus, the court's attention to the question whether the reported incident, in fact, had occurred was only the beginning of the inquiry.[3]

We find no merit in the government's contention that the dismissal of Juror #4, the only juror who witnessed the alleged photographing, sufficiently addressed the reported incident. The district court concluded that Juror #4 "may well believe that, in fact, something was going on . . . and that that could influence [the juror's] experience here and consequently [the juror's] judgment with respect to the case." This problem could apply equally to any jurors who heard Juror #4's statement, regardless whether they witnessed any photographing personally. The court security officer initially related that Juror #4 had stated "in front of all the rest of the jurors" concerns about photographs being taken. Three jurors later reported that Juror #4 had expressed suspicion regarding the alleged acts of photographing. Under these circumstances, we cannot presume a prejudicial impact on Juror #4 alone. Other jurors had the same information as Juror #4 and reasonably could have reacted to it the same way. Without questioning each juror individually, the district court could not know whether any remaining jurors were prejudiced by Juror #4's stated concerns, even if those jurors had not witnessed any of the alleged activity. *See United States v. Blitch*, 622 F.3d 658, 665 (7th Cir. 2010) (the "widespread nature of the discussions among the jurors" counseled in favor of individual voir dire of the entire panel).

---

[3] We likewise disagree with the government's assertion that any prejudice was cured when the district court informed the jury, after Juror #4's dismissal, that no photos had been taken. As discussed above, an attempt or threat to take a photo could prejudice the jury, regardless whether an actual photo was taken.

This potentially widespread taint of the jury compelled the district court to conduct a *Remmer* hearing.[4]

Our decision in *United States v. Hines*, 717 F.2d 1481 (4th Cir. 1983), further illustrates the need for holding a *Remmer* hearing when a district court is presented with a credible allegation involving an external contact with jurors.  There, a juror had observed a law enforcement agent taking photographs of persons leaving the courthouse.  *Id.* at 1491. Although the court informed the juror that "the photographs were not being made of jurors, that there was no cause for concern, and that the matter should be disregarded," the court nevertheless conducted a *Remmer* hearing to determine whether the juror's impartiality had been compromised.  *Id.*  We agreed with the district court that the defendants were entitled to a *Remmer* hearing under such circumstances.  *Id.*; *see also United States v. Hall*, 877 F.3d 800, 805-07 (8th Cir. 2017) (district court conducted *Remmer* hearing when a juror thought that a defense witness had followed her home after trial, though the court ultimately determined that the incident was a coincidence and that the juror could remain impartial). By conducting a *Remmer* hearing, the district court in *Hines* effectively eliminated any concerns that the juror's ability to remain impartial may have been compromised by his

---

[4] We respectfully disagree with our dissenting colleague's assertion that we would require a *Remmer* hearing based only on the "commonplace action[]" of holding a cell phone.  Dissent Op. at 3.  Our colleague does not address the reasonable possibility that Juror #4's expression of concern to the other jurors itself impacted the jury's impartiality, regardless whether anyone else witnessed the alleged photographing.  Nor does our colleague suggest why a threat to take a photograph, in a case involving retaliation against witnesses, should not be evaluated as a standalone external influence on the jury.

perceptions and conclusions regarding the activity observed. We have no basis for reaching a similar conclusion here that the jurors remained impartial.

Our decision is not altered by our recent holding in *United States v. Small*, 944 F.3d 490 (4th Cir. 2019). There, two jurors had reported to a courtroom deputy that they were concerned that certain individuals had been "watching" them as the jurors left the jury room after the first day of trial. *Id.* at 497. The two jurors also reported that one of the individuals was carrying a cell phone, but the jurors did not know whether that person was using the phone to take a photograph or video recording. *Id.* The district court denied the defendant's motion to question the two jurors who had reported their concerns. *Id.* at 505.

We concluded that "a vague report of 'watching,' without more," was not evidence of an extrajudicial "communication" or "contact" sufficient to invoke the protections of *Remmer*. *Id.* Further explaining, we stated that the terms "communication" and "contact" "imply an active exchange of information of some sort," an exchange that does not encompass the act of "watching," which "may be done passively and, unless context indicates otherwise, conveys little information." *Id.* And, notably, we observed that "[t]here was no reason for the jurors to associate the unknown individuals with [the defendant]." *Id.* In clear contrast, the case before us involves a report of actions taken by the defendants' associates, creating a direct concern of potential or actual juror intimidation and resulting bias.

