IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE UNITED STATES OF AMERICA     *

                         *

       v.                  *        CRIMINAL NO JKB-16-363

                         *

                         *

GERALD THOMAS JOHNSON, *et al.*,     *

    Defendants.                *

   *     *     *     *     *     *     *     *     *     *     *     *

# TABLE OF CONTENTS

I.   Background ........................................................................................................... 1

   A.   Trial ................................................................................................................. 1

   B.   Appeal ............................................................................................................. 6

   C.   Remand ........................................................................................................... 6

II.   Legal Standards ................................................................................................... 8

III.   The Court of Appeals' Mandate ........................................................................ 10

IV.   Factual Findings ................................................................................................ 13

   A.   Events of January 9 and 10, 2018 ................................................................ 13

   B.   Impact Thereof on the Jurors ....................................................................... 17

      1.   Juror No. 1 ............................................................................................ 17

      2.   Juror No. 2 ............................................................................................ 18

      3.   Juror No. 3 ............................................................................................ 18

      4.   Deliberating Juror No. 4 ...................................................................... 19

      5.   Juror No. 5 ............................................................................................ 20

      6.   Juror No. 6 ............................................................................................ 20

      7.   Juror No. 7 ............................................................................................ 21

      8.   Juror No. 8 ............................................................................................ 21

      9.   Juror No. 9 ............................................................................................ 21

      10.   Juror No. 10 .......................................................................................... 22

      11.   Juror No. 11 .......................................................................................... 22

      12.   Juror No. 12 .......................................................................................... 23

   C.   Non-Deliberating Jurors ............................................................................... 24

      1.   Alternate Juror No. 3 ........................................................................... 24

      2.   Alternate Juror No. 4 ........................................................................... 24

      3.   Alternate Juror No. 5 ........................................................................... 25

      4.   Alternate Juror No. 6 ........................................................................... 25

V.   Analysis ............................................................................................................. 26

   A.   Where Juror No. 4's Allegations are Presumptively Prejudicial .................. 27

   B.   The Remaining Analysis ............................................................................... 29

   C.   The Parties' Positions ................................................................................... 32

   D.   Defendants' Structural Arguments ............................................................... 33

      1.   Sufficiency of Questions Asked ........................................................... 34

      2.   Failure to Ask Additional Questions .................................................... 37

       a.     How Juror No. 4 and Alternates Would Have Deliberated ...............................38

          i.    Non-Deliberating Alternates ...........................................................39

         ii.    Juror No. 4.......................................................................................39

       b.    Whether Jurors Could Put January 9 "Out of their Minds" ................................41

  E.    Whether the Jury was Influenced by Juror No. 4's Report ...........................................44

    1.    Subjective Impartiality .......................................................................................48

       a.    Juror No. 1 .................................................................................................49

       b.    Juror No. 2 .................................................................................................51

       c.    Juror No. 5 .................................................................................................52

       d.    Juror No. 6 .................................................................................................53

    2.    Objective Factors................................................................................................54

       a.    Basham Factors Related to the Improper Communication ...................................54

       b.    The Court's Initial Assessment of Prejudice .......................................................59

       c.    The Weight of the Evidence .........................................................................61

VI.  Conclusion.............................................................................................................64

## MEMORANDUM

Now pending before the Court is the Government's Motion to Reinstate Guilty Verdicts with respect to Defendants Gerald Johnson, Kenneth Jones, and Marquise McCants. (ECF No. 1021.) This motion stems from a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954) (the "*Remmer* hearing"), conducted on May 10, 11, and 17, 2021. The motion is fully briefed, and no further hearing is necessary. *See* Local Rule 108.2 (D. Md. 2021). Having reviewed the entire record, including the evidence presented at the *Remmer* hearing, the Court concludes that there is no reasonable possibility that an external contact prejudiced the jurors in this case. Accordingly, the Government's motion will be GRANTED.

### I. Background

The factual and procedural background for much of this case have been described by the prior orders of both this Court and the Court of Appeals. (*See, e.g.*, ECF Nos. 922, 998); *see also United States v. Johnson*, 954 F.3d 174 (4th Cir. 2020). However, because that background is critical to the resolution of the instant motion, we reiterate and consolidate it here.

#### A. Trial

On November 9, 2016, a jury returned a superseding indictment charging Johnson, Jones, McCants (collectively, "Defendants") and six others with numerous federal crimes.[1] (*See* ECF No. 40.) The charged offenses related to unlawful activity committed by members of the Black Guerilla Family ("BGF") a Baltimore street and prison gang. *Johnson*, 954 F.3d at 176. Defendants demanded a trial by jury, which began on November 20, 2017. (ECF No. 413.)

---

[1] A federal grand jury had initially returned an indictment charging only Johnson with Possession with Intent to Distribute Cocaine and Aiding and Abetting. (ECF No. 9.) Defendants' six unnamed co-defendants plead guilty prior to trial and are not relevant for purposes of the instant motions.

During the trial, the Government presented evidence that BGF shielded their illegal activity through violence and intimidation against those who cooperated with law enforcement. The presentation of this evidence culminated on December 7, 2017, when the Government put forward evidence regarding the murder of Moses Malone, a government cooperator. *Johnson*, 954 F.3d at 177. That same day, the jurors raised two concerns with the Court. First, during the lunch break, jurors alerted the Court—through the courtroom deputy clerk (the "clerk")—that Defendants and their attorneys had been writing and passing notes. (*See* Dec. 7, 2017 Sealed Tr. at 2, ECF No. 764.) The jurors were concerned because, after receiving these notes, the defendants had looked at the jury. (*Id.*) Upon being informed of these concerns, Defendants' counsel moved for a mistrial, or alternatively, for *voir dire* of the jurors regarding their continued ability to serve as impartial jurors. (*Id.* at 11, 15.) Both motions were denied, and the Court issued "Juror Communication No. 1," wherein it explained that Defendants' note-passing was permissible; that no negative inference should be drawn from this; and reiterating that each defendant is presumed innocent until proven guilty beyond a reasonable doubt. (*See id.* at 25–26.) This message was delivered to the jurors by the clerk. (*Id.* at 48.)

On her return to the courtroom, the clerk informed the Court that when she delivered Juror Communication No. 1 to the jury room, the jurors had raised additional questions related to the potential exposure of their personal information during jury selection. (*Id.* at 48–49.) Defendants renewed their motion for a mistrial, or in the alternative, to individually *voir dire* the jury. (*Id.* at 49–50.) The Court again denied these motions and issued "Juror Communication No. 2," which explained the measures taken by the Court to prevent jurors' personal information being divulged during *voir dire* beyond the extent necessary to permit counsel to effectively select a jury. (*Id.* at 62–63.) This communication was also delivered to the jurors by the clerk. (*Id.* at 64.) The Court

2

noted that the delivery of the communications by the clerk, with whom the jurors were familiar, was intended to avoid giving undue credibility to any potential concerns the jurors may have held with regard to otherwise non-troubling circumstances. (*Id.* at 64–65.) The trial then recessed for ten days.

Following this recess, the Court informed the parties that the jurors had posed a final set of questions to the clerk when she delivered Juror Communication No. 2. (Dec. 18, 2017 Tr. at 2, ECF No. 765.) These questions reiterated the concerns previously raised by the jurors, namely the passing of notes and the potential exposure of their personal information during *voir dire*. (*Id.*) The Court again responded in writing, reiterating the substance of its prior communications related to the permissibility of note passing and the standard procedures utilized by the court to protect juror information. (*Id.* at 2–3.) The Court also denied renewed motions by Defendants for a mistrial and for *voir dire* of the jurors. (*Id.* at 3.) The trial then continued without further correspondence between the Court and the jury until January 9, 2018.

On that day, the Government raised an issue to the Court regarding potential contact between associates of Defendants and the jury. Following a break in the proceedings, a juror had approached Court Security Officer ("CSO") Ronald Beverly and reported that a group of defense witnesses were taking photos of the jurors in the hallway. (Jan. 9, 2018 Tr. at 134, ECF No. 778.) After discussion with counsel, the Court implemented a two-part strategy to further develop its understanding of the situation. First, the Court asked the clerk to individually speak with the jurors and to say "words to the effect of 'a court security officer indicated that something might have happened as one or more of you were leaving the jury room. Did something happen?'" (*Id.* at 145.) Defendants opposed this inquiry and moved again for a mistrial. (*Id.* at 148.) The Court again denied the motion, explaining that "the Court hasn't got enough information before it, not

3

even close, to suggest a mistrial is in order. We're still very much at an investigative exploratory stage. And, in fact, we are at the stage where we're investigating how much of an investigation is necessary . . . and that's why I'm going to take this first measured step." (*Id.* at 149.)

The Court's second step was to contact the United States Marshals Service ("USMS") and ask them to further investigate the alleged picture taking. (*See id.* at 153.) In chambers, with counsel present, the Court briefly spoke with USMS leadership regarding the incident. (*Id.*) Although the Court did not direct the USMS to take any specific follow-up in investigating the incident, it did order them to have no contact with the jury. (*Id.* at 154.) The USMS executed the Court's directive by speaking with a person whom CSO Beverly indicated had been present with her phone out as the jurors reentered the jury room. (May 17, 2021 Tr. at 8, 52, ECF No. 1017.) After obtaining her consent, they searched her cellular phone and discovered no photos of the jurors or the courthouse. (*Id.* at 54; *see also* Investigation Report, ECF No. 949 Ex. 1.) The USMS officers also reviewed relevant security video footage and concluded that no person appeared to be photographing the jury. (May 17, 2021 Tr. at 56–57.) The Marshals reported these findings to the Court.

In addition, the Court received the results of the clerk's inquiry of the jurors and alternates, which were transcribed and read into the record by Andrew Jaco, a law clerk. (Jan. 9, 2018 Tr. at 154–157.) Of the seventeen jurors and alternates interviewed, eleven reported seeing nothing. (*Id.*) In contrast, Juror No. 4[2] "saw two females on both sides of the vestibule doors . . . holding phones at their waists in both hands . . . [a]nd described it as if they were taking a picture." (*Id.* at

---

[2] To be clear, this case has had three persons who have held the role of Juror No. 4. The first such juror was excused by the Court on November 27, 2017 (ECF No. 424) and has no role in this case at this time. The person referred to in this opinion as Juror No. 4 began the trial as Alternate Juror No. 1 and became Juror No. 4 on November 27, 2017. The person referred to in this opinion as Deliberating Juror No. 4 began this case as Alternate Juror No. 2, became Juror No. 4 on January 10, 2018, and deliberated in this case.

4

155.) Three other jurors, Nos. 1, 6 and 11, affirmed Juror No. 4's observation of persons holding

phones in the vestibule, but disputed his characterization that any of them were or may have been

taking pictures. (*Id.* at 156.) The remaining two jurors heard Juror No. 4's report that persons had

been photographing the jury but did not observe the events that precipitated it. (*Id.* at 154, 157.)

Notably, Juror No. 2 reported that Juror No. 4 said, "[G]uys, this is really serious, they're taking

pictures of us." (*Id.* at 154.) Based on this information, and over the Government's objection, the

Court dismissed Juror No. 4. (*Id.* at 162.) Summarizing the evidence before it, the Court explained

that "one juror, juror No. 4, while transiting in and out of the jury room . . . saw something that

caused him to believe that he was or likely was being photographed. I don't find any corroboration

for juror No. 4's concerns or observations in the statements of any other jurors, any court security

officers, or any other information that has been brought to the Court's attention. So my conclusion

is that there is not evidence before the Court at this point, [that] any actual photographing or image

taking, was going on." (*Id.*)

        Consistent with this conclusion, the Court provided the jurors with an assurance the

following morning that:

> [y]esterday afternoon it was reported to the Court that one or more jurors had a
> concern that perhaps someone outside of the jury room, in the courtroom vestibule,
> or courtroom hallway had photographed or otherwise captured the image of jurors.
> This matter was investigated after that report was received.  The investigation
> included the examination of a relevant smart phone, camera-type device in the
> possession of a relevant individual.  That investigation revealed that there were no
> images, films, videos of the sort that I have referred to captured on that telephone.

(Jan. 10, 2018 Tr. at 18–19.) The trial continued thereafter, and Defendants were ultimately found

guilty and sentenced to life in prison. (*See* ECF Nos. 535–37 (verdicts); ECF Nos. 643, 666, 854

(sentencing).)  Defendants filed a joint motion for a new trial (ECF No. 556), which was denied. (ECF No. 599.)  Defendants then appealed their convictions.  (*See* ECF Nos. 652, 670, 856.) [3]

### B. Appeal

Defendants' appeal asserted that the Court should have conducted a *Remmer* hearing each and every time the jurors had come forward with concerns.  *See* Opening Br. of Appellants at 17– 26, *United States v. Johnson*, 954 F.3d 174 (2020).  On review, the Court of Appeals focused on the January 9, 2018 incident.  *See generally, Johnson*, 954 F.3d at 179–182; *see also id.* at 183 (Motz, J., dissenting) ("None of the [other] conduct triggers a presumption of prejudice . . . and the majority does not appear to seriously contend otherwise.").  It concluded that this Court had abused its discretion in declining to hold a formal *Remmer* hearing following Juror No. 4's report of potential picture taking.  *Id.* at 180.

Specifically, the Court of Appeals concluded that Juror No. 4's report had not only triggered *Remmer* but had immediately placed the Court in *Remmer* step two.  *Id.*; *see also infra*, Part II (outlining *Remmer* step one and step two).  Given this, the Court's subsequent steps to investigate the alleged photo-taking failed both procedurally and substantively to satisfy the formal hearing requirements of *Remmer*.  *Id.* at 180–81.  The Court of Appeals remanded so that this Court could hold a formal step two hearing.  *Id.* at 182–83.

### C. Remand

On remand, the Court held a telephone status conference and ordered briefing regarding the appropriate substance, scope, and structure of the forthcoming *Remmer* hearing.  (ECF No.

---

[3] Only Defendants Johnson and Jones appealed their conviction on grounds relevant here.  *See United States v. Johnson*, 954 F.3d 174, 176 n.1 (4th Cir. 2020).  After Johnson and Jones' successful appeal, Defendant McCants' independent appeal was remanded, and he was joined to the instant proceedings.  (*See* ECF No. 879 at 1 n.1; *see also* ECF No. 889.)  For purposes of continuity, the Court will continue to use the nomenclature "Defendants" as a collective term when describing the appellate proceedings despite this discrepancy.

879.) That briefing primarily focused on three issues. First, what questions could be permissibly asked of the jurors given the constraints imposed by Federal Rule of Evidence 606? Second, should those questions be posed by the parties, by the Court, or by both? And third, what evidence would be necessary for the government to meet its burden under *Remmer*? The parties disagreed on all three points (*compare* ECF Nos. 909, 918, *with* ECF Nos. 911, 921), and the Court resolved these disputes by written memorandum. (ECF No. 922.) In addition to these substantive issues, the Court also outlined a process by which it intended to resolve the administrative challenges posed by the hearing. (*Id.* at 7–8.)