We do not "casually invoke[]" the requirements of *Remmer*. *Stockton v. Virginia*, 852 F.2d 740, 745 (4th Cir. 1988). And we acknowledge that the district court was required to manage a challenging and lengthy trial with jurors who understandably were unsettled

by the violent acts allegedly committed by the defendants and others. Nevertheless, we reach the firm conclusion that the defendants were entitled to an evidentiary hearing under *Remmer* to determine whether all the jurors remained impartial throughout the case, as guaranteed by the Sixth Amendment.

III.

For these reasons, we vacate the district court's judgment. We remand the case for the district court to conduct an evidentiary hearing in accordance with the requirements of *Remmer*, and for such other proceedings consistent with the principles expressed in this opinion.

*VACATED AND REMANDED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

With respect, I dissent. The majority provides criminal defendants the power to demand new trials for what we ordinarily would consider innocuous conduct.

Against the backdrop of gruesome, but certainly admissible, evidence, the jury became concerned that the defendants "looked at the jury," communicated with their attorneys and a paralegal, and accessed voir dire information about the jurors in accordance with routine procedures. None of this conduct triggers a presumption of prejudice under *Remmer v. United States*, 347 U.S. 227 (1954). *See United States v. Small*, 944 F.3d 490, 505 (4th Cir. 2019) (watching jurors); *United States v. Ford*, 761 F.3d 641, 654–55, 654 n.9 (6th Cir. 2014) (access to juror's personal information); *United States v. King*, 627 F.3d 641, 650–51 (7th Cir. 2010) (evidence at trial). The district court properly exercised its "broad discretion" in managing these concerns, *see United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019), and the majority does not appear to seriously contend otherwise.

But the majority and I disagree about the consequences of a single juror's belief that two women holding cellphones were photographing jurors. No other juror who saw these women interpreted their actions as photographing or attempting to photograph the jury.

The majority apparently believes that the district court found a credible allegation of external conduct that could affect "the ability of the jurors to remain impartial" and so triggered the need for a *Remmer* hearing. Maj. Op. at 11. It seems to me that the record does not bear that out. The district court recognized only that *counsel* had "concerns that there *may* be an effort afoot to tamper with or intimidate a juror" (emphasis added). Concluding that it did not have "enough information," the court sought to explore "how

much of an investigation [was] necessary" at that "very preliminary, very early" stage.  By conducting this preliminary inquiry, the court carefully sought to determine *if* the threat was credible.

Such a preliminary exploration is entirely proper.  As the majority acknowledges, a court invokes the *Remmer* presumption only upon a *credible* allegation of jury tampering. Maj. Op. at 9–10 (quoting *Barnes v. Joyner,* 751 F.3d 229, 242–45 (4th Cir. 2014)).  The *Remmer* "presumption is not one to be casually invoked."  *Stockton v. Com. of Va.*, 852 F.2d 740, 745 (4th Cir. 1988).  Rather, "the defendant must first establish both that an unauthorized contact was made and that it was of such a character" as to require corrective action.  *Id.* at 743*; accord United States v. Baptiste*, 596 F.3d 214, 221 (4th Cir. 2010); *United States v. Heater*, 63 F.3d 311, 321–22 (4th Cir. 1995).

After its preliminary inquiry, the district court found that the allegation of jury intimidation was not credible.*  I would not hold that finding was clear error or that the court abused its discretion in declining to hold a *Remmer* hearing, particularly given the district court's firsthand view of the atmosphere at trial and among the jurors.  *See, e.g.*, *Heater*, 63 F.3d at 321–22 (holding that a "bald assertion" of improper jury contact was insufficient to require a *Remmer* hearing); *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988) (finding no abuse of discretion in the district court's declining to interview

---

* The district court's care in conducting this preliminary inquiry reflects its understanding that it needed to avoid creating unwarranted jury fears.  *See Smith*, 919 F.3d at 834 ("This trial judge made reasoned judgments in walking the line between detecting bias and creating bias.").

jurors where defendants failed to make "a threshold showing of improper outside influence").

By watering down what constitutes a credible threat and substituting its judgment for that of the district court, the majority's holding unfortunately provides defendants a valuable tool to disrupt their trials. I fear we are on a slippery slope where commonplace actions, such as the mere holding of a cellphone, could bring significant delay in criminal trials. In my view, an alleged threat of jury tampering must have stronger indicia of credibility to overcome a district court's considered contrary view and mandate a *Remmer* presumption and evidentiary hearing.

Accordingly, I respectfully dissent.