That process initially involved continuing to treat the former jurors[4] as jurors for administrative purposes, meaning that the Court would take the lead on ensuring their attendance at the *Remmer* hearing. (*Id.; see also* ECF No. 924.) Upon further consultation with the Administrative Office of the United States Courts, the Court was advised that for administrative purposes the former jurors must be classified as witnesses. (ECF No. 955.) Because witnesses must be assigned to some party, and the burden at the hearing lay with the government, the Court designated the former jurors as Government witnesses for administrative purposes only. (*See, e.g.,* ECF Nos. 955, 959, 973.) In keeping with this purely administrative delegation, the Court repeatedly reminded the Government that "[o]ther than ensuring the appearance of the former jurors, the government shall have no contact and no case-related communication with them." (*See, e.g.,* ECF No. 955 at 2.) The Government proposed a protocol for ensuring the effective separation of these responsibilities (ECF No 972), which the Court endorsed after consultation with the parties at a pre-hearing scheduling conference. (*See* ECF No. 975 at 1–2.)

---

[4] The Court uses the term "former jurors" in this paragraph to emphasize that they were no longer administratively considered jurors after termination of their jury service. Elsewhere, the Court refers to them as simply "jurors" for brevity.

As the hearing drew closer, the Court continued to engage with the parties to shape the proceedings, and in particular, with respect to the questions to be posed to the jurors. To ensure that "all interested parties [were] permitted to participate" in the hearing, the Court proposed an initial set of juror questions three weeks ahead of the hearing and solicited the parties' input on modifications or additions to that list. (*See* ECF No. 983.) The Court then incorporated many of those suggestions and finalized the list of questions (*See* ECF No. 998), which was later adjusted slightly on reconsideration. (ECF No. 1004.)[5]

At the hearing, the Court heard testimony from every juror and alternate regarding their memory of the trial, the events of January 9, 2018, and the impact those events had on their ability to continue to be fair and impartial jurors. *See Johnson*, 954 F.3d at 181 ("[T]he district court left key substantive matter unresolved, namely, whether anyone had attempted or threatened to take photographs of the jurors, the identity of the alleged actors and their relationship to the case, and the impact of Juror #4's statement on the other members of the jury."). The Court also heard testimony from non-juror witnesses called and examined by the parties. At the conclusion of this testimony, the Government indicated that it believed it had put forward sufficient evidence to meet its burden under *Remmer*.

## II. *Legal Standards*

The Sixth Amendment guarantees a criminal defendant's right to a "speedy and public trial, by an impartial jury." U.S. CONST. Amend. VI. That right "is violated if an influence outside the jury's deliberative process, a so-called 'external influence,' affects the jury's decision-making." *Johnson*, 954 F.3d at 179 (quoting *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014)).

---

[5] Defendants also moved for reconsideration of the questions on the eve of the *Remmer* hearing. (ECF No. 1005.) Because this motion only re-urged positions taken by Defendants in their original suggestions, that motion was denied without prejudice as to Defendants' ability to pose those questions as suggested additions at the hearing. (ECF No. 1006.)

Hearings to determine whether an external influence prejudiced a jury's verdict are governed by standards first outlined in *Remmer v. United States*, 347 U.S. 227 (1954). Under *Remmer*, those hearings proceed in two steps.

At step one, "[a] defendant seeking a *Remmer* hearing must present a 'credible allegation' that 'an unauthorized contact was made,' and that the contact 'was of such a character as to reasonably draw into question the integrity' of the trial proceedings." *Johnson*, 954 F.3d at 179 (quoting *Barnes*, 751 F.3d at 242–45). To substantiate a credible allegation of an unauthorized contact, a defendant must submit "competent evidence that the extrajudicial communications were more than innocuous interventions." *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996). When a court is "confronted with a credible allegation of an improper external contact" it "may not rely on ex parte, third-party information." *Johnson*, 954 F.3d at 180. Instead, the Court must proceed to step two and "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* (quoting *Remmer*, 347 U.S. at 229-30) (emphasis omitted).

At step two, a defendant "is entitled under *Remmer*: (1) to a rebuttable presumption that the external influence prejudiced the jury's ability to remain impartial; and (2) to an evidentiary hearing to determine what actually transpired and whether the challenged contact was harmless." *Id.* at 179 (internal quotation marks and citations omitted). At this hearing, the "government bears the burden of rebutting the presumption of prejudice by showing that there was no 'reasonable possibility' that the jury 'was influenced by an improper communication.'"[6] *Id.* at 180 (quoting *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009)).

---

[6] Although the Court of Appeals cites and largely quotes *Basham*, it cuts the quotation from *Basham* in half in order to omit the word "verdict." *Compare Johnson*, 954 F.3d at 180, *with Basham*, 954 F.3d at 318 (quoting *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996) (emphasis added) (prevailing party must "prove that there exists 'no reasonable possibility that the jury's *verdict* was influenced by an improper communication.'"). Although this

### III.    The Court of Appeals' Mandate

The Court of Appeals remanded this case with a straightforward mandate: "determine the circumstances, the impact thereof on the juror[s], and whether or not it was prejudicial, *in a hearing with all interested parties permitted to participate.*" *Johnson*, 954 F.3d at 180 (emphasis in original). It also provided guidance on the inquiry this Court should conduct in making this determination. *Id.* at 181. The Court's present analysis will track this guidance, which it briefly reiterates here.

As a preliminary matter, the Court of Appeals identified a number of factual predicates related to the circumstances of Juror No. 4's allegations that were not resolved by the Court's initial investigation. Specifically, it explained that by "limiting its inquiry to the actual existence of photographs, the district court left key substantive matters unresolved, namely, whether anyone had attempted or threatened to take photographs of the jurors, the identity of the alleged actors and

---

stylization seems deliberate, the Court ultimately concludes that it is immaterial to the analysis in this case. First, the Court of Appeals also cites *United States v. Small* as indicative of the proper analysis. 944 F.3d 490, 504 (4th Cir. 2019). Although the *Small* court uses neither "jury" nor "jury's verdict," it explains that the "government bears the burden of showing 'that such contact . . . was harmless to the defendant.'" *Id.* (quoting *Remmer*, 347 U.S. at 229–30). Logically, an external contact is only harmful to the defendant if it materially affects the jury's verdict. *Sherman v. Smith*, 89 F.3d 1134, 1139 (4th Cir. 1996) ("*Smith* and *Remmer* thus contemplate the precise inquiry . . . [of] discerning the effect of juror misconduct or bias on the verdict without examining the thought processes of the jury.").

This reading is also borne out by other portions of the *Johnson* mandate, which explain that "[a] defendant's Sixth Amendment right . . . is violated if . . . a so-called 'external influence,' affects the jury's *decision-making.*" *Johnson*, 954 F.3d at 179 (emphasis added) (quoting *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014)). This linguistic circle is fully squared by *Olano*, which explains that at a *Remmer* hearing, "the ultimate inquiry [is]: Did the intrusion affect the jury's deliberation and thereby its verdict?" *United States v. Olano*, 507 U.S. 725, 739 (1993). Reconciling this language is also consistent with the Fourth Circuit's repeated admonition that "while . . . a three-judge panel has the statutory and constitutional power to overrule the decision of another three-judge panel . . . as a matter of prudence, a three-judge panel . . . should not exercise that power." *McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2004) (en banc); *see also United States v. Cobler*, 748 F.3d 570, 577 (4th Cir. 2014) (citing *McMellon*, 387 F.3d at 334) ("It is well-established law in this Circuit that our first case to decide an issue controls later consideration of that same issue, unless it is overruled by this court sitting *en banc* or by the Supreme Court."). In short, the analytical emphasis placed by the Court of Appeals on the jury rather than the jury's verdict does not change the standard to be applied in this case, and this Court will use both terms interchangeably in its own analysis.

their relationship to the case, and the impact of Juror #4's statement on other members of the jury."[7] *Id.*

Contingent on these factual developments, the Court of Appeals identified four ways in which these circumstances could have impacted, and potentially prejudiced, the jurors. First, the investigation may have confirmed that photos were in fact taken, an event that would have been of a "plainly prejudicial nature." *Id.* at 180. Second, even if no photographs were actually taken, someone may have "attempted or threatened to take photographs of the jurors." *Id.* at 181. Third, even absent intent to take a photograph, "defendants' associates [may have] intimidated the jurors by displaying their cell phones," that is, prejudice may have arisen from a "*perceived* attempt to take a photograph." *Id.* (emphasis added). In analyzing potential prejudice, the Court of Appeals grouped this second and third scenario together, explaining that "[a] third party's threat or perceived attempt to take a photograph of a juror may be no less intimidating to that juror than the actual taking of such a photograph." *Id.* Last, the jurors may have been "prejudiced by Juror #4's stated concerns, even if those jurors had not witnessed any of the alleged activity." *Id.* Under any of these factual scenarios, the ultimate inquiry remained whether "actions taken [or perceived to be taken] by the defendants' associates" resulted in "potential or actual juror intimidation and resulting bias." *Id.* at 182.

Based on the testimony developed at the *Remmer* hearing, the Government argues that all material factual questions have been resolved and that the "record shows conclusively" that there

---

[7] The Court of Appeals also noted that "[a]lthough Juror 4 had alleged that two persons had used their cell phones to take photographs of the jurors, only one of those phones was examined to determine whether such photographs were taken." *Johnson*, 954 F.3d at 181. The facts, as developed at the *Remmer* hearing now suggest that only one person in the vestibule had their cell phone out at the time that Juror No. 4 alleges photographs were taken. *See infra* Part IV.A. Given this, and the parties agreement that no photos were actually taken, the Court concludes that it has satisfactorily resolved this issue. (*See* Defs. Opp'n at 2; *see also* Gov't Mot. at 15 ("[T]he allegation by the Former Juror No. 4 that a spectator had taken photographs of the jurors was simply not credible, and has not been borne out by the evidence.").)

11

is no "reasonable possibility that the [January 9, 2018,] incident influenced the verdicts in this case." (Mot. Reinstate at 2.) Although Defendants largely agree on the material facts developed at the *Remmer* hearing, they dispute the Government's conclusions based on that record. Defendants raise two categories of arguments. First, Defendants allege a number of structural flaws in the *Remmer* hearing that they argue precludes the Court from examining the "entire picture" around January 9, 2018, and accordingly, from making a determination that the Government had rebutted the presumption of prejudice. (*See* Defs. Opp'n at 13); *see also Cheek*, 94 F.3d at 142 (internal quotation marks and citation omitted) (explaining that following a *Remmer* hearing, a court must "examine the entire picture, including the factual circumstances and the impact on the juror"). Alternatively, Defendants argue that even as currently developed, the evidentiary record precludes the Government from rebutting the presumption of prejudice imposed by *Remmer*. (Defs. Opp'n at 15 ("The evidence demonstrates that there is a reasonable possibility that each of [several] jurors were subjectively influenced by the Photo Incident.").)

At a high level, the evidence adduced at the *Remmer* hearing strongly supports the Government's contention that the events of January 9, 2018 were a fleeting event that the jury readily discounted in the two subsequent weeks of trial. First, both parties now agree that there was no merit to Juror No. 4's allegations, and that no photos were actually taken of the jury. (Mot. Reinstate at 15; Defs. Opp'n at 2.) Second, the jurors did not provide substance to shadows; Juror No. 4's allegations sparked few concerns or conversations. *See Basham*, 561 F.3d at 320 (considering "the extent to which the communication was discussed and considered by the jury" in assessing prejudice). Last, each and every juror assured the Court that they maintained an open mind and were able to remain fair and impartial following January 9, 2018. *See United States v. Beasley*, 824 F. App'x 154, 157 (4th Cir. 2020) ("[D]istrict court did not commit error—plain or

otherwise—by declining to declare a mistrial" where "[e]ach of the jurors attested to their ability to be impartial."). The consistent repetition of these themes in the jurors' testimony renders the potential for prejudice arising from Juror No. 4's report highly unlikely.

*Remmer* demands more than "highly unlikely," however. It requires the Court to be satisfied that there is "no reasonable possibility that the jury was influenced by an improper communication." *Johnson*, 954 F.3d at 180 (internal quotation marks and citation omitted). This requires a granular analysis as to each individual juror, for "[i]f even a single juror's impartiality is overcome by such an external influence, the defendant's right to an impartial jury has been compromised." *Id.* at 179. As noted, the Court of Appeals identified several key facts necessary to make this determination; this Court now turns to how the record has developed with respect to those facts.

## IV. *Factual Findings*

The first two parts of the Court of Appeals' mandate are evidentiary, requiring this Court to assess "the circumstances" of January 9, 2018, as well as "the impact thereof on the juror[s]." *Johnson*, 954 F.3d at 180 (quoting *Remmer*, 347 U.S. at 229–30). Neither party argues that the testimony provided by the jurors and other witnesses is not credible or otherwise unreliable. Accordingly, the Court makes the following factual findings regarding what the evidence establishes occurred on January 9, 2018, and the testimony of the individual jurors regarding how they perceived and were impacted by those events.

### A. *Events of January 9 and 10, 2018*

On January 9, 2018, the Court excused the jury for an afternoon break at 3:00 p.m. (Jan. 9, 2018 Tr. at 131.) As he was returning to the jury room following that break, Juror No. 4 saw people gathered in the vestibule area with phones out. (*Id.* at 154; May 10, 2021 Tr. at 15.) Juror

13

No. 4 then entered the jury room and expressed his belief that the jury was being photographed in front of his fellow jurors. (May 10, 2021 Tr. at 15–16.) Although he denies that he viewed this event as significant or serious, two other jurors stated that his mannerisms and word choice connoted such a belief. (*Compare id.* at 20–21 (Juror No. 4: "I don't think I expressed those languages of serious or significant. I think it was more of concern."); *with id.* at 176 (Alternate 6: "[Juror No. 4] was very animated, he started talking real fast, you know, uncharacteristically . . . I mean, he was nervous, I think."); and Jan. 9, 2018 Tr. at 155 ("Juror No. 2 observed that juror No. 4 came in and told everyone that he observed someone that he thought may be McCants's mom and another woman surreptitiously taking pictures of them. He said, quote, 'guys this is really serious, they're taking pictures of us.'").) In response to Juror No. 4's report, Juror No. 2 approached CSO Beverly and requested that he follow her to the jury room.[8] (*See* May 10, 2021 Tr. at 14 (Juror No. 4: "one of my fellow jurors reported to the—I forgot her name, that was escorting us and, yes, so I believe they might have said that to the girl that escorted us."); *see also* Court Facility Incident Report ("CSO Report") ("An older white female juror wearing a light colored top, dark pants, blue eyes (one eye was lazy) approached CSO Beverly and asked me to follow her to the entrance of the jury room."),[9] ECF No. 949-1.) Juror No. 2 then repeated Juror No. 4's concern about picture taking to CSO Beverly in front of her fellow jurors. (CSO Report; *see also* May 17, 2021 Tr. at 12, ECF No. 1017.) Following Juror No. 2's report of the incident,

---

[8] Some testimony suggests that the decision to come forward was made by the jury as a collective. (*See, e.g.*, May 10, 2021 Tr. at 27, 88.) However, a significant majority of the jurors testified that they did not suggest raising the concerns to the Court or were unaware of the concerns until after they were initially raised. (*Id.* at 39, 56, 68, 76, 97, 112, 129, 140, 151.) On the weight of the evidence, the Court concludes that the issue was raised to CSO Beverly solely by Juror No. 2 and that jurors who recall a collective decision may be conflating the events of January 9, 2018 with other instances where the jury raised concerns to the Court's attention as a group.

[9] Although Juror No. 2 did not explicitly confirm her identity as the person who reported the incident to CSO Beverly, she is the only reasonable match for the description in CSO Beverly's contemporaneous report. (*See also* May 11, 2021 Tr. at 11–12 (confirming that Juror No. 12 was not the person who reported the incident to CSO Beverly), ECF No. 1016.)

the jury engaged in minimal further discussion regarding Juror No. 4's report. (*See* May 10, 2021 Tr. at 16, 56–57, 68, 76, 121–22, 140); *but see id.* at 130, 151 (recalling conversations regarding whether someone was actually taking pictures of the jury).) CSO Beverly communicated this report to AUSA Martinez, who in turn raised the issue of potential picture taking with the Court. (Jan. 9, 2018 Tr. at 134–35.)

The Court then implemented the two-track investigative procedures detailed above, with court personnel interviewing the jurors and the USMS seeking to confirm whether any picture taking occurred. *See supra* Part I.A. The two deputy U.S. Marshals tasked with investigating the event were Marshals Nesbit and Golob. They received directions from Chief Deputy U.S. Marshal Jack Leo (May 17, 2021 Tr. at 52), after Chief Deputy Leo had been told to investigate the incident by the Court at an *in camera* meeting held on the record and with counsel present. (Jan. 9, 2018 Tr. at 153–54). The deputy Marshals discussed any signs of potential picture taking with CSO Beverly, who had observed three women in the hallway when the jurors had been returning to the jury room following the break. (May 17, 2021 Tr. at 8.) CSO Beverly noted that one of these women had been holding a cell phone and passed on both observations to Marshals Nisbett and Golob. (*Id.* at 8, 14.) He also pointed them in the direction of the woman who had been holding the cell phone and who was still in the vestibule area. (*Id.* at 53.)

Marshals Nesbit and Golob approached the woman, Mona Lisa Carter, and asked whether she had taken photographs of a juror on her cell phone, which she denied. (*Id.* at 54.) They then requested, and Carter consented to, a manual search of her cell phone for any potential photographs that were taken of the jury or the courthouse. (*Id.* at 54–55.) No photos were found. (*Id.* at 55–56.) Concluding that they lacked probable cause for a more intrusive search and that Carter had

15

been forthcoming, cordial, and had immediately granted consent for a manual search of her phone, the marshals did not pursue further review of the contents of Carter's phone. (*Id.* at 56, 80–81.)

Following their conversation with Carter and the manual search of her phone, Marshal Nesbit reviewed security footage to identify any interactions between jurors and other people in the vestibule. (*Id.* at 57.) Again, there was nothing to corroborate any picture taking, threat, or even interaction between the bystanders and the jury. (*Id.* at 59.) This review was supplemented by a request from Marshal Golob to the Cyber Investigations Unit to search open-source social media, chat rooms, and other online fora for potentially relevant photos. (*Id.* at 81.) This search also failed to turn up any relevant photographs. (*Id.* 82–83.) These findings were reported to the Court,[10] and memorialized. (ECF No. 949-1 at 1–2.)

When the jury reconvened the next day, the Court provided the jurors with a brief update and curative instruction regarding the allegations of picture taking. (Jan. 10, 2018 Tr. at 18–19.) The jurors noted the absence of Juror No. 4 and may have speculated that he was excused because of his reaction to the events of the prior day. (*See* May 10, 2021 Tr. at 40 (Juror No. 2: "I do remember when that person left the jury and an alternate came in. And we all kind of looked at each other like, oh, boy, something's up. But no, not the jurors discussing that."), 149 (Alternate Juror No. 4: "I heard talk [about the incident]. I didn't hear it from the person that, you know, that left. But I heard talk and that was the reason why he left, but that's about it. . . . Well that was the reason why he—he felt that way and that was the reason why, you know, he was taken off the jury."). None of the jurors testified to any additional, significant conversations regarding either the events of January 9 or Juror No. 4's reaction to them.

---

[10] At the time the Court issued its January 10, 2018 curative instruction, the Cyber Investigation Unit had not completed their review of publicly available online sources. However, the Court was aware that both a search of Carter's phone and review of the surveillance video had not turned up any photographs or potential photographers.

### B. Impact Thereof on the Jurors

Every juror testified that he or she affirmatively recalled the trial and the events of January 9, 2018. Although some jurors expressed some discomfort arising from those events, each juror also affirmed that they were able to remain impartial through the remainder of the trial following Juror No. 4's allegations of potential photographing. The Court found, and finds, that the jurors' testimony was credible throughout and that minor inconsistencies can be accounted for by the passage of time. (*See, e.g.*, May 10, 2021 Tr. at 32, 47–48.) Though the parties dispute the import of the jurors' testimony, neither side argues that it should be discounted on the basis of credibility. Accordingly, based on this testimony, the Court finds the following with respect to the impact of January 9, 2018 on each individual juror:

#### 1. Juror No. 1

Juror No. 1 recalled a juror raising concerns that someone in the audience was photographing the jurors as they came into and out of the courtroom. (May 10, 2021 Tr. at 26.) Although she does not recall which juror initially raised concerns, she and the other jurors acknowledged those concerns for their "safety and well-being" and "decided to come forward and let everyone know what this juror expressed." (*Id.* at 26–27.) After some hedging, Juror No. 1 conceded that she was intimidated by what had occurred, stating, "I guess you could say 'intimidated' then; if my picture was being taken, I was definitely concerned." (*Id.* at 28.) However, she was adamant that any concerns did not affect her ability to remain impartial and listen to the evidence presented at trial with an open mind. (*Id.* (The Court: "[W]ere you able to remain an impartial juror and were you able to keep an open mind as the trial continued after that?" Juror No. 1: "Oh, yes. Absolutely."); *see also id.* at 31–34 (explaining that the "[m]ost significant part of her testimony, in the Court's view [was that] she became quite emphatic that she remained

17

open minded . . . [h]er words said that much, but her body language and the intensity with respect to how she expressed that view is what is persuasive to the Court.").)

### 2. Juror No. 2

While Juror No. 2 recalled both her time as a juror and the events of January 9 (*id.* at 37–37), her memory at the *Remmer* hearing was materially different from her contemporaneous report to the Court. For instance, she did not recall any discussion of picture taking, much less being the person who reported Juror No. 4's concerns to CSO Beverly and claimed Juror No. 4 had stated "this is really serious, they're taking pictures of us." (*Compare id.* at 38–40, *with* Jan. 9, 2018 Tr. at 155.) Despite this, there is no evidence either from the *Remmer* hearing or contemporaneous to the incident that she shared Juror No. 4's concerns that somebody may have been taking photos of the jury. (*See* May 17, 2021 Tr. at 10–11.) Further, she not only assured the Court that she was neither intimidated nor prejudiced by the events of January 9, she stated that she believed any person who had been prejudiced by the incident would be "expected to express that to someone in charge." (May 10, 2021 Tr. at 41.) Further, the evidence suggests that she is in fact the person who raised Juror No. 4's expressed concerns to the Court in the first instance. *See supra* n. 9. Therefore, while Juror No. 2 may not recall the events of the trial as well as she thinks (*see id.* at 36), the Court is confident that if at any point she felt that she or a fellow juror could no longer function fairly and impartially, she would have raised that concern with the Court.

### 3. Juror No. 3

Juror No. 3 recalled her service as a juror but only vaguely recalled the events of January 9, 2018, noting that she "didn't pay much attention" to Juror No. 4's allegations. (*Id.* at 56.) Further, she did not recall whether the photo taking allegations were brought to her attention before or after deliberations began. (*Id.* at 57.) While Juror No. 3 testified at two points that the photo

taking allegations "didn't have anything to do with the decision," (*id.* at 57, 62) the Court disregards this proffer as prohibited by Federal Rule of Evidence 606(b). However, Juror No. 3's more general testimony regarding what was brought to her attention, and how it affected her state of mind are permissibly considered by the Court. *See* Fed. R. Evid. 606(b)(2)(A); *see also United States v. Edwards*, 188 F.3d 230, 236 (4th Cir. 1999) (internal quotation marks omitted) (approving questioning of juror that elicited testimony that an external phone call received during the second day of deliberations had "surprised and scared him, that he was shocked that someone had his telephone number,  and that he had trouble sleeping after the call").

Considering only the admissible testimony, the Court credits Juror No. 3's statements that the events of January 9 and 10 "didn't phase" her and that she "didn't really pay any attention" to any suggestion of picture taking, and accordingly, that she remained a fair and impartial juror following those events. (May 10, 2021 Tr. at 58, 62.)

### 4. *Deliberating Juror No. 4*

Deliberating Juror No. 4 recalled his service as a juror and "vaguely" recalled the events of January 9, 2018. (*Id.* at 65, 67.) To the extent he recalled them, he did not credit the allegations regarding potential picture-taking, (*id.* at 67 ("I was like, I doubt it, but—someone said something like that")), which he described as "just a little bit of just paranoia." (*Id.*) He stated that he "didn't think anything of [the allegations,]" because Juror No. 4 "c[ouldn't] really prove [it], people are on the phone in the hallway all the time." (*Id.* at 67–68.)  Deliberating Juror No.4 also noted that Juror No. 4's allegations "didn't evolve into a real conversation," and that he did not recall anyone suggesting that the allegations should be raised to the Court. (*Id.*) He concluded by affirming that he was neither intimidated nor prejudiced by what he viewed as unfounded allegations. (*Id.* at 69.)

19

### 5. *Juror No. 5*

Juror No. 5 recalled her service as a juror and recalled "being called in and asked questions about what happened [on January 9, 2018.]" (*Id.* at 75.) She did not recall any conversations or discussions independent of the Court's inquiry into the matter. (*Id.* at 76.) And in fact, she did not hear "the whole thing kind of come out" until the Court's curative instruction on January 10, 2018. (*Id.* at 77.) She stated that the Court's instructions on January 10 was a "little intimidating to think that could possibly have happened," but that the Court's assurance that "everything was fine and there was nothing there" ultimately reassured her. (*Id.* at 77–78.) Based on the Court's assurance that the allegation of photo taking was unsubstantiated, Juror No. 5 credibly affirmed that she was able to keep an open mind and remain a fair and impartial juror for the remainder of the case. (*Id.* at 78.)

### 6. *Juror No. 6*

Juror No. 6 recalled her service as a juror and the events of January 9, 2018. (*Id.* at 85, 87.) She recalled Juror No. 4's concerns and that the jury believed those concerns should be raised to the Court because "if that's happening, someone should know about it." (*Id.* at 87–88.) Juror No. 6 did not say that she was intimidated by anything that occurred but attested to a general sense of nervousness based on the "environment." (*Id.* at 90.) She did not attribute this nervousness to the events of January 9 or any of the other concerns raised by the jury throughout the trial. (*Id.*) Rather, the Court concludes her reference to the "environment" was intended to mean general nervousness related to a lengthy and high-stake trial given that her response was prompted by the Court's general question regarding whether she felt "intimidated by anything that had occurred." (*Id.*) Juror No. 6 also confirmed that this sense of nervousness "didn't impact anything." (*Id.* at 90–91.) Further, when asked the more specific question of whether "the events of January 9 and

January 10, 2018 left [her] unable to [ ] serve as a fair and impartial juror" or keep an open mind, she responded that they did not. (*Id.*)

### 7. *Juror No. 7*

Juror No. 7 recalled both his time as a juror and the events of January 9. Specifically, he testified that Juror No. 4 raised concerns that he "claimed he saw, he thought, somebody taking pictures" and that Juror No. 4 was "very concerned and, you know, just a little scared." (*Id.* at 97.) He did not recall whether there was any further discussion of Juror No. 4's concerns but confirmed that he did not suggest raising those concerns to the Court. (*Id.*) Despite Juror No. 4's concerns, Juror No. 7 strongly affirmed that he was neither intimidated nor rendered partial by the events of January 9, 2018. (*Id.* at 98–99.)

### 8. *Juror No. 8*

Juror No. 8 recalled her service on the jury, but only recalled hearing the allegations regarding potential picture-taking "third-hand," that is, "from other jurors or alternates [rather than Juror No. 4]." (*Id.* at 104.) She further recalled that in that third-hand conversation, a juror had suggested raising Juror No. 4's concerns to the clerk. (*Id.* at 104–05.) She affirmed that these conversations did not intimidate her nor prevent her from remaining a fair and impartial juror. (*Id.* at 106.)

### 9. *Juror No. 9*

Juror No. 9 did not recall "every detail" but did recall his jury service and did recall the events of January 9, 2018. (*Id.* at 109.) He identified two jurors[11] as having raised concerns related to potential picture-taking and recalled that those concerns triggered the Court's contemporaneous questioning of the jury. (*Id.* at 111–12, 115–16.) However, he described those concerns as

---

[11] From his description, the Court finds that Juror No. 9 identified Jurors No. 1 and 4.

"nothing concrete, but they had suspicions" and that he "didn't know anything about it really . . . didn't suspect anything." (*Id.* at 112.) He also twice confirmed that the other jurors' concerns did not intimidate him or render him unable to be an impartial juror. (*Id.* at 110, 113.)

### 10. Juror No. 10

Juror No. 10 recalled his service as a juror and recalled "hearing discussions" about potential picture-taking but could not remember what specifically was discussed or even which jurors engaged in those discussions. (*Id.* at 121.) However, he affirmed that he did not participate in any discussions or raise any concerns and that he was able to remain a fair and impartial juror through the remainder of the trial. (*Id.* at 123–24.)

### 11. Juror No. 11

Juror No. 11 recalled his service as a juror and the events of January 9, 2018.  He corroborated Juror No. 4's account that "there was someone sitting outside, right across from where we would go in and out, with a camera that would seem to be taking picture or videos . . . the way it was sitting." (*Id.* at 128.)  Notably, while his informal testimony at trial corroborated that somebody was holding a phone, Juror No. 11 had stated that he "did not think they appeared to be taking pictures [and d]escribed them generally as holding a phone in a natural position." (Jan. 9, 2018 Tr. at 156.)  The discrepancy in Juror No. 11's testimony may be explained by the fact that he also recalled discussions by two or three other jurors that "there was someone out there, was she taking pictures.  There was some concern she was taking pictures, but nothing more than that that I remember." (May 10, 2021 Tr. at 129.)  Given that he was aware of conversations regarding potential picture-taking, it is possible that Juror No. 11 conflated those discussions with his own personal recollections of January 9, 2018.

22

In either case, Juror No. 11 recalls the discussion as not raising concerns, but rather speculating as to the purpose of any potential picture-taking. (*Id.* at 130 ("[I]t wasn't like a, oh, my gosh, someone's taking pictures. They were just kind of like, what are they doing?").) On follow-up questioning, Juror No. 11 confirmed that no juror described the incident as "serious" and that although people wondered "why they were doing it" there was "nothing like being intimidated or afraid or scared or anything like that." (*Id.* at 134.)

He also confirmed that he was not intimidated, but rather that any issue "was handled" when the Court started "not allowing anyone to take cameras or phones into the courtroom."[12] (*Id.* at 131.) After this assurance, Juror No. 11 "didn't think twice about it" and was able to continue as a fair and impartial juror. (*Id.* at 132.)

### 12. *Juror No. 12*

Juror No. 12 recalled her service as a juror and the events of January 9, 2018. (May 11, 2021 Tr. at 5–6.) She recalled that there was speculation regarding potential picture taking by one juror and that another juror suggested that those concerns should be raised to the Court. (*Id.* at 6–7.) On follow-up, Juror No. 12 confirmed that she was neither the person who suggested that concerns should be raised to the Court nor the person who reported those concerns to CSO Beverly. (*Id.* at 11–12.) She also affirmed that the events of January 9 did not intimidate her and that she was able to remain a fair and impartial juror for the remainder of the trial. (*Id.* at 8.)

---

[12] Here again, there is evidence that Juror No. 11 may have conflated events that occurred during the trial. From the outset of the trial, cameras in the courtroom had been prohibited by Standing Order of the Court. Juror No. 11 may instead be recalling the Court's curative instruction where he was informed that no photos were taken—or some other event entirely. In any event, the Court found the juror to be candid in his recollection and his affirmation of continued impartiality. Therefore, despite factual inconsistencies with Juror No. 11's testimony, the Court believes his ultimate conclusions regarding intimidation and impartiality can be credited.

23

### C. Non-Deliberating Jurors

In addition to the twelve jurors who deliberated, the Court took testimony from the alternate jurors who remained through the conclusion of trial. Although these alternates did not deliberate, their testimony provided context on the "entire picture" of the events of January 9, discussion of those events amongst the jury, and the impact of those events. *See Basham*, 561 F.3d at 319. The Court finds the following with respect to the non-deliberating alternate jurors:

### 1. Alternate Juror No. 3

Alternative Juror No. 3 recalled both her time on the jury and the events of January 9, 2018. She recalled that some concerns regarding picture taking were raised by a juror who was subsequently excused from service. (May 10, 2021 Tr. at 139.) She also stated that the jurors did not discuss Juror No. 4's allegations. (*Id.* at 140.) She confirmed that she was not intimidated by the events of January 9, 2018 and was able to remain impartial until she was excused at the end of trial. (*Id.* at 141.)

### 2. Alternate Juror No. 4

Alternate Juror No. 4 recalled both his time on the jury and the events of January 9, 2018. (*Id.* at 148–49.) He did not hear about Juror No. 4's claims directly, but rather heard about them during discussions about why Juror No. 4 had been excused from the jury. (*Id.* at 149.) While Alternate Juror No. 4 was skeptical of Juror No. 4's claims, he recalled that those claims were discussed and some jurors indicated that someone "could have been taking pictures[, although t]hey didn't say anything definite." (*Id.* at 151.) However, while these conversations were "roaming around," Alternate Juror No. 4 confirmed that they did not intimidate him nor affect his ability to remain fair and impartial. (*Id.* at 151–52.)

24

### 3. *Alternate Juror No. 5*

Alternate Juror No. 5 recalled her jury service and recalled events that raised concerns with the jurors, though not the specific date on which they occurred. (*Id.* at 158–59.) Although she did not recall any allegation of picture-taking, she recalled that a "juror[] was very concerned about the attention that the gallery, I guess you could call it, was paying attention to us." (*Id.* at 159.) She identified this juror as a "relatively young African-American girl," likely Juror No. 1. (*Id.*) She also recalled "one day there was a group of people that seemed to be in support of the [D]efendants that were kind of like congregating where we would have to leave the building." (*Id.* at 160.) In neither situation did she recall discussions of picture taking, and none of these events intimidated her or impacted her ability to continue to hear the evidence fairly and impartially. (*Id.* at 160–161, 164–65.)

### 4. *Alternate Juror No. 6*

Alternate Juror No. 6 recalled her service on the jury and the events of January 9, 2018. (*Id.* at 168–69.) Although Alternate Juror No. 6 was in the vestibule area at the time the alleged photographing occurred, she did not recall seeing anybody who appeared to be taking photographs of the jury. (*Id.* at 169.) She did, however, recall that following the break, one of the jurors "sort of freaked out." (*Id.*) On follow-up, she elaborated that by "freaked out," she meant that this juror became "very animated, he started talking real fast, you know, uncharacteristically. . . . I mean he was nervous, I think. I mean, I think he really did think that they were taking pictures, even though, you know, you had told us that they did not." (*Id.* at 176.) Aside from Juror No. 4, she didn't "really recall anybody [else] being overly concerned . . . [didn't] remember anybody thinking anything about it." (*Id.* at 177–78.) Alternate Juror No. 6 also stated that conversations about

25

potential picture taking amongst the other jurors were minimal, "[m]aybe to the point of, oh, really? . . . I don't remember people specifically talking about it." (*Id.* at 171.)

Alternate Juror No. 6 also confirmed that she was similarly not "freaked out" by the events of January 9, 2018, explaining that she "didn't really have a reaction. I mean, it—I don't get rattled. It is what it is. I trusted the Marshals and everybody else who were with us all the time were doing. I honestly paid it no real attention." (*Id.* at 176–77.)[13] Her affirmation that she was not "freaked out" was further supported by her testimony that she was not intimidated and remained fair and impartial for the remainder of the trial. (*Id.* at 173.)

### V. Analysis

The Court now turns to whether the entire record, as supplemented by the *Remmer* hearing, permits the Government to rebut the "presumption of prejudice by showing that there was no reasonable possibility that the jury was influenced by an improper communication." *Johnson,* 954 F.3d at 180 (internal quotation marks and citation omitted). A more granular parsing of the evidence produced at the hearing reveals that Juror No. 4's unsubstantiated allegations raised a few concerns with individual jurors, all of whom assured the Court that these concerns did not impact their impartiality. Often, unsubstantiated allegations that raise only scattered concerns are dismissed as "innocuous interventions" at *Remmer* step one. *See Small,* 944 at 497 (concluding that allegation of "individuals outside the jury room [ ] 'watching' [the jury]" and that "at least one of these individual was carrying a cellphone, though they could not tell if any videos or photographs were taken" did not require *Remmer* hearing); *Barahona,* 606 F. App'x at 66 (holding that Defendants did not trigger *Remmer* where "juror had the impression [defendant] had followed

---

[13] Although the Court did not make a formal finding to this effect, the Government also pointed out that in describing Juror No. 4's reaction, Alternate Juror No. 6 "characteriz[ed] his reaction with an almost bemused [tone]—you know, she was chiding him for overreacting." (*Id.* at 175.) Defendants did not object to this characterization.

26

her down a courthouse escalator and taken a picture of her with a cellphone" but "counsel reported

that she had checked [defendant's] phone, and that there were no pictures of any jurors").

The Court of Appeals' mandate makes clear, however, that this case cannot be resolved at

*Remmer* step one. Indeed, it explained that "[a] defendant seeking a *Remmer* hearing must present

[only a] 'credible *allegation*' that 'an unauthorized contact was made,'" even if that allegation is

later disproven. *Johnson*, 954 F.3d at 179 (emphasis added). It also concluded that such a showing

had been made at the time that Juror No. 4's concerns were initially reported to this Court. *Id.* at

180. The need for a step two hearing is also confirmed by the Court of Appeals' directive that this

Court consider not only whether photos were actually taken of the jury (that is whether an external

contact occurred), but also whether bias was created by either perceived picture taking or Juror

No. 4's report of picture taking. *See id.* at 181. The parties similarly agree that this case must be

decided at step two. (Mot. Reinstate at 2; Defs. Opp'n at 12.)

### A. Where Juror No. 4's Allegations are Presumptively Prejudicial

The evidentiary developments in this case also raise doubts as to whether Juror No. 4's

report, without an actual external contact, should be deemed presumptively prejudicial at *Remmer*

step two. Generally, to trigger *Remmer*'s presumption of prejudice, a defendant must "introduc[e]

competent evidence that the communications or contacts were more than innocuous interventions."

*Basham*, 561 F.3d at 319. That is, they "must *establish* both that an unauthorized contact was

made and that it was of such a character as to reasonably draw into question the integrity of the

verdict." *United States v. Small*, 944 F.3d 490, 504 (4th Cir. 2019) (emphasis added) (quoting

*Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988)). In considering whether an external

contact is "more than [an] innocuous intervention[]," *Basham*, 561 F.3d at 319, courts generally

look to five factors: "any private communication; any private contact; any tampering; directly or

indirectly with a juror during trial; about the matter before the jury." *Barnes*, 751 F.3d at 245 (citations omitted). Defendants concede that they cannot establish that any of these factors apply to this case in light of the complete record, given that the parties now agree that "as far as can be determined, no photos were actually taken. Instead, the incident was generated entirely by the jurors themselves." (Defs. Opp'n at 2; *see also* Mot. Reinstate at 15 ("[T]he allegation by the Former Juror No. 4 that a spectator had taken photographs of the jurors was simply not credible, and has not been borne out by the evidence.").) Under the Court of Appeals' mandate, this concession suggests that Juror No. 4's allegation is not entitled to a presumption of prejudice.

That mandate plainly entitles Defendants to a hearing on Juror No. 4's allegations, but is not as sanguine regarding a definite presumption of prejudice. The Court of Appeals' opinion suggests that Juror No. 4's allegations "entitled [Defendants] under *Remmer*: (1) to a rebuttable presumption that the *external* influence prejudiced the jury's ability to remain impartial; and (2) to an evidentiary hearing to determine 'what actually transpired' and whether the challenged contact was harmless." *Id.* at 180 (emphasis added). However, it later clarifies that when potential bias is "based on a factor *internal* to the jury's deliberative process" the district court must hold a *Remmer* hearing, but "the presumption of prejudice dictated by *Remmer* is inapplicable." *Id.* at 180 n. 2 (emphasis in original) (internal quotation marks and citations omitted). Thus, while the Court of Appeals "reach[ed] the firm conclusion that the defendants were entitled to an *evidentiary hearing* under *Remmer* to determine whether all the jurors remained impartial throughout the case" it came to no equivalent conclusion as to the presumption of prejudice. *Id.* at 182 (emphasis added). Defendants' concession that the photo incident was juror-made appears to preclude their entitlement to such a presumption. *Cf. Robinson v. Polk*, 438 F.3d 350, 362 (4th Cir. 2006) (internal citations and quotation marks omitted) ("[A]n influence is not an internal one if it (1) is

28

extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case . . . or (2) is an outside influence upon the partiality of the jury, such as private communication, contact or tampering . . . with a juror.").

Despite this, the Government willingly shoulders the presumption of prejudice and the associated burden of showing that there was "no reasonable possibility that the jury was influenced by an improper communication." *Johnson*, 954 F.3d at 180 (internal quotation marks and citation omitted); (*see also* Mot. Reinstate at 2–3 ("[T]he Fourth Circuit has already concluded that the alleged encounter between Juror No. 4 and spectators was a non-innocuous external contact . . . and the government bears the burden of showing that the external contact was harmless."). Thus, while the Parties agree that as a matter of *fact*, there was no external contact with the jurors in this case; they also agree that as a matter of *law*, Juror No. 4's report should be analyzed as an external contact. The Court, though skeptical, will adopt the parties' consensus view.

### B. The Remaining Analysis

Adopting the parties' view that this should be treated as an external influence creates significant analytical challenges due to the disparity between the facts and the legal presumptions that operate in this case at *Remmer* step two. The parties agree that the evidence shows that there was no external contact—no photos were taken—and the evidence further shows that Juror No. 4's report raised minimal concerns with the rest of the jury. This modicum of evidence must, however, be deemed presumptively prejudicial and scrutinized to ensure that there is "no reasonable possibility that the jury was influenced by an improper communication." *Johnson*, 954 F.3d at 180.

The difficulties in applying this rigorous scrutiny to such sparse evidence is exemplified by the parties' briefing, which propose diametrically opposed readings of the *Remmer* case law.

29

On the one hand, Defendants reads the case law to require near automatic reversal at step two unless no other jurors were made aware of a putative external contact. (Defs. Opp'n at 9 ("[T]he question to be resolved by the *Remmer* hearing in this case is whether there is any reasonable possibility that the Photo Incident had *any* influence on any juror.))[14]  Indeed, their proposed test is at times so demanding that it is difficult to reconcile with the Court of Appeals' decision to remand for a *Remmer* hearing rather than a new trial. *See infra*, Part V.E.2.b.  On the other hand, the Government parses the same case law to argue that the Court must look well beyond the putative external contact and also consider factors such as the strength of the Government's case in determining the likelihood of prejudice. (Mot. Reinstate at 3.)  On this view, presumably, even more material concerns of juror intimidation than those presented in this case may be ameliorated by robust evidence of guilt. (*Id.* at 30 ("[I]n light of th[e] evidence, there is no reason to believe that the alleged photographing incident had any impact whatsoever on the integrity of the verdict in this case.").

Given the stakes of this case, the Court will engage with the full spectrum of analytical complexity presented by the parties' arguments and the *Remmer* case law.  At times, disentangling the finer points of these arguments requires tedious or convoluted discussion.  That said, this case is ultimately quite straightforward.  The Court of Appeals' mandate is direct: "determine whether all jurors remained impartial throughout the case, as guaranteed by the Sixth Amendment." *Johnson*, 954 F.3d at 180; *see also United States v. Olano*, 507 U.S. 725, 738 (1993) ("[A] presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry:

---

[14] (*See also* ECF No. 911 at 10 ("[T]he only factual question remaining for determination in the upcoming hearing is whether any of the remaining jurors were aware of Juror No. 4's report.  If so, Defendants are entitled to a new trial.")); (ECF No. 919-1 at 8 ("The result required here [is] a new trial if any of the deliberating jurors was aware of the Photo Incident.")); (ECF No. 989 at 14 ("[O]nly if all of the Remaining Jurors and Alternates were able to put the incident completely out of their minds after it occurred [can there] be no 'reasonable possibility' that any of them were influenced by it in reaching their verdict.").)

Did the intrusion affect the jury's deliberations and thereby its verdict?"). It also provides specific

guidance as to the factual developments and considerations necessary to make this assessment. *Id.*

at 180–81; *see also supra* Part III. The *Remmer* hearing showed that a few jurors raised concerns

about Juror No. 4's report and that the jury briefly discussed those allegations. *See supra* Part IV.

It also established that there was no substance to Juror No. 4's allegations; that any concerns the

jury had did not affect their ability to remain impartial; and that sporadic conversations about the

allegations rapidly dissipated. *Id.* On this fully developed record it is clear to the Court that there

was "no reasonable possibility that the jury was influenced by an improper communication."

*Johnson*, 954 F.3d at 180.

In further elaborating this conclusion, the Court notes that the factual developments from

the *Remmer* hearing significantly narrows the sources of potential prejudice enumerated by the

Court of Appeals. In its mandate, the Court of Appeals suggested four ways in which the allegation

of photographing may have prejudiced the jury. *See supra* Part III. Of those four, only one,

"whether any remaining jurors were prejudiced by Juror #4's stated concerns," remains plausible

given that no photographing occurred or was perceived by the remainder of the jury. *Johnson*, 954

F.3d at 181. Accordingly, the Court's remaining analysis will focus on "the impact of Juror #4's

statement on other members of the jury" and whether that impact created a reasonable possibility

that an "external influence affect[ed] the jury's decision-making." *Id.* at 179 (internal quotation

marks and citations omitted). Such a reasonable possibility exists "[i]f even a single juror's

impartiality is overcome by [ ] an external influence." *Id.* at 180 (internal quotation marks and

citation omitted).

31

### C. The Parties' Positions

The Government argues that they have rebutted the presumption of prejudice and shown that there is no reasonable possibility that Juror No. 4's report influenced the jury based on the test articulated by the Fourth Circuit in *Basham*. (*See* Mot. Reinstate at 3.) Under *Basham*, "[c]ourts look at a variety of factors" in determining whether "there exists no reasonable possibility that the jury's verdict was influenced by an improper communication." *Id.* at 320. Those factors include "(1) the extent of the improper communication, (2) the extent to which the communication was discussed and considered by the jury, (3) the type of information communicated, (4) the timing of the exposure, and (5) the strength of the Government's case." *Id.* The Government argues that all five factors enumerated in *Basham*, and particularly the overwhelming evidence against Defendants, confirms that they have met their burden under *Remmer*. (Mot. Reinstate at 4–31.)

Defendants' opposition raises various independent arguments as to why the Government has failed to make the requisite showing under *Remmer*. These arguments can initially be placed into two categories. First, Defendants argue that the Court failed to "conduct an inquiry broad enough to lead it to a reasonable judgment that there has been no prejudice on an assumption as to the facts favorable to [the] defendant's claim." (Defs. Opp'n at 13 (alteration in original) (quoting *United States v. Williams-Davis*, 90 F.3d 490, 499 (D.C. Cir. 1996)), ECF No. 1023.) Though unstated, the conclusion of these arguments appears to be that the Government is unable to meet its burden of proof irrespective of the testimony adduced at the *Remmer* hearing.

Second, Defendants argue that "despite the Court's errors" in structuring the *Remmer* hearing, that hearing "made clear that there is a reasonable possibility that one or more jurors was influenced by the Photo Incident." (Defs. Opp'n at 14.) They primarily urge this Court to apply an "objective test, assessing for itself the likelihood that the influence would affect a typical juror."

(*Id.* at 15.) Defendants further claim this assessment is foreordained because "[w]hen the Court learned of the incident it 'immediately recognized its seriousness'" and acted upon this assessment in dismissing Juror No. 4. (*Id.* at 16.) Defendants conclude that in dismissing Juror No. 4, "the Court made an independent determination, using an objective standard, that the incident was likely to influence a typical juror." (*Id.*) This independent determination of the potential for bias, Defendants contend, also extends to any other juror "who was aware of the Photo Incident and might believe 'that something was going on in that regard.'" (Defs. Opp'n at 10 (quoting Jan. 9, 2018 Tr. at 163).)

The Court begins its own analysis with the preliminary question of whether the structure of the *Remmer* hearing was able to "effectively eliminate[] any concerns that [any] juror's ability to remain impartial may have been compromised by his [or her] perceptions and conclusions regarding the activity observed." *Johnson*, 954 F.3d at 182.

### D. Defendants' Structural Arguments

In arguing that the *Remmer* hearing was fundamentally defective, Defendants take issue both with questions the Court did ask, and with the Court's refusal to ask certain questions proposed by Defendants. Both objections fall within this Court's "broad discretion in choosing how to handle a claim of juror bias." *Basham*, 561 F.3d at 321 n. 9 (rejecting defendant's "contention that the district court failed to adequately investigate the issue of prejudice by failing to further question the jurors"). This includes "ample leeway to formulate the questions to be asked." *United States v. Smith*, 919 F.3d 825, 834 (4th Cir. 2019) (citing *United States v. Barber*, 964, 967 (4th Cir. 1996) (en banc)). While that significant discretion is circumscribed somewhat by the Court of Appeals' mandate, nothing in that mandate required this Court to ask the questions requested by Defendants or refrain from asking the questions it posed to the jurors.

33

This leaves only an analysis of whether the questions asked at the *Remmer* hearing were "appropriate inquiries of each of the jurors as to their knowledge of the incident and whether it [affected] their ability to be fair and impartial." *United States v. Beasley*, 824 F. App'x 154, 157 (4th Cir. 2020); *see also Williams-Davis*, 90 F.3d at 499 ("[W]here the court conducts an inquiry broad enough to lead it to a reasonable judgment that there has been no prejudice, on an assumption as to the facts favorable to defendants' claim, it has fulfilled its procedural as well as its substantive duty."). The Court concludes that the questions asked at the *Remmer* hearing were sufficient "to determine whether all of the jurors remained impartial throughout the case," *Johnson*, 954 F.3d at 182, and that the additional questions proposed by Defendants were unnecessary and likely would have been counterproductive.

### 1. *Sufficiency of Questions Asked*

The questions asked by the Court followed the conventional *voir dire* model under which "[d]istrict courts are encouraged to take [a] direct approach to detect bias in jurors." *Smith*, 919 F.3d at 834. To do so, a court asks "about bias directly" then "consider[s] the jurors' reactions, and, where necessary, follow[s] up." *Id.* The Court supplemented this direct approach to the bias inquiry with questions designed to elucidate other key, substantive matters identified by the Court of Appeals, such as "whether anyone had attempted or threatened to take photographs of the jury[;] . . . the impact of Juror #4's statement on other members of the jury[;]" and if "one or more jurors may have *felt* intimidated regardless" of whether photographs were in fact taken. *Johnson*, 954 F.3d at 181 (emphasis in original). Again, where appropriate, the Court asked follow-up questions either *sua sponte* or when requested to do so by the Parties.

Defendant avers that this conventional approach was "insufficient to provide the Court with the factual information necessary to make the determination required here, obfuscated, rather than

illuminated, the relevant facts, and w[as] irrelevant to the independent determination the Court was required to make." (Defs. Opp'n at 14.) They do not provide examples from the hearing, but rather refer back to their pre-hearing memoranda in support of this argument. (*See id.* (citing ECF No. 989 at 12–14).) There, Defendants argued that "only if all of the Remaining Jurors and Alternates were able to put the incident completely out of their minds after it occurred that there can be no reasonable possibility that any of them were influenced by it in reaching their verdict." (ECF No. 989 at 14 (internal quotation marks omitted).) Thus, despite the Court of Appeals' explicit mandate to "consider whether the defendants' associates had in any way intimidated the jurors" and "determine whether all jurors remained impartial throughout the case," *Johnson*, 954 F.3d at 181, 183, Defendants argue that the Court's inquiries as to "whether [the jurors] felt intimidated by anything that had occurred" and "whether they were able to remain an impartial juror and keep an open mind," were improper (Defs. Opp'n at 13–14), because they "fail[ed] to address other ways in which the jury may have been 'influenced' by the Photo Incident."[15] (ECF No. 989 at 12.)

Defendants' argument misconstrues the relationship between influence and partiality in the *Remmer* context. As explained by the Court of Appeals, "[a] defendant's Sixth Amendment right . . . is violated if an influence outside the jury's deliberative process . . . affects the jury's

---

[15] At the hearing, Defendants raised a related argument that these questions may be insufficient because "the Court asked the juror[s] whether [they] could remain impartial without explaining to the juror what impartial means." (May 10, 2021 Tr. at 30.) They stated that this could create confusion because, in their view, "there is a significant difference between the ordinary understanding of the word impartial as being open minded and the definition of that term for Sixth Amendment purposes." (*Id.*) Defendants do not press this argument in their briefing, and the Court has been unable to identify any support for this proposition. Rather, the case law strongly suggests that jurors are presumed to understand what it means to be impartial and that "if a district court views juror assurances of continued impartiality to be credible, the court may rely upon such assurances." *United States v. Jones*, 716 F.3d 851, 857 (4th Cir. 2013); *see also Smith*, 919 F.3d at 835 (citation omitted) ("[L]eft only with jurors who had assured him of their continued impartiality, the trial judge acted well within his discretion in denying the requested mistrial."). Here, the Court repeatedly found that the jurors understood the crux of the Court's questions regarding impartiality and Defendants have not identified situations where any juror indicated confusion regarding the meaning of the term "impartial." (*See, e.g.*, May 10, 2021 Tr. at 31, 45.) Accordingly, the Court will treat the jurors' assurances of impartiality as facially credible and consistent with that term as it is used throughout the *Remmer* case law.

decision-making." *Johnson*, 954 F.3d at 179 (citing *Barnes*, 751 F.3d at 240). This occurs "[i]f even a single juror's impartiality is overcome by such an external influence." *Id.* (internal quotation marks and citation omitted). The core inquiry is not, therefore, whether a juror was "influenced" by Juror No. 4's report but whether their impartiality was overcome by that influence. Thus, influence is not a stand-alone endpoint of the *Remmer* inquiry, but rather a potential cause of juror partiality or bias. This causal relationship is exemplified by the Court of Appeals' discussion of juror intimidation. As the Court of Appeals explained in summarizing their analysis, the circumstances surrounding Juror No. 4's "creat[ed] a direct concern of potential or actual juror intimidation *and resulting bias*." *Id.* at 182 (emphasis added). Thus, inquiries into intimidation, or other forms of juror influence, are only useful insofar as they inform the Court's ability to reach a "conclusion here [as to whether] the jurors remained impartial." *Id.*

Properly understood, the Court's questioning did not "fail to address other ways in which the jury may have been influenced by the Photo Incident" (ECF No. 989 at 12), or "obfuscate[], rather than illuminate[], the relevant facts." (Def. Opp'n at 14.) Rather, it followed the conventional practice of going directly to the heart of the matter: "whether all the jurors remained impartial throughout the case." *Johnson*, 954 F.3d at 182. It prefaced this inquiry by priming the jurors to consider likely influences arising from Juror No. 4's report—such as intimidation or close mindedness—that may have caused a juror to be biased against Defendants.

The open-ended and flexible nature of the inquiry also ensured that the Court and the parties had the opportunity to identify and explore any potential biases plausibly raised by each juror's testimony. For example, when Alternate Juror No. 6 recalled that Juror No. 4 was "freaking out," the Court fully explored what Alternate Juror No. 6 meant by that phrase. (*See* May 10, 2021 Tr. at 176.) The Court also discussed with the juror whether any other members of the jury were

similarly concerned by Juror No. 4's report. (*Id.* at 176–77.) Thus, although the Court employed the conventionally direct methodology used when inquiring into juror bias, it was not relying on a rote recitation of the pre-hearing list of questions. Rather, it used those questions to answer the core inquiry and also to spark juror reflection on whether and how Juror No. 4's statements and worries might have impacted their ability to remain open-minded and impartial. If a juror or a party provided the Court with a plausible reason to ask additional questions, it did so. Ultimately, the jurors' universal and credible assurances of continuing impartiality provided the Court fewer opportunities for extended follow-up than Defendants may have preferred, but the Court remains convinced that the jurors were provided with sufficient prompts to search their memories and reflect on how their mental processes were or were not affected by the events of January 9, 2018, and whether their ability to continue on with impartiality had been disturbed. The Court finds no issues arising from the nature and scope of questions posed to the jurors at the *Remmer* hearing.

### 2. Failure to Ask Additional Questions

Defendants also fault the Court for failing to ask additional questions they proposed at the *Remmer* hearing. While their briefing suggests this critique is generalized to every question proposed by the Defendants but rejected by the Court, their papers press only two questions which they identify as the "most important[]" omissions.[16] (Defs. Opp'n at 13.) Neither of these questions would have benefitted the *Remmer* inquiry.

---

[16] The Court rejected in part and adopted in part Defendants' other proposed modifications by prior written Memorandum. (ECF No. 998.) With respect to questions Defendants do not continue to press in their present briefing, the Court concludes that its prior reasoning rejecting those questions fell well within its "ample leeway to formulate the questions asked." *Smith*, 919 F.3d at 834. With the benefit of hindsight, the Court can confirm its predictions that many of these additional questions were unnecessary to the hearing and risked harassing or confusing the jurors. *See* Fed. R. Evid. 611.

    That said, the Court acknowledges that Defendants also provided several key suggestions that were incorporated into the Court's questioning of the jurors. For instance, they correctly pointed out that the Court's initial description of Juror No. 4's report in its background statement was "far [too] restrained and measured," leading the Court to revise that statement to more accurately portray Juror No. 4's report. (*See* ECF No. 998 at 3–4.) Similarly, they identified that inquiries into why the jury reported Juror No. 4's concerns may be probative as to whether they

### a. How Juror No. 4 and Alternates Would Have Deliberated

First, Defendants argue that the Court should have asked "Juror No. 4 and the Alternate Jurors who did not deliberate . . . whether the Photo Incident would have affected their ability to remain impartial had they not been dismissed from service." (Defs. Opp'n at 13.) As a preliminary matter, the Court did ask this question of the non-deliberating alternate jurors. (May 10, 2021 Tr. at 141, 152–53, 161, 173.) Thus, Defendants may instead be arguing that the Court should have asked the jurors who did not deliberate about how Juror No. 4's report would have hypothetically *affected their deliberations*, and presumably, their verdict. (*See id.* at 18–19, 142–43; *see also* ECF No. 1005 at 3.) Neither inquiry would have been productive.

Both inquiries are also facially inconsistent with the rest of Defendants' briefing, which argues this Court should make an objective assessment as to the risk of prejudice. (*See* Defs. Opp'n at 10.) Under this objective test, "a district court must ignore a juror's comment regarding how a particular piece of material disposed the juror toward a particular verdict." (*Id.* (quoting *United States v. Paneras*, 222 F.3d 406, 411 n. 1 (7th Cir. 2000)). Thus, one part of Defendants' brief chides the Court for not asking a question and another part of the brief would have the Court ignore the answer to that same question. However, as the Court ultimately rejects Defendants' proposed objective framework, it also considers whether these questions would have been beneficial to the correct *Remmer* inquiry, which considers the juror's individual reactions to Juror No. 4's allegation. *See infra* Part V.E.

---

harbored similar concerns, which led the Court to incorporate that additional inquiry. (*Id.* at 9.) Similarly, Defendants' counsel pointed out various times during the hearing where clarification of testimony would be beneficial to the inquiry, with the Court adopting several of these lines of questioning. (*See, e.g.*, May 10, 2021 Tr. at 18–19, 60–63.)

In sum, while the Court ultimately disagrees with Defendant on the propriety of several of their proposed questions, it does not with those disagreements seek to obscure the significant and consequential role of defense counsel in shaping the questioning that actually occurred.

### i.  Non-Deliberating Alternates

The Court concludes that even though a juror's subjective ability to remain impartial is relevant to the *Remmer* inquiry, Defendants' proposed questions remain only marginally helpful. The best subjective evidence of the deliberating jurors' partiality is gained from the deliberating jurors themselves.  This is particularly true because each juror's attestation of impartiality stands alone.  *See Smith*, 919 F.3d at 835 (approving of court's decision to "excuse[] those jurors who, by their answer or demeanor, suggested they could not be fair or impartial" but deny mistrial when "[l]eft only with jurors who had assured [the court] of their continued impartiality").  Thus, asking whether jurors who did *not* deliberate would have done so impartially provides little help to the Court in making the determination of whether those who did deliberate were able to do so impartially.  The value of this question is diminished even further because the Court did ask each alternate whether Juror No. 4's report impacted their ability to remain open minded and impartial and each affirmed that it had not.

### ii.  Juror No. 4

The subjective testimony of Juror No. 4 would also have been unhelpful in determining if the jurors who did deliberate remained impartial.  Two additional problems with Juror No. 4's testimony are also worth noting.  First, Juror No. 4 believed photographs were being taken of the jury, whereas other jurors only heard of potential picture taking from Juror No. 4.  Thus, the relationship between Juror No. 4 and the rest of the jury is similar to that described in *United States v. Hines*, where a juror discussed perceived picture taking with his fellow jurors before being later informed by the court "that the photographs were not being made of the jurors, that there was no cause for concern, and that the matter should be disregarded." 717 F.2d 1481, 1491 (4th Cir. 1983) (emphasis added) ("Nor was the incident *further* discussed by him or the other jurors after he

conveyed the court's assurances to the other jurors."). Although the district judge in *Hines* heard from *only* the juror who saw the photos being taken, the Court of Appeals (both then and here) confirmed that this "effectively eliminated any concerns that the juror's ability to remain impartial may have been compromised by his perceptions and conclusions regarding the activity observed." *Johnson*, 954 F.3d at 182. The fact that the other jurors in *Hines* did not even need to be questioned about potential bias shows a clear distinction between jurors who perceive an external influence and those who may be affected by one through a secondhand report.

Other courts have made this distinction explicit, explaining that where "affected jurors only learn[] *indirectly* of the situation," the "analysis differs in notable respects from th[e conventional *Remmer*] paradigm." *United States v. Angiulo*, 897 F.2d 1169, 1184 (1st Cir. 1990) (emphasis in original) (questioning but not ultimately deciding whether a presumption of prejudice is applicable to indirect contacts). These cases, at a minimum, make clear that Juror No. 4's experience raises distinct concerns and that his assessment of continued impartiality would be an inexact approximation of that of the remainder of the jury.

Second, the gap between Juror No. 4's experience and that of the remainder of the jury is widened further by the Court's decision to excuse Juror No.4 prior to issuing a curative instruction on the morning of January 10, 2018. (*See* May 10, 2021 Tr. at 16.) Such instructions are critical to navigating complex trials, where "it is difficult to fully shield juries from the outside world." *Small*, 944 F.3d at 504. Jurors are "ordinarily presumed to obey curative instructions," *Prichard v. Kurucz*, 22 F. App'x 122, 125 (4th Cir. 2001), and at least one juror testified that the Court's instruction on January 10, 2018 helped them set aside any potential concerns. (May 10, 2021 Tr. at 77–78, 131); *see also United States v. Lawson*, 677 F.3d 629, 646 n. 21 (4th Cir. 2012) ("We note that [our] concerns are greater here because the district court only became aware of the juror

misconduct after the verdicts, and, thus, did not have an opportunity to take remedial action, such as giving a curative instruction."). Thus, Juror No. 4's experience was both more extreme and less mitigated than that of the remainder of the jury. The evidentiary value of his self-assessment as to how he, hypothetically, would have reached a verdict and whether that verdict would have been impacted by the events of January 9, 2018, is vanishingly small.

For all these reasons, there would have been a *de minimis* benefit to asking any of the non-deliberating jurors (including Juror No. 4) whether they would have improperly considered the events of January 9, 2018, if they had deliberated in this case. And declining to do so does not prevent the Court from determining "whether all the jurors [who did deliberate] remained impartial throughout the case." *Johnson*, 954 F.3d at 182.

### b. Whether Jurors Could Put January 9 "Out of their Minds"

Defendants also fault the Court for failing to ask the jurors "whether they were able to put the Photo Incident out of their minds after it occurred." (Defs. Opp'n at 13 (internal quotation marks omitted).) The supposed value of this question appears to derive from Defendants' view that "only if all of the Remaining Jurors and Alternates were able to put the incident completely out of their minds after it occurred that there can be no 'reasonable possibility' that any of them were influenced by it in reaching their verdict." (ECF No. 989 at 13; *see also* Defs. Opp'n at 10 (arguing that "the Court concluded that there was a reasonable possibility that the Photo Incident might influence a juror who was aware of it").) Even assuming the soundness of Defendants' argument that the juror's may have been influenced by mere awareness of Juror No. 4's report, the proposed question would have had minimal evidentiary value.

In direct evidentiary terms, this question was redundant; as the Court observed with respect to Juror No. 5, it was "[u]nquestionabl[e that] the matter was in her head. She's able to recall it

41

today when she's questioned about it, and with some specificity." (May 10, 2021 Tr. at 82.) This same observation would hold true for the remainder of the jury, all of whom were able to recall their time as jurors and, if only vaguely, the events of January 9, 2018. Thus, to the extent that "the question to be resolved at the hearing rested on a determination of which jurors were aware of the Photo Incident" (Defs. Opp'n at 11), that question was resolved in the affirmative without the need for further inquiry.

Further, although Defendants' proposed questions do not run afoul of the text of Federal Rule of Evidence 606(b), every unnecessary question is in direct tension with the principles that rule is intended to uphold. (*See* Defs. Opp'n at 13 (arguing this question is "not barred by Federal Rule of Evidence 606(b)").)  Specifically, Federal Rule of Evidence 606(b) is built on "[s]ubstantial policy considerations [that] support the common-law rule against the admission of jury testimony to impeach a verdict." *Tanner v. United States*, 483 U.S. 107, 119 (1987).  While *Remmer* hearings "do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process," *id.* at 120, "[t]he willingess of jurors to serve and to speak freely during deliberations depends on this no-impeachment principle." *United States v. Birchette*, 908 F.3d 50, 55 (4th Cir. 2018); *see also Tanner*, 483 U.S. at 120–21 ("[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny.").  Courts must balance this tension by ensuring that hearings regarding a jury's verdict do not "*stretch out* or [ ] turn adversarial, and thereby undermine the no-impeachment presumption." *Birchette*, 908 F.3d at 55–56 (emphasis added).  Entertaining unnecessary inquiries vitiates the compromise struck by Rule 606's prohibitions and exceptions. *See United States v. Boylan*, 898 F.2d 230, 258 (1st Cir. 1990) (quoting *United States v. Ianello*,

866 F.2d 540, 544 (2d Cir. 1989) ("[T]he scope of [the *Remmer*] inquiry 'should be limited to only what is absolutely necessary to determine the facts with precision.'").

Further, during a *Remmer* hearing, the Court must make "reasoned judgment in walking the line between detecting bias and creating bias." *Smith*, 919 F.3d at 834; *see also Small*, 944 F.3d at 505 (approving of district court's analysis that "[j]ust the questioning process could plant in jurors' minds the notion that perhaps something untoward is afoot"). To avoid both these concerns, the "encouraged . . . approach to detect bias in jurors" is to "ask[] about bias directly . . . . consider[] the jurors' reactions, and, where necessary, follow[] up." *Smith*, 919 F.3d at 834. The Court sees no merit to Defendants' contention that it should have deviated from this well-established approach and posed vaguer inquiries to the jurors. (*See* May 10, 2021 Tr. at 82 ("The question of whether something is in someone's head has an inherent vagueness to it . . . The [real] question is the significance that it is given . . . accordingly, my questions ultimately are designed to zero in on that issue.").)

In sum, the questions asked were "broad enough to lead [] to a reasonable judgment," *Williams-Davis*, 90 F.3d at 499, about "whether all the jurors remained impartial through the case, as guaranteed by the Sixth Amendment." *Johnson*, 954 F.3d at 182. Further, the questions the Court declined to ask would not have provided additional context necessary to make the ultimate decision in this case. Thus, the Court now turns to the question of whether the government has "rebutt[ed] the presumption of prejudice by showing that there was no reasonable possibility that the jury was influenced by an improper communication." *Id.* at 180 (internal quotation marks and citation omitted).

43

### E. Whether the Jury was Influenced by Juror No. 4's Report

As noted, the parties propose significantly different tests for assessing whether the Government has met its burden in this case. Defendants principally propose what they describe as an "objective test" which requires that the Court "assess[] for itself the likelihood that the influence would affect a typical juror." (Defs. Opp'n at 15.)[17] As "the Court [already] made an independent determination, using an objective standard, that the incident was likely to influence a typical juror," (id.), Defendants contend, that a new trial is warranted if any other juror "was aware of the Photo Incident and might believe 'that something was going on in that regard.'" (Defs. Opp'n at 10 (quoting Jan. 9, 2018 Tr. at 163).)

Although it does not use the same label as Defendants, the Government also proposes an objective test—that is, a test that does not consider the jurors' subjective assessment of their ability to remain impartial. Instead, the Government urges this Court to apply the factors that the Fourth Circuit enumerated in Basham, namely: "(1) the extent of the improper communication, (2) the extent to which the communication was discussed and considered by the jury, (3) the type of information communicated, (4) the timing of the exposure, and (5) the strength of the Government's case." 561 F.3d at 320.

The challenge with applying either Defendants' or the Government's test wholesale is that both address a type of external influence not present in this case. The Fourth Circuit has explained that an external influence raises concerns under Remmer if it "(1) is extraneous prejudicial

---

[17] Defendants' briefing repeatedly suggests that their approach is endorsed by the Government. (See Defs. Opp'n at 10, 15.) This appears to refer to the Government's initial briefing on the scope and structure of the Remmer hearing, which suggested the objective approach Defendants now adopt. (See ECF No. 909 at 6–7.) The Government has long since disavowed this position (see ECF No. 918 at 5 n. 1), and even in its initial briefing proposed a test drastically different than what Defendants now argue for. (ECF No. 909 at 3 (arguing the photo incident should be assessed under the Basham factors).) Ultimately, the Government's briefing speaks for itself; the Court merely notes that the filings in this case do not suggest that the Government has provided any imprimatur of correctness to Defendants' test.

information, *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact

at issue in the case . . . *or* (2) is an outside influence upon the partiality of the jury, such as 'private

communication, contact, or tampering . . . with a juror." *Robinson*, 438 F.3d at 362 (emphasis

added) (quoting *Remmer*, 347 U.S. at 229). The principal cases cited by the Government[18] and

Defendants[19] arise under facts implicating concerns of extraneous prejudicial information, where

an inquiry into the jury's subjective impartiality is unlikely to be probative. The concern in those

cases is that an unbiased jury has received "information that was not admitted into evidence but

nevertheless bears on a fact at issue," *Robinson*, 438 F.3d at 362, whereas here the concern is that

a jury may be biased in its consideration of properly admitted evidence. This distinction means

that cases arising from extraneous prejudicial evidence raise concerns that do not fully map onto

the analysis of an outside influence on a juror's partiality; a juror's use of a dictionary, for example,

simply does not raise "concern[s] of potential or actual juror intimidation and resulting bias."

*Johnson*, 954 F.3d at 182; *see also Lawson*, 677 F.3d at 646 (applying objective test similar to

*Basham* to "a juror's unauthorized use of a dictionary during jury deliberations").

---

[18] *See Basham*, 561 F.3d at 320 (emphasis added) ("The district court found that there was 'no showing' that the media outlets even provided any *information* to Wilson."); *United States v. Lloyd*, 269 F.3d 228, 238 (emphasis added) ("We are only concerned with the probable effect the *extraneous information* would have."); *Williams-Davis*, 90 F.3d at 499 ("[T]he material to which the jurors belatedly claimed exposure was in its essence cumulative of the trial evidence."); *United States v. Blumeyer*, 62 F.3d 1013, 1017 (8th Cir. 1995) ("[T]he foreman's question was intended to clarify a point of law, much as the juror's use of the dictionary in [other cases].").

[19] Notably, the case law cited by Defendants derives almost exclusively from the Second Circuit, which has been the predominant advocate for Defendants' particular variation of the objective test, though again, primarily in situations of prejudicial extraneous information. *See Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) ("[T]he extra-record information provided by Ms. Krainak was cumulative."); *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir. 1987) ("[T]he claim is made that a jury has considered extra-record information."); *United States v. Greer*, 223 F.3d 41, 52–53 (2d Cir. 2000) ("The court found that Baker has learned 'nothing of substance' about the case from his conversation with a third party."); *Boylan*, 898 F.2d at 258 ("[T]he juror not only reiterated his concerns about predisposition [to find defendants guilty] but stated that, during the trial, a questionable magazine article [about defendants' attorneys] had circulated in the jury room."); *but see United States v. Ianello*, 866 F.2d at 544 (applying objective test to inquiry into "whether the judge or marshal made ex parte statements to the jury, [and] what each said.").

Thus, while objective factors are still relevant in the context of a potentially prejudicial outside influence on the juror's partiality, *see Stockton*, 852 F.2d at 746 (analyzing objective factors related to prejudicial comment made to jurors at penalty phase), the primary concern in such cases is that the jurors will be *subjectively* prejudiced against the defendant. *Johnson*, 954 F.3d at 181 (emphasis in original) (explaining that "whether a photograph was taken was not dispositive of the prejudice inquiry, as one or more jurors may have *felt* intimidated regardless"). Thus, when considering a plausible allegation of prejudice arising from tampering rather than extraneous information, the primary consideration is the subjective effect of that external influence on the impartiality of individual jurors. *See, e.g., Barahona*, 606 F. App'x at 66, 68 (finding that the "district court . . . did not err in failing to find actual bias" where the "juror had the impression Barahona had followed her down a courthouse escalator and taken a picture of her with a cellphone" because the "district court asked [the juror] whether the incident with Barahona caused her 'any concern whether she can continue to be a fair juror in this case,' and the juror answered clearly, 'no, it does not.'").[20]  This analytical priority is carried through in the Court of Appeals' mandate, which directs this Court to "consider the *effect* on the jurors of the perceived external contact" including assessing whether "one or more jurors may have *felt* intimidated" and, more generally "the impact [of Juror No. 4's report] upon the juror[s], and whether or not it was

---

[20] *See also Hines*, 717 F.2d at 1491 (affirming district court's finding of no prejudice from alleged photographing of a juror where "juror Denton indicated that after receiving the court's assurances, he was not concerned about the photographing and the incident did not affect his deliberations . . . [and] [t]he district court considered Denton's testimony credible."); *Smith*, 919 F.3d at 834 (approving of judge's handling of "jurors' fears of gang retaliation" where court "excused jurors who, by their answers or demeanor, suggested they could not be fair and impartial [because] [l]eft with only jurors who had assured him of their continued impartiality, the trial judge acted well within his discretion."); *United States v. Beasley*, 824 F. App'x 154, 157 (4th Cir. 2020) (affirming district court's determination of no prejudice where "a man walked up very close behind [a juror] and said 'I'm gonna get a hit tonight. Oh yeah, I'm gonna get a hit tonight" where "[e]ach of the jurors [who heard of the incident] attested to their ability to be impartial."); *Cf. United States v. Edwards*, 188 F.3d 230, 236 (4th Cir. 1999) (approving of district court's decision to dismiss juror who received a phone call and was told "those . . . two brothers need your help" because juror testified that the call "had 'surprised' and 'scared' him, that he was 'shocked' that someone had his telephone number, and that he had trouble sleeping after the call.").

prejudicial." *Johnson*, 954 F.3d at 180–81 (emphases in original). The Court of Appeals also highlighted *Hines* as the paradigm for "effectively eliminat[ing] any concerns that the juror's ability to remain impartial may have been compromised." *Id.* at 182 (citing *Hines*, 717 F.2d 1481 (4th Cir. 1983)). The court in *Hines* found that those concerns had been eliminated when "[a]t a post-trial hearing . . . [the] juror [ ] indicated that after receiving the court's assurances, he was not concerned about photographing and the incident did not affect his deliberations." 717 F.2d at 1491.

These cases make clear that the appropriate analysis in the context of an allegation of an "outside influence upon the partiality of the jury," *Robinson*, 438 F.3d at 362, begins with an individualized, subjective inquiry as to whether the jurors were able to remain impartial. *See Johnson*, 954 F.3d at 179 (internal quotation marks and citation omitted) (noting that "[i]f even a single juror's impartiality is overcome by such an external influence, the defendant's right to an impartial jury has been compromised"). When making this assessment, a court "may rely on a juror's assurance of continued impartiality if the court finds it credible," that is, unless a juror "by their answers or demeanor, suggest[s] they [cannot] be fair and impartial." *Smith*, 919 F.3d at 835 (quoting *United States v. Jones*, 716 F.3d 851, 857 (4th Cir. 2013)).

Courts supplement this subjective inquiry by considering objective factors regarding the external contact. These objective indicia may lend credibility to a juror's assurance of impartiality. *Hines*, 717 F.2d at 1491 (affirming district courts finding of no prejudice and noting that "the incident [was not] further discussed by . . . the other jurors after [the directly affected juror] conveyed the court's assurances to the other jurors"). Or, particularly egregious objective circumstances may render a juror's assurances of impartiality categorically incredible. *Stockton*, 852 F.2d at 746 (finding *Remmer* presumption not rebutted without inquiry into subjective effect

47

on jurors where "rather prominent local figure" told jurors "they ought to fry the son of a bitch [defendant]," and then engaged in "several minutes of conversation [with] the jurors, the subject of which is unknown"). In short, the court should consider the juror's assurances of impartiality against the backdrop of "the entire picture, including the factual circumstances and the impact on the juror." *Basham*, 561 F.3d at 319.

### *1. Subjective Impartiality*

The Parties disagree whether the jurors' assurances of impartiality establish that there was "no reasonable possibility that the jury was influenced by an improper communication" in light of other testimony indicating that jurors may have been concerned or intimidated. *Johnson*, 954 F.3d at 180. To show that there remained a reasonable possibility of bias despite these assurances, Defendants points to the three jurors (Nos. 1, 5, and 6) who directly testified that they were "concerned," "intimidated," or "nervous" as well as testimony by jurors and court personnel that certain jurors (identified by description, not name)[21] were "very concerned" and asked, "is this going to be a problem?" (Defs. Opp'n at 11–12.) The Government rejoins that, placed in context, these statements either do not identify concerns arising from Juror No. 4's allegations or are insufficient to undermine confidence in any juror's assurance of impartiality. The Court agrees that the scattered concerns raised by the jurors are insufficient to raise a reasonable possibility of subjective "juror intimidation *and resulting bias*." *Johnson*, 954 F.3d at 182; *see also supra*, Part V.A.i. None of the proffered testimony suggests that a juror's "impartiality [was] overcome" by their concerns. *Johnson*, 954 F.3d at 179.

---

[21] Based on the descriptions, the Court believes this testimony references Jurors No. 1 and 2, respectively.

### a. *Juror No. 1*

Juror No. 1 testified that when she heard Juror No. 4's report, she was "concerned, just like everyone else, for my safety and well-being." (May 10, 2021 Tr. at 27.) When asked whether the report intimidated her, she stated, "[p]ersonally, I wouldn't say intimidated," but then backtracked, explaining, "I guess you could say intimidated then, if my picture was being taken, I was definitely concerned." (*Id.* at 28.) One other juror corroborated these concerns, noting the Juror No. 1 "may have been a little worried. I guess she was questioning what was going on." (*Id.* at 115 (Juror No. 9).) Another juror suggested she may have raised more general concerns, stating that Juror No. 1 "was very concerned about the attention that the gallery . . . was paying to us." (*Id.* at 159 (Alternate Juror No. 5).)

Juror No. 1's testimony presented the most concerning risk of prejudice arising from Juror No. 4's report. First, she adopted the Court's use of the word "intimidated," candidly acknowledging that this could fairly characterize her reaction to Juror No. 4's report and that she "was definitely concerned" if her "picture was being taken." (*Id.* at 28.) Second, two other jurors singled out Juror No. 1 in recalling persons who were "a little worried" by Juror No. 4's report and by the circumstances of the trial more generally. No other juror was similarly highlighted.

In sharp contrast, though, Juror No. 1 strongly rejected the notion that her concerns had rendered her an impartial juror. (*Id.*) Juror No. 1 was adamant that she was "absolutely" able to "remain an impartial juror and . . . to keep an open mind as the trial continued." (*Id.* at 28.) None of the other jurors presented the Court with such mixed testimony, and indeed, both parties requested follow-up questioning of Juror No. 1. (*See id.* at 29–31.) Though the Court acknowledged this tension, it declined to further question Juror No. 1 given the compelling non-verbal evidence of her ability to remain impartial.

49

As the Court explained, contrasting her confidence in affirming her impartiality with her circuitous admission of concern, Juror No. 1's assurance of impartiality was credible. The Court concluded that "[o]nce someone had raised the possibility that pictures were being taken, [Juror No. 1] was concerned. She also indicated some generalized concerns through this trial, as one would expect any person to have after they heard the evidence that was presented." (*Id.* at 32.) On the other hand, "she became quite emphatic that she remained open minded . . . [h]er words said that much, but her body language and the intensity with respect to how she expressed that view is what is persuasive to the Court." (*Id.*)

This emphatic affirmation also convinced the Court that further questioning of Juror No. 1 was ultimately unnecessary. While the parties urged the Court to inquire further into the precise quantum of Juror No. 1's concerns and whether they were ameliorated by the Court's curative instruction, at bottom, "[t]he question of juror bias is to be resolved by the trial judge's assessment of demeanor and credibility." *Perkins v. Lee*, 72 F. App'x 4, 14 (4th Cir. 2003). At a *Remmer* hearing each additional question must be carefully considered because each unnecessary question frustrates the insulation normally accorded to jurors. *See supra* Part V.D.2.b. Thus, the Court must be especially sensitive to its unique position to "make judgments about the impartiality and credibility of potential jurors based on the judge's own evaluation of demeanor evidence and response to questions," in order to limit the scope of questioning to inquiries necessary to make a determination as to the juror's impartiality. *United States v. Gutierrez*, 963 F.3d 320, 334 (4th Cir. 2020) (citation omitted). Here, Juror No. 1's responses to the questions asked made clear to the Court that additional questions would not have caused Juror No. 1 to flinch in her confidence as to her continued impartiality following the events of January 9, 2018.

This holds true even when Juror No. 1's responses are viewed in light of the entire record, including other juror's testimony of Juror No. 1's concerns. Despite some additional testimony that Juror No. 1 may have been concerned by Juror No. 4's report, the Court nevertheless continues to find Juror No. 1's assurances that she was able to set aside any concerns eminently credible. There may have been some concerns and even fleeting intimidation when she suspected her photo was being taken, but there was no "doubt in [her] mind," (*id.* at 28), that there was no "resulting bias." *Johnson*, 954 F.3d at 182.

### b. *Juror No. 2*

The testimony of the remaining jurors raises even fewer concerns of potential bias. First, Defendants also point out that the juror who reported Juror No. 4's concerns to CSO Beverly, asked him "is this going to be a problem?" (May 17, 2021 Tr. at 9–10.) Though she did not confirm this, based on CSO Beverly's description of the juror who approached him, the Court finds the juror who reported the incident was Juror No. 2. CSO Beverly also confirmed that when this juror asked him this question, she was not "flustered in any way" and that "she just wanted to know what [the incident] was. She didn't seem concerned. She didn't seem upset." (*Id.* at 11.)

Juror No. 2's own testimony corroborates CSO Beverly's view that she was not overly concerned about Juror No. 4's report. She explained that although "several people, and I have to include myself in that, were feeling a little uncomfortable[,] as far as picture taking, absolutely not, saw no evidence of that." (May 10, 2021 Tr. at 39.) She elaborated that in her view "nothing happened. I mean, nobody said anything to us as we walked in. And as I said, I saw nobody holding [a] camera here, there, or trying to hide it or anything." (*Id.*) Further given that "the Marshals were always watching us come in and out . . . I don't think people were worried about it." (*Id.*)

In addition to her view that nothing had occurred on January 9, 2018, Juror No. 2 confirmed that she remained open minded and impartial through the remainder of trial. (*Id.* at 41.) She explained that she "assume[d] we—had that been the case [that a juror was unable to remain impartial], I would assume that a juror would be expected to express that to someone in charge." (*Id.*) This cogent understanding of a juror's duty to remain impartial and disclose bias further assures the Court of the veracity of Juror No. 2's assurance of impartiality. (*Id.* at 46 ("[A]t the end of the day, [the Court must make] a bottom-line assessment of whether or not the government can demonstrate that the juror's ability to function fairly, impartially . . . prevailed. And [Juror No. 2's] answers and the emphasis that she has supplied in providing them, provides the Court with what it will need.").

### c. Juror No. 5

In response to the Court's questioning about Juror No. 4's report, Juror No. 5 acknowledged that it was "a little intimidating to think that could possibly have happened." (*Id.* at 77.) As the Government points out, however, Juror No. 5's concerns arose from the Court's curative instruction,[22] not from Juror No. 4's report. (*Id.* (attributing concerns to "when [the Court] shared the incident the next day in the courtroom, which was where I kind of heard the whole thing kind of come out.").) Further, Juror No. 5 clarified that she "believed everything [the Court] said. I'm just saying when I first heard it . . . that's in your head a little bit. But when you said everything was fine and there was nothing there, then that's what I went with." (*Id.* at 78.) She also affirmed

---

[22] The Government argues that this means that any concerns that Juror No. 5 may have had would have been the result of an *intrinsic* influence and therefore not properly within the scope of the *Remmer* inquiry. (Reply at 6.) Given that the curative instruction also summarized Juror No. 4's allegations, (Jan. 10, 2018 Tr. at 18), the Court is not sure that it can be deemed a wholly intrinsic influence. Nonetheless, because Juror No. 5 testified that the curative instruction remedied any concerns it raises, the Court need not definitively resolve whether those concerns should be properly construed as arising from an intrinsic or extrinsic source.

that there was no "doubt in [her] mind about" her continued impartiality and open mindedness following the Court's curative instruction. (*Id.*)

### d. Juror No. 6

The last juror who Defendants assert may have been prejudiced by the events of January 9, 2018, is Juror No. 6. Juror No. 6 testified that Juror No. 4 "w[as] concerned about what might have been happening" and that Juror No. 4 stated, "maybe we need to bring this up to someone because this is what I saw and it's concerning." (*Id.* at 87.)[23]   She also testified that, more generally, "we were all kind of nervous just being in that environment." (*Id.* at 90.)[24]   Juror No. 6 did not, however, state that she was intimidated by the events of January 9, 2018. She also affirmed her continued impartiality following those events. (*Id.* at 90–91.)

In sum, the Court cannot conclude that the jurors' across-the-board assurances of continued impartiality were impeached by testimony suggesting some jurors were initially made uncomfortable or even intimidated when they first heard Juror No. 4's report. *Johnson*, 954 F.3d at 181 (emphasis added) (requiring this Court to determine "whether all the jurors remained impartial" and to particularly consider "concern[s] of potential or actual juror intimidation *and resulting bias*"). In many cases, this discomfort was attributed not to Juror No. 4's report, but rather to the environment at trial—such discomfort does not implicate *Remmer* concerns. *See United States v. King*, 627 F.3d 641, 651 (7th Cir. 2010) (emphasis added) ("[T]he jurors' fears likely originated from the invocation of [defendant's] membership with the Latin Kings. As this

---

[23] Defendants attribute this sentiment to "several jurors." (Defs. Opp'n at 11.)  However, Juror No. 6's use of the singular in the next line of her testimony suggests that she intended to attribute this statement only to Juror No. 4. (May 10, 2021 Tr. at 87.)  Ultimately, the Court believes this distinction is immaterial.

[24] The Government also notes that Juror No. 6 said that this sense of nervousness "didn't impact anything." (May 10, 2021 Tr. at 90; *see also*, Reply at 7.)  Given the ambiguous nature of this statement, the Court is concerned that Juror No. 6 may have been speaking to the verdict, testimony that would be inadmissible under Federal Rule of Evidence 606(b).  Out of an abundance of caution, the Court will not consider this specific testimony in determining whether the Government has made the requisite showing in this case.

evidence was part of and *intrinsic* to the trial, there was no cause for inquiry."). While some jurors tied their concerns directly to Juror No. 4's report, those juror's reactions fell far short of the reactions that have been found to raise serious concerns of partiality. *See Edwards*, 188 F.3d at 236 (affirming dismissal of juror without asking about impartiality when juror testified that he was "surprised," "scared," "shocked," and "that he had trouble sleeping after [an external contact]" that occurred during jury deliberations).

The question before the Court is not, however, whether any individual juror was *in fact* prejudiced by Juror No. 4's report, but whether the Government has met their burden of showing that "there was no reasonable possibility" of prejudice. *Johnson*, 954 F.3d at 180. After considering the jurors' scattered concerns and their assurances of impartiality against the backdrop of an objective assessment of the events of January 9, 2018, the Court is convinced that there is no such reasonable possibility.

### 2. *Objective Factors*

The parties' briefing predominantly focuses on objective factors in disputing whether the Government has met its burden. Though their wholly disparate views of the appropriate analysis make a direct comparison of their arguments difficult, the parties essentially argue two points: (1) whether an objective assessment of the events of January 9, 2018 indicates that those events were likely prejudicial despite the jurors' assurances of impartiality; and (2) whether and how the strength of the Government's case should factor into the assessment of potential prejudice.

#### a. *Basham Factors Related to the Improper Communication*

The Government argues that this Court's assessment of potential prejudice should begin and end with the factors articulated in *Basham*, 561 F.3d at 320. In *Basham*, the Fourth Circuit explained that "courts look at a variety of factors in determining" whether there "exists no

reasonable possibility that the jury's verdict was influenced by an improper communication." *Id.*
*Basham* enumerated five factors as particularly relevant when assessing the nature of the improper
communication: "the extent of the improper communication, the extent to which the
communication was discussed and considered by the jury, the type of information communicated,
the timing of the exposure, and the strength of the Government's case."[25] *Id.* The *Basham* court
made clear that these factors are not exclusive or dispositive and that "courts look to a variety of
factors in determining if [the *Remmer*] standard has been met." *Id.* While the Government argues
for the use of only the enumerated *Basham* factors (Mot. Reinstate at 4–21), the Court ultimately
concludes that deviating slightly from those factors is appropriate in light of the nature of this
particular case.

In addition to the enumerated *Basham* factors, an important facet of the Court's objective
assessment is the objectively insignificant nature of what occurred on January 9, 2018. While the
Court of Appeals made clear that this fact is not dispositive, *Johnson*, 954 F.3d at 181, the Court
still finds it significant in assessing the potential risk of prejudice. This is especially so because
the Court issued a curative instruction that no photographs were taken and that the issue should be
disregarded. Jurors are "ordinarily presumed to obey curative instructions," *Prichard*, 22 F. App'x
at 125, and it appears that those jurors who had concerns readily adopted the Court's assessment
as dispositive of the issue. (*See* May 10, 2021 Tr. at 78 ("[W]hen you said everything was fine
and there was nothing there, then that's what I went with."); *id.* at 131–32 ("[W]e felt it was
handled . . . didn't really think twice about it once we knew that the cameras weren't coming back
in.").)  Thus, the Court's curative instructions appears to have significantly diminished the
potential prejudice arising from Juror No. 4's unsupported allegation. *See Hines*, 717 F.2d at 1491

---

[25] Given the parties' significant dispute as to the relevance of the strength of the Government's case, the Court
addresses this fifth factor in a separate section. *See supra* Part V.E.2.c.

("[J]uror Denton indicated that after receiving the court's assurances, he was not concerned about the photographing."); *cf. Lawson*, 677 F.3d at 646 n. 21 ("[C]oncerns [of prejudice] are greater here because the district court only became aware of the juror misconduct after the verdicts, and, thus, did not have an opportunity to take remedial action.").

Moving to the enumerated factors, the Court concludes that the "extent of the communication," has less probative value given the nature of the putative external influence in this case. *Basham*, 561 F.3d at 320. While *Basham* cites this factor as "the most important," *id.*, the Court of Appeals' mandate reflects that the critical inquiry in this case is the nature of the contact and its impact on the jurors. *Johnson*, 954 F.3d at 181. This difference of emphasis is logical given the differential concerns raised in *Basham* and this case. In *Basham*, the Fourth Circuit analyzed whether a juror's contact with media outlets had exposed her to prejudicial extraneous information. 561 F.3d at 320. On those facts, the length of the correspondence is directly proportional to the risk of prejudice. Not so here.

Insofar as the "extent of the communication" is probative, however, it further supports a finding that the contact was objectively not prejudicial. The *Basham* court found that "several phone calls to different media outlets, none lasting longer than six minutes" was a "minimal" amount of contact that did not raise concerns. *Id.* The Government points out that the contact here was both far less frequent and for far less time. (Mot. Reinstate at 4–5.) If the contacts in *Basham* were "minimal," the contact here was plainly *de minimis*. *See Basham*, 561 F.3d at 320 (quoting *United States v. Sampson*, 486 F.3d 13, 41–42 (1st Cir. 2007)) ("[N]o prejudice where communication between juror and witness . . . was 'terse, fortuitous, and devoid of substantive content.'").

56

For similar reasons, the "type of information communicated" is not a particularly useful indicia of prejudice. This assessment generally looks to whether "such information was [ ] cumulative of what the jury had already heard." *Basham*, 561 F.3d at 320; *see also United States v. Butler*, 822 F.2d 1191, 1196 (D.C. Cir. 1987) (finding no prejudice where external contact "did not provide the juror with any crucial extra-judicial information"). While one could argue (as the Government does) that this is the appropriate lens through which to consider the fact that no external contact actually occurred (Mot. Reinstate at 12–14), given the non-exhaustive nature of the *Basham* factors the Court sees no need to use this factor for that inquiry. As the Court has already addressed that facet of the incident above, this factor does not provide any additional value in determining whether Juror No. 4's report was objectively prejudicial.

In contrast, the remaining two enumerated *Basham* factors are both probative and militate against a finding that Juror No. 4's report was prejudicial. First, "the extent to which the communication was discussed and considered by the jury," shows that any impact of Juror No. 4's report quickly dissipated. Every juror testified that there were either no, or minimal, further conversations regarding Juror No. 4's allegations of picture taking. (*See, e.g.*, May 10, 2021 Tr. at 27 (discussion immediately following Juror No. 4's report), 40 (no discussions), 56 (no discussions beyond Juror No. 4's report), 68 (discussions "really didn't evolve into a real conversation").).). Further, the tone of those minimal discussions was primarily not one of concern, but of either doubt as to the veracity of the allegation or curiosity as to its import. (*See id.* at 67 ("Q. What do you remember hearing? A. . . . I thought [Juror No. 4's report] was, you know, just a little bit of just paranoia . . . I was like, I doubt it, but—someone said something like that."), 130 ("At the time I remember it was like—it wasn't like a, oh, my gosh, someone's taking pictures. They were just kind of like, what are they doing?"), 151 ("[W]e talked about it, some of the people

57

on the jury. But we just said they were—could have been taking pictures . . . [it w]asn't anything concrete."), *but see id.* at 27 ("I basically was concerned, just like everyone else . . . so we all decided to come forward and let everyone know what this juror expressed."). The minimal conversations and their tone make it implausible to conclude that Juror No. 4's report snowballed into "widespread taint of the jury." *Johnson*, 954 F.3d at 181.

Second, any modicum of prejudice created by these limited discussions is further minimized by the "timing of the exposure." *Basham*, 561 F.3d at 320. Generally, courts of appeals have found timing to be problematic where jurors are exposed to external influences on the cusp of or during deliberations. *Id.* ("[T]he timing of the communication, right before jury instructions, is troubling."); *see also Waldorf v. Shuta*, 3 F.3d 705 (3d Cir. 1993) (internal quotation marks and citation omitted) ("We also find significant the fact that the jury was exposed to the [verdict in a related case] both the night before and the very same day that it reached its verdict . . . a more critical moment would have been difficult to find."). In contrast, exposures that significantly predate this critical phase are unlikely to be found prejudicial. For example, in *United States v. Gilsenan*, the Third Circuit could not "conceive [how] the allegedly prejudicial information could have had an impact on the verdict" where the "allegedly prejudicial information was received at the outset of the trial and was followed by a mass of evidence delivered over a 24-day, six-week period." 949 F.2d 90, 96 (3d Cir. 1991). While this case lies between those two extremes, the two-week gap between Juror No. 4's report and deliberations denies an inference of prejudice, particularly when considered in light of the minimal discussion of the issue by the jury.

### b. *The Court's Initial Assessment of Prejudice*

Taken together and tailored for the nature of this case, the *Basham* factors bolster the jury's subjective affirmance that it was not rendered partial by Juror No. 4's report, and Defendants do not argue otherwise. Rather, they place dispositive weight on the Court's facial assessment of the objective risk of prejudice when first provided with Juror No. 4's allegations on January 9, 2018. (*See* Defs. Opp'n at 16–17.) Placed in context, these statements by the Court do not provide an accurate analysis of the objective risks posed by Juror No. 4's report given the factual development that subsequently occurred.

As the Court of Appeals observed, this Court "immediately recognized the seriousness," *Johnson*, 954 F.3d at 180, of Juror No. 4's allegations and raised "concerns that there may be an effort afoot to tamper with or intimidate a juror." (Jan. 9, 2018 Tr. at 136.) However, this statement was made when the Court had before it only an initial report as to the nature of these allegations by the Government and court personnel. Recognizing this, the Court of Appeals' mandate makes clear this assessment only required a *Remmer* hearing, *Johnson*, 954 F.3d at 180, but not that this assessment should control the outcome of that hearing. *Id.* at 182 ("We have no basis for reaching a similar conclusion here that the jurors remained impartial."). Were this not so, remand of this case for a *Remmer* hearing would have been unnecessary. The informal testimony adduced at trial plainly established that other jurors were "aware of the Photo Incident and might believe that 'something was going on.'" (Defs. Opp'n at 10–11.) Under Defendants' view, the Court of Appeals should have remanded for a new trial, not a *Remmer* hearing.

The reasons that the Court of Appeals declined to remand for a new trial are obvious. Even by the end of this Court's initial assessment, it indicated "the Court hasn't got enough information before it, not even close . . . we are at the stage where we're investigating how much of an

investigation is necessary." (Jan. 9, 2018 Tr. at 149.) By the end of the day, the Court was even more doubtful, stating that "[t]here's an insufficient basis in the record to permit or to justify . . . the extraordinary process of having individual voir dire with jurors." (*Id.* at 185.) Even initial factual development affirmed for the Court that Juror No. 4's report was nothing more than an "innocuous intervention." *Johnson*, 954 F.3d at 179. While the Court of Appeals disagreed with that ultimate assessment, it hardly suggested that the Court's initial, uninformed reaction should control the entirety of the *Remmer* proceedings.

Nor does the Court's dismissal of Juror No. 4 alter this analysis. (Defs. Opp'n at 16.) First and foremost, Juror No. 4 was uniquely situated—the Court's assessment of his continued impartiality is not comparable to the remainder of the jury. Further, the Court made clear it did not conclusively decide that Juror No. 4 had been rendered impartial by his perception of an external contact. Rather the decision to dismiss Juror No. 4 was done "[o]ut of an abundance of caution [and] with the agreement of defense counsel, or at least their lack of objection." (*Id.* at 185.) This ultra-cautious approach hardly suggests a definitive finding of partiality as to Juror No. 4, much less that any risk of partiality existed for the remaining jurors.

In light of the fully developed record, it is strange that Defendants retreat to statements made by the Court prior to *any* factual development regarding Juror No. 4's allegations. The Court finds that the need to do so is strongly contraindicated by the Court of Appeals' directive that this Court develop significantly more evidence prior to deciding the question of prejudice. The Court concludes that its preliminary assessment of the situation does not influence, much less control, the disposition of the issues at this late stage.

60

### c.  *The Weight of the Evidence*

The final, and most contested, objective factor commonly considered by courts in determining the possibility of prejudice is the "strength of the government's case." *Basham*, 561 F.3d at 320 (citing *United States v. Lloyd*, 269 F.3d 228, 240–41 (3d Cir. 2001); *see also Lawson*, 677 F.3d at 646 (considering, *inter alia*, "[t]he strength of the evidence"); *Williams-Davis*, 90 F.3d at 497 (finding no risk of prejudice in part because "the evidence against defendants was overwhelming"). The Government argues that the evidence of guilt presented in this case was overwhelming, or, more colorfully, that "[f]or 10 weeks, the truth rained down on these Defendants in a federal courtroom." (Reply at 10 (reiterating that "[d]ozens of brave civilian witnesses testified, as did dozens more tenacious investigators who corroborated the civilian witnesses with every type of evidence imaginable").) Defendants do not directly rebut the Government's assessment of the strength of the evidence but rather offer two rejoinders.

First, they argue that the weight of the evidence is irrelevant to the *Remmer* analysis because there is "no 'no harm no foul' exception to the Sixth Amendment." (Defs. Opp'n at 2–3.) This view, which has predominated throughout Defendants' briefing in this case, is squarely opposed to the Fourth Circuit precedent that "[a]lleged infringement of Sixth Amendment rights is no exception to the general rule that 'most constitutional errors can be harmless.'" *Sherman*, 89 F.3d at 1139 ("The Supreme Court has long since rejected that argument that, as a general matter, the Sixth Amendment prohibits the application of harmless-error in determining whether constitutional error had a prejudicial impact on the outcome of a case."). This "argument is further undercut by the Supreme Court's application of harmless error analysis to claims of juror misconduct and bias." *Id.* Further still by both the Court of Appeals' mandate and broader *Remmer* case law.

The Court of Appeals' mandate required a broad factual inquiry into various facets of the events and their impact on the jury. These inquiries would have been irrelevant had the Court of Appeals seen this case through the narrow lens that Defendants now suggest. Also irrelevant would have been the command to investigate whether an "external influence affect[ed] the jury's *decision-making*" in this case. *Johnson*, 954 F.3d at 179 (emphasis added) (internal quotation marks and citation omitted). This decision-making is only affected where a "juror's impartiality is overcome by such an external influence"—that is, when an outside influence causes them to deviate from the result they would have reached had they deliberated impartially. *Id.* (internal quotation marks and citation omitted); *see also United States v. Olano*, 507 U.S. 725, 738 (1993) ("[A] presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?"). Thus, the question is not whether there is a reasonable possibility that the jury was influenced, writ large, but whether there "exists no reasonable possibility that the jury's *verdict* was influenced by an improper communication." *Basham*, 561 F.3d at 319 (emphasis added) (internal quotation marks and citation omitted). Ignoring the strength of the evidence in making this sort of holistic determination would be nonsensical. Doing so would also depart from broader *Remmer* precedent, which, as noted, explicitly directs district courts to consider the strength of the Government's case in making a determination as to the possibility of prejudice. *Id.* at 320; *Lawson*, 677 F.3d at 646.

Alternatively, Defendants argue that the evidence presented at trial cuts *in favor* of finding Juror No. 4's report objectively prejudicial. They argue that the gruesome *intrinsic* evidence of Defendants' violence towards informants and other government cooperators made it more difficult for the Court to ensure that jurors remained untainted by *extrinsic* events. (Defs. Opp'n at 1–2.) They point to the concerns raised by the jurors prior to January 9, 2018—concerns the Court of

Appeals found did not even satisfy *Remmer* step one[26]—as evidence of this particularly acute risk of prejudice. (*Id.* at 2.) This attempt to bootstrap valid evidence of guilt into invalid prejudice plainly fails.

As a matter of law, where concerns or discomfort arises from "evidence that was part of and *intrinsic* to the trial, there [is] no cause for inquiry with the jurors." *King*, 627 F.3d at 651 (emphasis in original). Deviating from this principle would create fundamental and untenable challenges in prosecuting those accused of disturbing offenses either by routinely invalidating verdicts or causing the government to self-censor probative, but graphic, evidence.

Even assuming the proposition that concerns arising from a mix of intrinsic and extrinsic sources can be prejudicial, Defendants' chain of reasoning is deeply counterintuitive. Presumably, under Defendants' theory, the extrinsic contact would still have to be a but-for cause of the jury's bias. (*See* Defs. Opp'n at 17 (emphasis added) (explaining that there must be a "reasonable possibility that one or more Deliberating Jurors was influenced *by the Photo Incident*").) Thus, Defendants' argument is, essentially, that after being presented with eight weeks of brutal and graphic evidence, any concerns the jury may have had for their safety should be attributed solely or predominantly to an objectively *de minimis* external influence.

The far more plausible interpretation of these events is that after eight weeks of seeing evidence of "Mr. Rochester's brains [ ] looking like 'spaghetti sauce,'" (Defs. Opp'n at 1–2 n. 1), one juror's anxieties manifested in an illusory external contact. In contrast, the other jurors were able to observe the evidence without becoming unduly concerned. Both Juror No. 4's reaction and the remainder of the jury's scattered concerns would therefore be attributed to the evidence presented at trial and wholly outside the scope of *Remmer*. (*See* Defs. Opp'n at 2 (emphasis added)

---

[26] *See Johnson*, 954 F.3d at 180 ("In conducting our analysis, we focus on the alleged photographing incident reported by Juror #4."); *see also id.* at 183 (Motz., J., dissenting).

("[T]he incident was generated entirely by the jurors themselves, expressing—as they had on three previous occasions—the fear generated *by the government's case*.")); *see also United States v. Thornton*, 1 F.3d 149, 155 (3d Cir. 1993) (approving of decision not to *voir dire* jury where it was "perfectly understandable why the jurors would feel apprehensive simply from listening to the testimony in the case"); *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007) (holding that jurors' "subjective fear of reprisal even in the absence of an extraneous source" was an intrinsic influence on the jury)).

This sort of causal parsing, however, is not required by the *Remmer* case law. That authority makes clear that a strong case by the Government—no matter how gruesome—cuts only one way. *United States v. Blumeyer*, 62 F.3d 1013, 1017 (8th Cir. 1995) (asking "whether [external contact] was reasonably likely to affect the verdict, considering the strength of the government's case and whether it outweighed any possible prejudice" and "conclud[ing] that the evidence of [the defendants'] guilt was overwhelming and outweighs any prejudice"); *see also Basham*, 561 F.3d at 320 (citing *Blumeyer* favorably and collecting other, similar cases). In short, the only reasonable view is that the strength of the government's case reduces the likelihood that Juror No. 4's report was prejudicial to the jury's verdict.

### *VI.    Conclusion*

The Court of Appeals' mandate provided this Court with guidance as to both factual and analytical developments that were necessary to confirm that Defendants were accorded their Sixth Amendment right to a verdict by an impartial jury. The Court's implementation of this directive confirmed two key facts: (1) no photos of the jury were in fact taken, and (2) Juror No. 4's report produced minimal concerns and conversations among the remaining jurors. It also confirmed that every deliberating juror believed that they were subjectively able to remain impartial and open

64

minded after the events of January 9, 2018. These subjective assurances were bolstered by several objective indicia that Juror No. 4's report was a fleeting distraction in the face of overwhelming evidence. Based on the facts developed at the *Remmer* hearing, the Court concludes that the Government has met their "burden of rebutting the presumption of prejudice by showing that there was no reasonable possibility that the jury was influenced by an improper communication." *Johnson*, 954 F.3d at 180.

For these reasons, and for all of the reasons set out in this Memorandum, the Government's Motion to Reinstate Guilty Verdicts (ECF No. 1021), will be GRANTED as to all Defendants.

DATED this ___2___ day of September, 2021.

BY THE COURT:

James K. Bredar
Chief Judge

65